# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

SMITHFIELD FOODS, INC.,
PATRICK CUDAHY, INC.,
ALLIANZ GLOBAL RISKS US INSURANCE CO.,
ACE AMERICAN INSURANCE CO.,
GENERAL SECURITY INDEMNITY
COMPANY OF ARIZONA,
LIBERTY MUTUAL FIRE INSURANCE CO.,
TOKIO MARINE AND NICHIDO FIRE
INSURANCE COMPANY, LTD., and
CERTAIN UNDERWRITERS AT LLOYD'S OF
LONDON AND ITS MEMBERS SUBSCRIBING
TO CONTRACT NO. DP685509(1), UNIQUE
MARKET REFERENCE B0509685509,

          **Plaintiffs,**

      **-v-**                            **Case No. 13-C-651**

UNITED STATES OF AMERICA,

          **Defendant.**

---

# DECISION AND ORDER

---

This negligence action against Defendant United States of America under the Federal Tort Claims Act ("FTCA" or the "Act" ), 28 U.S.C. §§ 2671, *et seq.*, arises from a five-day fire at Plaintiff Patrick Cudahy, Incorporated ("Patrick Cudahy") in Cudahy, Wisconsin. The fire was ignited by a military flare stolen from a California military base.[1]

---

[1] An earlier version of the action, Case No. 11-C-1148 (the "1148 action"), was filed in this District and randomly assigned to this Court. On March 16, 2012, the

The Plaintiffs, Patrick Cudahy, Smithfield Foods ("Smithfield") — Patrick Cudahy's parent corporation, and Smithfield's six insurers listed above, allege that the Navy owed a duty to the public, including Smithfield, to keep munitions and ordnance properly "tracked, secured and stored," and to prevent any item from "finding its way into an uncontrolled and unsecured area, or into unauthorized hands;" and that the Navy was negligent, in violation of Cal. Civ. Code § 1714 and California common law. This Decision and Order addresses the United States' motion for summary judgment. (ECF No. 68.)[2]

On June 7, 2013, the Central District of California court issued an order transferring the action to this District pursuant to 28 U.S.C. § 1404(a). (ECF No. 97.) In its order, the California district court applied California conflict of law principles and concluded that Wisconsin law regarding comparative negligence should be applied.

---

Plaintiffs voluntarily dismissed the 1148 action and filed the Complaint in the Central District of California.

[2] The Plaintiffs filed a motion for leave to exceed page limit regarding their opposition memorandum, and the over-long memorandum and other documents in opposition to the United States' summary judgment motion. (ECF Nos. 75, 76-76-6.) The motion to exceed page limit was denied. (ECF No. 80.) With subsequent permission from the California district court, the Plaintiffs filed a revised memorandum in opposition to the summary judgment motion. (ECF Nos. 89, 90.) Thus, the Plaintiff's revised memorandum, electronic filing number 90, relies on supporting documents with electronic filing numbers 76-1 through 76-6.

The transfer under § 1404(a) does not affect the applicable law. *Anderson v. Aon Corp.*, 614 F.3d 361, 365 (7th Cir. 2010) (citing *Ferens v. John Deere Co.,* 494 U.S. 516 (1990)). Thus, California's choice-of-law rules, which governed in the federal district court in California, continue to govern the proceeding in this District. *See id.* (citing *Eckstein v. Balcor Film Investors,* 8 F.3d 1121, 1126-27 (7th Cir. 1993)). However, the procedures of this Circuit govern the action. *See id.*

## MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Summary judgment should be granted when a party that has had ample time for discovery fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* If the moving party establishes the absence of a genuine issue of material fact, the non-moving party must demonstrate that there is a genuine dispute over the material facts of the case. *Id.* at 323-24. The Court must accept as true the evidence of the nonmovant and draw all justifiable

inferences in their favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Summary judgment is appropriate only if, on the record as a whole, a rational trier of fact could not find for the non-moving party. *Rogers v. City of Chi.,* 320 F.3d 748, 752 (7th Cir. 2003).

## Relevant Facts[3]

Joshua Popp ("Popp"), who took the military flare that ignited the Patrick Cudahy fire and transported it to Wisconsin, served in the United States Marine Corps ("Corps") from 2004 to 2008. Popp earned numerous awards for his service, including the Marine Corps Good Conduct Medal, the Combat Action Ribbon, a Certificate of Commendation, and a Purple Heart.

The flare was an M125 flare. An M125 green star cluster flare is 10.16 inches long and 1.67 inches in diameter, contains 29.62 grams of magnesium fuel, and has magnesium clusters that burn for 6 to 12 seconds before the fuel is exhausted.[4]

---

[3] The relevant facts are based on the United States' statement of uncontroverted facts to the extent those facts are undisputed. (*See* ECF Nos. 68-2, 90.) The first part of the Plaintiffs' statement of genuine disputes of fact includes 19 facts which they assert are disputed and must be resolved at trial ("Pls. Disputed Facts") (ECF No. 76-1.) The second part of the Plaintiffs' statement of genuine disputes of fact is a response to the United States' statement of uncontroverted facts ("Pls. Resp. Defs Facts.")

[4] There is a factual dispute as to how many feet into the air the M125 flare travels. (*See* Pls. Resp. Defs. Facts ¶ 6.)

While at Camp Pendleton in 2005, Popp was instructed in the use of an M125 signal flare. The flare is launched by holding the flare in one hand away from the body while pointing its top towards the sky and striking a firing mechanism on the bottom with the other hand. During training the Corps uses flares to signal a shift in the line of fire.

During 2006 Popp's unit was deployed to Ramadi, Iraq, where Popp was wounded in a mortar attack and his unit suffered more than 100 casualties. After his first deployment, Popp was assigned to an intelligence unit because of his reliability and trustworthiness. The intelligence unit trained at the Corps Air Ground Combat Center in Twentynine Palms, California, and Popp trained with that unit prior to his second deployment to Ramadi in April of 2007.

The Twentynine Palms base is separated into live-fire training ranges and non-live-fire areas where live ammunition is not issued or expended. Two combat center orders, CCO 3500.4F and CCO 8000.4D[5], promulgated by the command at Twentynine Palms are relevant to this action. The regulations do not apply to any other bases and may be altered by the Twentynine Palms command.

---

[5] The content of CCO 8000.4D is not discussed by the parties' summary judgment submissions.

Responding to the unit's 2006 Ramadi experiences, pre-deployment training at Twentynine Palms was altered to better prepare Marines for combat conditions in Iraq and Afghanistan. Popp was not issued an M125 flare at any point during his training at Twentynine Palms. Popp was issued live ammunition during his training with the intelligence unit, and he returned the ammunition to his supervisor at the conclusion of each exercise. Popp's supervisors searched his unit after every exercise on a live-fire range. The search, including a pat-down of each Marine and the emptying and physical search of each Marine's bags, was conducted before the Marines could leave the live-fire training range and travel to Camp Wilson (a non-live-fire area). Popp's supervisors also inventoried all unexpended ammunition before leaving a live-fire range.

Popp's supervisors thoroughly indoctrinated the Marines in his unit in all safety precautions, procedures, and principles, and they ordered that the Marines sweep live-fire ranges by hand after exercises to recover ordnance and salvageable ammunition. Popp's supervisors also instructed the Marines to use ammunition only for training purposes and not to bury or hide any munitions. Munitions were transported in vehicles inspected by a certified driver, and a guard was assigned to an ammunition truck at

all times to prevent pilferage. Unit commanders can order that Marines be searched at almost any time and place.

During rest periods between live-fire range exercises, Marines stay at Camp Wilson to get a shower, a hot meal, and a haircut. Popp's supervisors prevented him and his unit from transporting munitions into or staging munitions at Camp Wilson, which is comprised of several rows of dome-shaped huts. Each hut accommodates about 50 Marines. A large dirt area behind the huts is designated as a motor pool. The motor pool is surrounded by large dirt mounds.

In 2007, Camp Wilson was operated by the Mojave Viper Support Detachment, which enforced the standard operating procedure for Camp Wilson (the "2007 Camp Wilson SOP"). The 2007 Camp Wilson SOP required an extensive check-out procedure, which included inspection of the dorms, scheduling of transportation, return of food containers and waste, and removal of trash prior to a unit's departure. The 2007 Camp Wilson SOP did not require searches of Marines or their bags before the

Marines left Camp Wilson to return to "Mainside"[6] of the base at Twentynine Palms.[7]

In April of 2007, shortly before his second deployment, Popp found an M125 flare and a smoke grenade buried in a dirt mound behind the motor pool at Camp Wilson.[8] How the flare(s) and smoke grenade(s) came to be located in the berm is unknown. Twentynine Palms is subject to flash flooding that can bury or uncover ammunition. According to CCO 3500.4F, Camp Wilson is not a live-fire range, and since the 1970s it has been an ammunition free zone where live ammunition is not issued or expended. Prior to the 1970s, Camp Wilson was an "impact area" where ordnance and ammunition were expended. Camp Wilson is also used by members of foreign militaries, such as that of Saudi Arabia, who use the same ordnance as the Corps — including M125 flares — when training on the ranges at Twentynine Palms. However, foreign troops are also subject

---

[6] The parties' summary judgment submissions do not provide additional information about the nature of "Mainside."

[7] The Plaintiffs assert that Camp Wilson was also subject to unwritten standard operating procedures and MCO P3570.2A. (*See* Pls. Resp. Defs. Facts ¶ 45, 51.) The United States asserts that MCO P3570.2A "never existed." (*See* Def. Summ. J. Reply, 20 n.8 (citing Enright-LaMere Decl.)) (ECF Nos. 86, 85-4.) That assertion is dubious given that United States Combat Center Order P3500.4F, dated July 18, 2000, states "Ref. (a)MCO P3570.2A" on its first page. (ECF No. 9-3.)

[8] There is a factual dispute between the parties as to whether Popp found additional items in the berm. (*See* Pls. Resp. Defs. Facts ¶ 21.)

to mandatory shakedowns when they leave the live-fire ranges and travel to Camp Wilson.

The Corps repeatedly instructed Popp to report abandoned or found ammunition or ordnance up the chain of command. There was no culture of permissiveness in Popp's unit regarding theft of ordnance. Marines were not even allowed to keep sand from their deployment. Popp did not report the flare he found to his supervisors. He intentionally concealed the flare in his pocket, and later concealed it in his gear. Popp knew he would be punished if caught with the flare, and his supervisors never "looked the other way" or gave him a reason to believe they would not enforce Corps rules. (Def. Facts ¶ 56 (citing Ex. 2 (Popp Dep.) 52.)) (ECF Nos. 68-2, 69-1.)

At the conclusion of a final deployment exercise, Marines are permitted about two weeks of leave before being deployed to an active combat zone. Before Popp left Camp Wilson in 2007, his immediate supervisor, Corporal David Langham ("Langham"), patted him down. Langham did not search Popp's pack. Popp was able to remove the flare from Camp Wilson by concealing it in his pack, having his pack thrown on a truck before it could be searched, and convincing his supervisor not to retrieve the bag. Popp drove to his parents' Cudahy, Wisconsin residence

with the flare and stored it in Wisconsin for more than two years. Popp and his brother, Kurtis Popp ("Kurtis"),[9] intended to launch the flare on July 4, 2009, at Lake Michigan's shore in Wisconsin. On July 5, 2009, Popp gave the flare to Kurtis. Popp did not tell Kurtis that the flare was a fire hazard or how far it would travel. Popp's only instructions to Kurtis were showing him how to hold the flare and telling him to "take the cap off, . . . to hit the cap, and [that the flare] would shoot into the air." (Def. Facts ¶ 67 (citing Ex. 24 (Kurtis Dep.) 42.)) (ECF No. 69-4.) Popp was with Kurtis at the time of the launch, and Kurtis launched the flare from the Popp home at an incorrect angle.

The flare landed on the roof of Building C of the Patrick Cudahy factory, igniting the roofing material.[10] Building C was constructed in 1895, and its roof had not been renovated in more than 25 years. One floor of Building C and other floors in neighboring buildings were vacant before the fire.[11] Over the course of five days, 64 Wisconsin fire

---

[9] To distinguish between Popp and Kurtis Popp, the Court refers to the latter by his given name. No disrespect is intended.

[10] There is a factual dispute regarding whether the conditions of the roof, the building, the sprinkler, and/or the fire pump contributed to the fire. (*See* Pls. Resp. Defs. Facts ¶¶ 85-87.)

[11] There is a factual dispute regarding whether any of the areas were abandoned. (*See* Pls. Resp. Defs. Facts ¶ 88.)

departments responded to the fire. Milwaukee Emergency Management, the Wisconsin Department of Natural Resources, the Cudahy Police Department, the Wisconsin State Fire Marshal, and the Wisconsin Department of Justice also responded to the fire.

Smithfield owns Patrick Cudahy, which is a Wisconsin corporation. The six plaintiff insurers are Smithfield's insurers, all doing business in Wisconsin the subject of which is the factory at issue in this case. Only one of the plaintiff insurers is domiciled in California, and its business in California is unrelated to the facts of this case.

Kurtis resides in Wisconsin, has never been employed by the United States,[12] and is not a party to this lawsuit. Popp and Kurtis were convicted of a felony in a Wisconsin court and sentenced to 90 days of imprisonment for launching the flare. Popp currently resides in Wisconsin and was not employed by the United States when the flare was launched by Kurtis.

West Marine Products Inc. ("West Marine") is the largest retailer of aerial flares in California. The bags of West Marine's employees are subject to search, but West Marine does not require that supervisors

---

[12] There is a factual dispute regarding Kurtis's educational-level at the time he launched the flare, and whether he knew the military flare was stolen. (*See* Pls. Resp. Defs. Facts ¶¶ 77, 78.)

search employees' belongings or their persons before the employees leave the premises.  Private retailers do not empty or reach into an employee's bag as a part of a search.  They look into the bag and make a visual inspection.

West Marine sells two brands of aerial flares.  Publically available flares are about 11 inches long and are launched by triggering a mechanism on the bottom of the cylinder while the top of the  flare is pointed toward the sky.[13]

Since at least 2006, Coast Marine & Industrial Products, Inc. ("Coast Marine") has sold aerial flares to members of the public in California.  Coast Marine does not require that supervisors search employees' belongings or their persons before the employees leave the premises.  The M125 flare is manufactured by Security Signals Inc. ("Security Signals"), a private company in Tennessee.  Security Signals does not search its employees or their bags before they leave its premises each work day.

---

[13] There are factual disputes regarding the comparability of publicly available flares and M125 flares in terms of travel distance, burn time, amount of magnesium fuel, burning temperature, and whether publically available flares would have started a fire on a roofing assembly similar to the roofing assembly of Building C.  (*See* Pls. Resp. Defs. Facts ¶¶ 93-98.)   These factual disputes are based in part on information provided by the Plaintiffs' experts, Gerald Hayes,  Robert Schroeder, and Richard Pehrson. (*See* Pls.' Disputed Facts ¶¶ 9, 10, 12, 14.)

**Analysis**

The United States seeks summary judgment dismissing this action, contending that: (1) the Corps' security guidelines cannot be used to create a duty under the FTCA; (2) it did not owe a duty to supervise Popp more carefully; (3) it did not owe the Plaintiffs a duty to prevent the criminal conduct of third parties; (4) it exceeded the standard of care applicable to private persons for preventing employee theft; (4) its conduct in 2007 did not cause the fire at the Patrick Cudahy factory; and (5) the FTCA's discretionary function bars the Plaintiffs' claims.  In a footnote the United States contends that Wisconsin law should govern this action, citing the reasons set forth in its motion to transfer, although its brief analyzes the issues under both Wisconsin and California law.  (Def. Mem. Summ. J., 10 n.6.) (ECF No. 68-1.)  The Plaintiffs assert that California law applies and that the United States has departed from its position, held throughout this litigation, that California law is applicable.  (*See* Pls. Resp. Mot. Transfer 5-7, Ex. 6 at 5, Ex. 7 at 4.) (ECF Nos. 39, 39-6, 39-7.)

*FTCA*

The FTCA allows a suit against the federal government when an employee of the federal government, while acting in the scope of his employment, injures a person either negligently or by some wrongful act.

- 13 -

28 U.S.C. § 1346(b). Pursuant to the Act, the United States is liable "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Id.* *See also*, *Spurgin-Dienst v. United States,* 359 F.3d 451, 455 n.2 (7th Cir. 2004) (applying the law of the place where the "alleged negligent act or omission occurred" to an FTCA case brought in an Illinois court and governed by Indiana law); *Bunting v. United States,* 884 F.2d 1143, 1144-45 (9th Cir. 1989). Liability for an employee's act of negligence is determined by the law of the state where the act occurred. *See LeGrande v. United States*, 687 F.3d 800, 808 (7th Cir. 2012). *See Beech Aircraft Corp. v. United States,* 51 F.3d 834, 838 (9th Cir. 1995) (per curiam).

The United States' alleged act of negligence occurred in California. *See Richards v. United States,* 369 U.S. 1, 3, 10-13 (1962) (holding "federal courts are to look in the first instance to the law of the place where the acts of negligence occurred," regardless of where the ultimate harm transpired and that the Act requires "the whole law (including choice-of-law rules) of the [State] where the [allegedly tortious federal act or omission] occurred"; *Carter v. United States,* 333 F.3d 791, 793 (7th Cir. 2003). "Because [the United States] seeks to invoke the law of a

jurisdiction other than California, [it] bears the burden of proof." *Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1187, *opinion amended on denial of reh'g,* 273 F.3d 1266 (9th Cir. 2001).[14]

In briefing the summary judgment issues, the United States has not identified any difference between California law and Wisconsin law and, therefore, has not met its burden of demonstrating that Wisconsin law applies to the issues presented by its summary judgment motion. Thus, the Court will apply California law regarding a cause of action for negligence. *See Wash. Mutual Bank, F.A. v. Super. Ct.,* 15 P.3d 1071, 1080 (Cal. 2001).

*California Negligence Law*

California law requires that to establish a cause of action for negligence a plaintiff must show (1) a legal duty to use due care, (2) a breach of the duty, and (3) that the breach proximately caused the resulting injury. *Ting v. United States,* 927 F.2d 1504, 1513 (9th Cir.

---

[14] A court should apply California's three-step governmental interest test to make this determination: (1) the court must first determine whether the relevant law of each of the potentially affected jurisdictions with respect to the particular issue in question is the same or different; (2) if there is a difference, the court must examine each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists; and (3) if there is a true conflict, the court must compare the nature and strength of the interest of each jurisdiction to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then apply the law of the state whose interest would be more impaired. *See Sullivan v. Oracle Corp.,* 254 P.3d 237, 244-45 (Cal. 2011).

1991) (citing *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.,* 1 Cal.3d 586, 594 (Cal. 1970)).  *Warner v. Santa Catalina Island Co.,* 282 P.2d 12, 17 (Cal. 1955) held that "[t]he risk incident to dealing with fire, firearms, explosive or highly inflammable matters, corrosive or otherwise dangerous or noxious fluids requires a great deal of care to be exercised. In other words, the standard of care required of the reasonable person when dealing with such dangerous articles is so great that a slight deviation therefrom will constitute negligence."[15]  *See also Jacoves v. United Merch. Corp.,* 9 Cal. App. 4th 88, 116 (Cal. Ct. App. 1992) (firearm); *Borenkraut v. Whitten,* 364 P.2d 467, 470 (Cal. 1961) (finding prejudicial error, based on the trial court's refusal to give a requested instruction regarding the duty of a person of ordinary prudence to use "extreme caution" because of the great danger involved, in a negligence case stemming from an individual pouring gasoline down an open carburetor and starting the engine when people were in the immediate area, despite a general instruction relating to the quantum of care being dependent upon dangers involved in the activity undertaken.)

---

[15] The United States contends that *Warner* states "an antiquated doctrine of California law that is no longer valid," relying on *Duran v. City of Maywood*, 221 F.3d. 1127, 1132 (9th Cir. 2000.) (Pls. Reply Br. 5.)  (ECF No. 86.)  However, the issue is not as clear cut as the United States asserts. *See* 6 B. Witkin, *Summary of California Law,* Torts §920, p. 156  (10th ed. 2005).

The existence of a legal duty is a question of law for the court. *John B. v. Super. Ct.,* 137 P.3d 153, 159 (Cal. 2006). "The standard of care required in a particular circumstance may be based on a statute (see, e.g., Evid. Code, § 669) or the custom and practice in the relevant community." *Bullis v. Sec. Pac. Nat'l Bank,* 582 P.2d 109, 112 (Cal. 1978) (citing *Perumean v. Wills,*[16] 8 Cal.2d 578, 583, 67 P.2d 96 (Cal. 1937); 4 Witkin, *Summary of Cal. Law* Torts, § 498, pp. 2764-65 (8th ed. 1974) and cases cited). "While the custom in the community does not necessarily establish how a reasonable person must act, it is evidence to be considered in determining the proper standard of care." *Id.* at 112-13 (citing *Polk v. City of Los Angeles*, 26 Cal.2d 519, 531-32, 159 P.2d 931 (Cal. 1945); Prosser, *Torts* § 33, 166-68 (4th ed. 1971); Rest. 2d Torts, § 295A)).

"Fundamentally, a defendant owes a legal duty of care to persons who are foreseeably endangered by the defendant's conduct, but a defendant has no duty to control the conduct of another or to warn others endangered by another's conduct." *Jacoves,* 9 Cal. App. 4th at 114. "[O]ne's general duty to exercise due care includes the duty not to place another person in a situation in which the other person is exposed to an

---

[16]In *Perumean*, which involved an accident in a high school automotive shop class, the court considered evidence of practices in shop classes of Los Angeles high schools.

unreasonable risk of harm through the reasonably foreseeable conduct (including the reasonably foreseeable negligent conduct) of a third person." *Lugtu v. Cal. Highway Patrol,* 28 P.3d 249, 256 (Cal. 2001).

The United States contends that the Corps "guidelines" cannot establish a duty of care; it did not owe a duty to supervise Popp more carefully, and it did not owe the Plaintiffs a duty to prevent criminal conduct.

*Marine Corps Guidelines*

Courts of appeal in the Seventh Circuit, the Ninth Circuit, and other circuits have held that state law duties may be defined with reference to federal sources. *See LeGrande*, 687 F.3d at 809 n.10 (collecting cases). And, although *LeGrande* involved federal aviation regulations, the appeals court noted that "[i]t is worth noting that this approach to defining state-law duties by reference to federal sources is not unique to the aviation context." *Id*. (collecting cases including *Bolt v. United States*, 509 F.3d 1028, 1031-32 (9th Cir. 2007) ("reiterating that a federal rule, such as the Army rules for snow removal, can determine standard of care in exercising state law duty.")). *See also Lutz v. United States*, 685 F.2d 1178, 1184 (9th Cir. 1982) (holding that under Montana law a base regulation would be the equivalent of an ordinance and violation of the regulation satisfied the

Montana negligence per se rule). Thus, because California law holds that those involved with explosive or highly flammable matters owe a duty of care, the Corps standards, including the testimony of Brian Catlin and Andres Fuentes (ECF No. 76-3, Exs. C, F) may be considered in establishing the duty of care.

*Duty to Supervise*

The United States asserts that it did not owe the Plaintiffs any duty of care to supervise Popp more closely, citing *Juarez v. Boy Scouts of Am., Inc.*, 81 Cal. App. 4th 377, 401, 97 Cal. Rptr. 2d 12, 29 (Cal. Ct. App. 2000). However, that is not the theory of the Plaintiffs' case. The Plaintiffs' claim is based on the United States' failure to follow its own mandatory procedures in conducting shakedowns of the Marines, both at the live training range and at Camp Wilson. (Pls. Rev. Mem. Opp'n Def. Summ. J. Mot. 7.) (ECF No. 90.)

Applying the Plaintiffs' theory, they have presented sufficient evidence upon which a reasonable fact-finder could find that the United States had a duty to insure that flares were not stolen or removed from the base, that the United States breached that duty, and that the Plaintiffs were harmed by that breach.

*Criminal Conduct*

The United States contends that it did not owe the Plaintiffs a duty to prevent the criminal conduct of third parties, citing a portion of *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1203-05 (9th Cir. 2003). The cited portion applied California law, but it does not stand for the proposition the United States asserts.

The United States does not cite the portion of *Ileto*, 349 F.3d at 1208, that discusses the issue of intervening conduct: the criminal conduct of the third party who used the gun to shoot the victims — family members of the Plaintiffs. Under California law, a foreseeable intervening act by a third party does not amount to a superseding cause relieving the negligent defendant of liability. *See id.* Applying California law, the Ninth Circuit Court of Appeals determined that based on the allegations of the complaint it was reasonably foreseeable that if the gun manufacturer continued to foster the illegal gun market, a person like the shooter, who was prohibited by law from buying a gun, would purchase and use the gun in the manner that was the basis for prohibiting such purchases. The United States has the burden of proving the affirmative defense of superseding cause; that is, that the intervening event is so highly unusual or extraordinary that it was unforeseeable. *Arreola v.*

*Cnty. of Monterey,* 99 Cal. App. 4th 722, 760 (Cal. Ct. App. 2002), as modified on denial of reh'g (July 23, 2002). The question is usually one for the trier of fact. *Id.*

Barclay Kitchen, Inc. v. Cal. Bank, 208 Cal. App. 2d 347, 355, (Cal. Ct. App. 1962), addressed the Defendant bank's contention that its negligence was a prior and remote cause of plaintiff Barclay's loss, but the negligence was superseded by the criminal acts of a third person, and for that reason it could not be held liable. The court held that "[w]hile intervening criminal acts in some cases may supersede the defendant's negligence, the test is whether the actor should have realized at the time of his negligent conduct that there was a likelihood that as a result thereof a third person might commit an intentional tort or crime." *Id.* The court further held that the defendant need not foresee the precise injury or the exact manner in which it occurs; it is sufficient if the result is within the ambit of risk created by defendant.

Construing the facts in the light most favorable to the Plaintiffs, the type of conduct that Popp and Kurtis engaged in with the stolen flare is within the ambit of risk created by the United States' negligent failure to search Popp's pack when he departed from Camp Wilson.

*Discretionary Exception to Waiver of Sovereign Immunity*

The FTCA waives the federal government's sovereign immunity, as it generally authorizes suits against the United States. *Berkovitz v. United States,* 486 U.S. 531, 535 (1988). The United States, however, invokes an exception to the FTCA's waiver of federal sovereign immunity as set forth in 28 U.S.C. § 2680(a).

Section 2680(a) states that the provisions of the FTCA, including 28 U.S.C. § 1346(b), shall not apply to:

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). This exception to section 1346(b) covers acts that are discretionary in nature; that is, acts that involve choice, judgment, or considerations of public policy. *United States v. Gaubert,* 499 U.S. 315, 322 (1991); *Berkovitz,* 486 U.S. at 536-37. The discretionary function exception to the FTCA bars such actions. *Hylin v. United States,* 755 F.2d 551, 553-54 (7th Cir. 1985). It is the Government's burden to assert the exception if and when it seeks to defeat a claim because of it. *Parrott v.*

*United States,* 536 F.3d 629, 634-35 (7th Cir. 2008).

Sovereign immunity is a defense, not a jurisdictional issue: "[W]hat sovereign immunity means is that relief against the United States depends on a statute; the question is not the competence of the court to render a binding judgment, but the propriety of interpreting a given statute to allow particular relief. . . . The statutory exceptions . . . to the United States' waiver of sovereign immunity . . . limit the breadth of the Government's waiver of sovereign immunity, but they do not accomplish this task by withdrawing subject-matter jurisdiction from the federal courts." *Id.* at 634. *See also Wis. Valley Improvement Co. v. United States,* 569 F.3d 331, 333 (7th Cir. 2009) ("Sovereign immunity is not a jurisdictional doctrine."); *Blagojevich v. Gates,* 519 F.3d 370, 371 (7th Cir. 2008) ("[S]overeign immunity does not diminish a court's subject-matter jurisdiction."). Compare *Midwest Knitting Mills, Inc. v. United States,* 950 F.2d 1295, 1297 (7th Cir. 1991) ("a district court is without jurisdiction to entertain a suit for damages against the United States.").

Analysis of whether an act or omission of a Government employee is shielded by the discretionary function exception involves two steps. *Gaubert,* 499 U.S. at 322-23. First, the discretionary function exception covers only acts or omissions which are discretionary in nature; that is,

involving an element of judgment or choice. *Id.* at 322. The nature of the conduct, rather than the status of the actor, governs whether the exception applies. *Id.* If the challenged act or omission does not involve the exercise of choice or judgment, or if federal statutes, regulations, or policies specifically prescribe courses of action for an employee to follow, then the discretionary function exception does not apply. *Id.*

Second, the discretionary function exception, when properly construed, protects only government actions and decisions based on considerations of public policy. *Id.* at 323. A suit is barred only if a Government employee's judgment or choice furthers the purposes of a regulatory regime which gives an employee such discretion. *Id.*[17] This requirement is imposed because the purpose of the discretionary function exception is to prevent "judicial second guessing" of legislative and

---

[17] *Gaubert,* 499 U.S. at 325 n.7, explains:

> There are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception. . . . If [a Government employee] drove an automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply. Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy.

administrative decisions grounded in social, economic and political policy through the medium of an action in tort.  *Id.*

There is a genuine dispute of material fact regarding the existence of a mandatory requirement that all departing military members and their belongings be searched prior to leaving Camp Wilson.  Construing the evidence in the light most favorable to the Plaintiffs, the United States has not met its burden of presenting sufficient evidence to establish that the pat-down search of military members departing Camp Wilson is discretionary.

Based on the foregoing analysis of the grounds raised for summary judgment, the United States' motion for summary judgment is  denied.

## Scheduling Matters

The Court will conduct a supplemental scheduling conference to set final pretrial conference and trial dates.  In advance of that conference, the parties must file a joint report stating whether the estimate of a 10-15 day trial remains accurate and, if so, whether they would be available and ready for trial in the spring or summer of 2015.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

The United States' motion for summary judgment (ECF No. 68) is

**DENIED**;

No later than **December 1, 2014,** the parties must file a joint report stating whether the estimate of a 10-15 day trial remains accurate and, if so, whether they would be available and ready for trial in the spring or summer of 2015;

The parties must participate in a supplemental status conference to be conducted by the Court on **December 9, 2014, at 10:00 a.m. (Central Time).** The Court will initiate the call.

Dated at Milwaukee, Wisconsin, this 18th day of November, 2014.

**BY THE COURT:**

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**