# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**SMITHFIELD FOODS INC., et al.,**

    Plaintiffs,

    v.                                    Civil Action No.: 2:13-cv-651-RTR

**UNITED STATES OF AMERICA,**

    Defendant.

---

## Defendant United States' Pretrial Report

---

### Statement of the Case

    Plaintiffs seek damages relating to property damage caused by a fire in Cudahy, Wisconsin. Bringing suit under the Federal Tort Claims Act, Plaintiffs Smithfield Foods and its insurers allege that the actions of the Marine Corps at a massive base in the Californian desert, Twentynine Palms, were unreasonable in failing to prevent a Marine, Joshua Popp, from stealing a flare. Plaintiffs assert that that the Corps had a duty to secure ordnance and breached that duty by not securing the flare that Popp stole. In their view, the Corps should have foreseen that if a flare was unsecured, it could be stolen by a Marine, removed from base, and given to an untrained person.

    In early 2007, after secreting the flare and a smoke grenade off base, Popp brought them to Cudahy, his hometown. Popp left the stolen ordnance, returned to California, and deployed to Iraq. After his deployment, Popp returned to California and traveled to Cudahy to celebrate the Fourth of July. Over the weekend, Popp and his brother Kurtis decided to shoot the stolen flare. Popp gave the flare to Kurtis with minimal instruction and watched Kurtis set it ablaze. It flew out of sight

above the neighborhood where the Popps' parents lived, landing on top of Smithfield's Patrick Cudahy meatpacking plant. A fire ensued.

Plaintiffs focus on one Marine's actions at a single point in time: decamping from a month-long training exercise, Mojave Viper. At Twentynine Palms in early 2007, every Marine deploying to Iraq or Afghanistan, went through Mojave Viper, live-fire pre-combat training. During Mojave Viper, Popp and a few other Marines were part of an intelligence unit, "a CLIC." The CLIC's preparation during Mojave Viper focused on learning intelligence techniques. Thus, while most his battalion went off to practice shooting on ranges, Popp went to a classroom. Popp had occasion to be on a live-fire range perhaps only once during Mojave Viper, if at all. At the conclusion of every live-fire exercise, the Marines attempt to account for all ordnance by searching each Marine. The flare and smoke grenade Popp stole were not issued to him but, instead something he dug from the dirt from the cantonment, Camp Wilson, in which his battalion was temporarily billeted during Mojave Viper. Popp took the flare and grenade and stashed it in his pack in the hut in which he was staying. At the conclusion of Mojave Viper, Popp's battalion commander ordered his Marines to be searched ("lined out") upon vacating Camp Wilson. Popp was subject to that line-out. What happened is in dispute. He and others in in the CLIC were searched by Corporal David Langham. During his 2012 deposition, Popp equivocated but ultimately said he evaded the search of his pack by telling Langham he hadn't been issued any ordnance and had already put his pack on the truck. More recently, however, Popp recanted that version, admitting that he took the flare from his pack and hid it in his hut before the line out. Langham searched Popp and his bag. After the search, Popp retrieved the ordnance from the hut and secreted it off base.

Plaintiffs must prove that Langham did not search Popp's pack. Assuming arguendo they do, they must also prove that decision was unreasonable. But considering what Langham knew and expected, he acted reasonably. He did not expect Popp to have ordnance because it was prohibited at Camp Wilson and he knew that Popp was rarely, if ever, issued ordnance during exercise Mojave

1

Viper. Langham's alleged decision not to search Popp's pack was also not negligent because it was not foreseeable that ordnance would end up in Wisconsin, be handed to someone with no training whatsoever, and carelessly launched above a neighborhood.

Determining damages here requires resolving basic questions. Are Plaintiffs entitled to the entire value of Patrick Cudahy plant when only a fraction of the plant was destroyed? Should the equipment destroyed in the fire be considered brand new or should the valuation reflect its age and condition? Did Smithfield Foods successfully mitigate losses by transferring production to other locations and making capital improvements in other operating units? Wisconsin courts have long resolved tort suits involving damages to property and profit. The correct application of that law to these facts demonstrates that the sum of Plaintiffs' damages is far less than is alleged.

**Statement of the Issues**

1. Did Corporal Langham search Popp's pack before he vacated Camp Wilson at the conclusion of the Mojave Viper training exercise.?


2. Under California's choice-of-law provisions, does Wisconsin's law of negligence determine the liability issues?


3. Is the battalion commander's order to perform searches at the conclusion of Mojave Viper relevant to the standard of care, considering that the order is not akin to a statute or regulation but was instead a particular directive to search a specific group at a specific time and a specific place, for the principal purpose of troop safety, a purpose wholly unrelated to the damages at issue?

2

4.   If Popp's pack was not searched, did Corporal Langham nevertheless act reasonably under these circumstances: (1) Popp was part of an intelligence unit that was rarely, if ever, issued ammunition; (2) Popp would have been searched after leaving a live-fire range; (3) ordinance was prohibited at Camp Wilson; (4) Popp knew he could be punished if he were caught with any ordnance; (5) Langham had no reason to suspect Popp would attempt to steal ordnance; (5) Popp flatly told Langham that he was not issued ordnance as a member of an intelligence unit.

5.   Was the alleged failure to search Popp's pack a substantial factor in causing Plaintiffs' harm?

6.   As a matter of policy under Wisconsin law, is Smithfield's injury is too remote from the alleged negligence of the United States to justify holding the United States liable?

7.   Whether any of the multiple reckless acts of the Popp brothers were unforeseeable thus constituting a superseding cause which broke the causal chain linking the United States to the damages alleged.

8.   If the United States was negligent, what was the proportion of its fault in relation to the fault of Joshua Popp and Kurtis Popp.

3

9. Is the correct measure of damages for damage to Patrick Cudahy's real property the difference between the market value immediately before the fire and the market value immediately afterward?

10. Is the best measure of damages for equipment losses the depreciated value at the time of the fire rather than the replacement cost?

11. Did Smithfield Foods entirely mitigate its operating losses by moving production of products to other locations and by making capital investments in Smithfield's other operating companies instead of Patrick Cudahy, Inc.?

12. Is Plaintiffs' claim for operating losses after February 2012 too speculative to be quantified?

13. What is the quantum of damages for Plaintiffs' real-property, equipment, and operating losses?

**Witnesses**

1. Joshua Popp

2. Kurtis Popp

3. David Langham

4. Roger Turner

5. Rory Quinn

4

6. Matthew T. Carpenter

7. Andrew Fuentes

8. Anthony Atler

9. Gerald Haynes (expert)

10. Raymond A. Esposito (expert)

11. Robert Traven (expert)

12. William Kreidler (expert)

13. Mark Ewing (expert)

14. Richard Marchitelli (expert)

15. Randal D. Dawson (expert)

16. Susan Lee (may call if the need arises)

17. William G. Otis (may call if the need arises)

18. Gerald Popp (may call if the need arises)

19. Melinda Lee Ann Abshier (may call if the need arises)

20. Victoria Dee (may call if the need arises)

21. Catherin Dial (may call if the need arises)

22. Denise Alexander (may call if the need arises)

23. William Glover (may call if the need arises)

24. Keith N. Ross (may call if the need arises)

25. Steven L. Walls (may call if the need arises)

26. James Redding (may call if the need arises)

27. Robert Warfield (may call if the need arises)

28. Brian Catlin (may call if the need arises)

29. Chris M. Nicholson (may call if the need arises)

30. David Graves (may call if the need arises)

31. Jason Williams (may call if the need arises)

32. Dustin Wilcox (may call if the need arises)

33. Scott Pryor (may call if the need arises)

34. Casey Senn (may call if the need arises)

35. Brian Middleton (may call if the need arises)

36. John Gibson (may call if the need arises)

37. Kim Keefer (may call if the need arises)

38. Jason Flaherty (may call if the need arises)

39. David Malek (may call if the need arises)

40. Tony Pierce (may call if the need arises)

41. Stanton C. Lee (may call if the need arises)

42. Michael P. Quick (may call if the need arises)

43. Rick A. Hankins (may call if the need arises)

44. Sandra DeValkenaere (may call if the need arises)

45. Michael A. Elredge (may call if the need arises)

46. Glen E. Haase (may call if the need arises)

47. Michael Carchesi (may call if the need arises)

48. Joe Zblewski (may call if the need arises)

49. Antonio H. Martinez (may call if the need arises)

50. Mark Storandt (may call if the need arises)

51. Ray Marsh (may call if the need arises)

52. Robert Ingersoll (may call if the need arises)

53. David Halverson (may call if the need arises)

54. Greg Eggum (may call if the need arises)

6

**Expert Witnesses**

    **Randal D. Dawson,** a real-estate appraiser, is a Director at the CBRE, a global real-estate firm. He received a Bachelor degree from the University Kansas and is a Designated Member of the Appraisal Institute. Mr. Dawson has over 25 years' experience as an appraiser, completing valuation assignments throughout the country. Mr. Dawson now focuses on valuation and consulting assignments in the Midwest.

    **Raymond Esposito** is the Executive Vice President of LP Innovations, the largest provider of loss prevention services to private companies in North America. Mr. Esposito has worked for LP Innovations for fifteen years and has more than twenty years of experience in the loss prevention industry. Mr. Esposito has provided loss prevention solutions to more than 120 retailers, distributors, and manufacturers. Mr. Esposito has developed loss prevention procedures for banks, crystal manufacturers, retailers of ammunition, sporting goods retailers, and grocery chains. Mr. Esposito is a licensed private investigator and holds a Bachelor's degree in Psychology from the University of Connecticut.

    **Mark L. Ewing**, is employed by PT&C LWG, a forensic consulting firm. A Principal Consultant in LWG's Complex Loss Group, Mr. Ewing has 21 years of industry experience assessing complex losses and restoration, which experience includes fire, flood, tornado, and hurricane losses, and also includes losses involving the World Trade Center. He holds a Bachelor of Science in Electrical Engineering from Valparaiso University and a Masters of Business Administration from the University of Kansas.

    **Gerald A. Haynes**, P.E., is a fire protection engineer with more than twenty-five years of experience investigating fires and supporting arson investigations. For eleven years, Mr. Haynes served as a member of the National Fire Protection Associations' Guide for Fire and Explosion Investigations Technical Committee. From 1992 until 2005, Mr. Haynes served as a fire protection

Case 2:13-cv-00651-RTR   Filed 06/10/15   Page 8 of 77   Document 139

engineer at the ATF's Fire Research Laboratory. Mr. Haynes has a Bachelor's degree and a Master's degree in fire protection engineering from the University of Maryland.

**William M. Kreidler**, P.E., is a principal in the firm of Madsen, Kneppers & Associates, Inc., a construction and engineering consulting firm. During his 40-year career, he has had extensive experience in construction management, estimating, cost control, and scheduling. Mr. Kreidler is a 1974 graduate of the University of Washington, holding a Bachelor of Science in Civil Engineering. He is licensed by the State of Colorado as a professional engineer.

**Richard Marchitelli,** a real-estate appraiser, is an Executive Managing Director at Cushman & Wakefield of North Carolina, Inc. Mr. Marchitelli received a Bachelor of Arts from Belmont Abbey College, is a Designated Member of the Appraisal institute, and has over forty years' experience in valuing real estate. Mr. Marchitelli's practice now focuses on complex litigation, unusual valuation problems, and damages theory.

**Robert J. Traven**, a certified public accountant, is a vice-president in the accounting firm Meaden & Moore, leading the Investigative Accounting and Litigation Support Services division. He was graduated with honors from Loyola University of Chicago, receiving the Bachelor of Business Administration, majoring in Public Accounting. Mr. Traven has over twenty-eight years of experience, specializing in the evaluation of business interruption, property damage, loss of income, extra expense, inventory, product liability, maritime and environmental claims.

## Exhibits

| Exhibit Number | Document | Bates Number | |
|---|---|---|---|
| 1 | M125 Item Description | N/A | |
| 2 | Declaration of Brian Catlin | N/A | |
| 3 | Declaration of Andres Fuentes | N/A | |
| 4 | CCO 8000.4E | N/A | |
| 5 | CCO 3500.4H | N/A | |
| 6 | MCO 4340.1A | USMARINE 1756-1771 | |
| 7 | Cudahy Police Report, Interview w/ J. Popp 7/19/2009 | USMARINE 53, 63-66 | |
| 8 | Map of 29 Palms | USMARINE 233 | |
| 9 | DAPAM 385-63 | USMARINE 3745-3765 | |
| 10 | CCO3500.4F | USMARINE 208-454 | |
| 11 | Range Safety Pocket Guide | USMARINE 3061-3098 | |
| 12 | UXO Brief | USMARINE 3460-3470 | |
| 13 | Civil Complaint | N/A | |
| 14 | Criminal Complaint | WISCRIM 70-73 | |
| 15 | Map of Cudahy, WI | N/A | |
| 16 | AIM Report, Kurtis | WISCRIM 186-187 | |
| 17 | Cudahy Police Interview w/ K. Popp, 7/21/2009 | USMARINE 67-70 | |
| 18 | Commercial Flares | USMARINE 1030-1032; WISCRIM 79-94 | |
| 19 | Personnel File of Joshua Popp | USMARINE 3936-3962 | |
| 20 | Pyrotechnic Safety Guide | SMITHFIELD 594-626 | |
| 21 | Atler's Letter to Court | WISCRIM 115-116 | |
| 22 | Map of Camp Wilson | USMARINE 3766 | |
| 23 | EOD Incident Reports | USMARINE 3871-3874 | |
| 24 | PMO Incident Reports | USMARINE 3974-3977 | |
| 25 | Camp Wilson SOP, March 2007 | USMARINE 2769-2865 | |
| 26 | Smithfield Organizational Chart | PL-DAMAGES 1-3 | |

| | | | |
|---|---|---|---|
| 27 | News Articles Re: Smithfield Fire | PL-DAMAGES 151-195 | |
| 28 | Patrick Cudahy Plant Diagrams | SMITHFIELD 13-22 | |
| 29 | Risk Worldwide Website | PL-DAMAGES198-199 | |
| 30 | Marsh Report | PL-ADMIN 656-671 | |
| 31 | Continental Invoice re: Narrative ACV Methodology | PL-ADMIN 17180 | |
| 32 | Ace Insurance Contract | PL-ADMIN 7-94 | |
| 33 | Replacement Cost Solicitations | PL-ADMIN 1239, 1294, 874, 876, 2056, 2057, 2882, 2928, 2946, 2987, 3195, 3196 | |
| 34 | ILC Report | SMITHFIELD 1300-1307 | |
| 35 | Quantum Report | SMITHFIELD 1440-1445 | |
| 36 | Administrative Claim Damages Summary | PL-ADMIN 832-833 | |
| 37 | Binder 10 – Time Element | PL-ADMIN 6345-6716 | |
| 38 | MDD Table Comparing E & Y | PL-ADMIN 5385 | |
| 39 | Smithfield 10-K Fiscal 2011 | PL-DAMAGES 4-150 | |
| 40 | Pl. Responses to US 1st Interrogatories | N/A | |
| 41 | Interrogatories Verification Page signed by Parul Stevens | N/A | |
| 42 | Continental Machinery Rebuilding Timelines | SMITHFIELD 1-12 | |
| 43 | Patrick Cudahy April 2009 Net Book Value Report | SMITHFIELD140-203 | |
| 44 | US 30(b)(6) Deposition Notice | N/A | |
| 45 | Pl. Objections to US 30(b)(6) Deposition Notice | N/A | |
| 46 | Provost Marshall Instruction and Incident Reports | | |
| 47 | Cudahy Fire Department Inspection Summary | FIRE 15-18 | |

| | | | |
|---|---|---|---|
| 48 | Diagram of Patrick Cudahy Plant | **FIRE 431** | |
| 49 | Aerial Photo of Patrick Cudahy Plant After the Fire | **FIRE 1718** | |
| 50 | Wisconsin DOJ Report | **FIRE 1814-1881** | |
| 51 | J.J. Ahern 2007 Sprinkler Inspection | **FIRE 897-1034** | |
| 52 | Surveillance Video | | |
| 53 | Cudahy Fire Department Fire Narrative | **FIRE 1-13** | |
| 54 | Cudahy Fire Department Record of Sprinkler Renovation | **FIRE 388-407** | |
| 55 | Demolition Timeline | **PL-DAMAGES 446** | |
| 56 | Capital Expenditure Report | **PL-DAMAGES 426-442** | |
| 57 | ILC Equipment List | **SMITHFIELD 1309-1439** | |
| 58 | Patrick Cudahy Equipment List | **PL-DAMAGES 215-265** | |
| 59 | Building F Equipment Ages | **SMITHFIELD 23-24** | |
| 60 | Continental Machinery Equipment List | **SMITHFIELD 25-139** | |
| 61 | Patrick Cudahy Cost Tracking Memo | **PL-DAMAGES 443** | |
| 62 | Patrick Cudahy Budget Weight Spreadsheet | **SMITHFIELD 1290-1299** | |
| 63A-63I | Patrick Cudahy Net Operating Profit Statements | **PL-DAMAGES 266-425** | |
| 64 | Insurer RFI Responses | **PL-DAMAGES 444-445** | |
| 65 | Schroeder/ Pehrson Expert Report | | |
| 66 | Photograph Showing an Opening Between C & D Buildings | | |
| 67 | Schroeder Affidavit | | |
| 68 | MSDS – White Parachute | | |
| 69 | MSDS – M125 | **FIRE 2222-2225** | |
| 70 | UN Numbers List from Wikipedia | | |
| 71 | Crawl Space Photos of Building P by Pehrson | FIRE 2487-2495, 2497-2504, 2520-2521 | |

| 72 | Photos by Firefighters | | |
|---|---|---|---|
| 73 | Satellite Photos of Roof of Factory Before Fire | FIRE 2078 | |
| 74 | Google Earth Color Photos of Factory Before Fire | | |
| 75 | Ingersoll Log of Sprinkler Heads | | |
| 76 | Ray Marsh Docs | | |
| 77 | S. Milwaukee Fire Dept. Report | FIRE 1934-1941 | |
| 78 | Photo of Sprinkler Hangers by Pehrson | | |
| 79 | Other Photos of Hangers | | |
| 80 | Surveillance Video Stills | | |
| 81 | Post-Fire Photos of Sprinkler Flow | | |
| 82 | First-In Report | FIRE 1913-1919 | |
| 83 | Pehrson Hand-Written Firewall Analysis | | |
| 84 | Pehrson Square Footage Analysis | | |
| 85 | Ingersoll List of Fire Doors | | |
| 86 | TT Fire Door Memo | TT 1-5 | |
| 87 | TT Fire Wall Report | SMITHFIELD 1562-1667 | |
| 88 | Firewall Penetration Photos | | |
| 89 | Firewall Articles | | |
| 90 | Brookfield Fire Department Narrative | FIRE 2159-2161 | |
| 91 | Break in Firewall between C3 & D3 | | |
| 92 | Notice of 30(b)(6) deposition of Pierce | | |
| 93 | Esposito Expert Report | | |
| 94 | Esposito Supplemental Report | | |
| 95 | Esposito Contract | | |
| 96 | Esposito File (Entire File) | | |
| 97 | Surveillance Stills | | |
| 98 | Haynes Expert Report | | |
| 99 | Haynes Contract | | |
| 100 | Haynes Preliminary Bills | | |
| 101 | Declaration of Susan Lee | | |
| 102 | Security Signals M125 Pamphlet | | |

| | | | |
|---|---|---|---|
| 103 | Subpoena of Lee | | |
| 104 | DODIC of M125 | USMARINE 1653 | |
| 105 | Security Signals' Security Procedures Binder | | |
| 106 | Statement of Operations for Sausage Department | Schulz Depo. Ex. 1 | |
| 107 | Monthly Overhead Rpt. | Schulz Depo. Ex. 2 | |
| 108 | Microwave Bacon Weekly Reports for September 2009 | Schulz Depo. Ex. 3 | |
| 109 | Profit and Loss Statement for September 2009 | Schulz Depo. Ex. 4 | |
| 110 | Patrick Cudahy Capacity Report | Schulz Depo. Ex. 5 | |
| 111 | Gross Margin by UPC Report | Schulz Depo. Ex.6 | |
| 112 | Patrick Cudahy Functional P&L | Schulz Depo. Ex. 7 | |
| 113 | Fixed Overhead Report | Schulz Depo. Ex. 8 | |
| 114 | Variable Overhead Expenses | Schulz Depo. Ex. 9 | |
| 115 | SG&A Overhead | Schulz Depo. Ex. 10 | |
| 116 | SG&A Overhead Relating to the Distribution Center | Schulz Depo. Ex.11 | |
| 117 | Margin Report | Schulz Depo. Ex. 12 | |
| 118 | A list of the fixed assets that were damaged by the fire at the Cudahy Facility in July 2009 | Schulz Depo. Ex. 13 | |
| 119 | Patrick Cudahy, Inc. Net Book Value Report | Schulz Depo. Ex. 14 | |
| 120 | 2.7.09 Press Release: Smithfield Foods Announces Details of Pork Group Restructuring Plan | D. Kapella Depo. Ex. 1 | |
| 121 | Statement of Operations for PCI for Fiscal Years 2008 and 2009 Pertaining to Dept. Sliced Cooked Meats | D. Kapella Depo. Ex. 2 | |
| 122 | Statement of Operations for the Microwave Department for two periods of operations in | D. Kapella Depo. Ex. 3 | |

| | | | |
|---|---|---|---|
| | the fiscal year of 2008 | | |
| 123 | Listing of Sub-Brands for Microwave Bacon | D. Kapella Depo. Ex.4. | |
| 124 | Dan Kapella's file relating to the Patrick Cudahy fire | D. Kapella Depo. Ex. 5 | |
| 125 | Production and Sales Report | Saunders Ex. 1 | |
| 126 | John Morrell & Patrick Cudahy Implementation & Managed Services, Statement of Work, February 10, 2009 | Saunders Ex. 2 | |
| 127 | Change Order No. 10, 6.29.09 | Saunders Ex. 3 | |
| 128 | Change Order No. 4, 5.13.09 | Saunders Ex. 4 | |
| 129 | Change Order No. 21, 11.16.09 | Saunders Ex. 5 | |
| 130 | SAP Timeline e-mail | Saunders Ex. 6 | |
| 131 | Production spreadsheet, PCI | Matthews Ex. 1 | |
| 132 | Email and attachment RE: Business Loss due to Fire 11.20.09 | Matthews Ex. 2 | |
| 133 | Recap of Down and Lost Business Nov- Jan. | Matthews Ex. 3 | |
| 134 | e-mail, customer claims follow up 12.5.09 | Matthews Ex. 4 | |
| 135 | e-mail: volume projections-fire claim. 12.4.09 | Matthews Ex. 5 | |
| 136 | Collection of emails recapping post-fire conference calls | Matthews Ex. 6 | |
| 137 | Bud Matthew's file regarding fire | Matthews Ex. 7 | |
| 138 | Jason Kapella's file regarding fire | | |

| | | | |
|---|---|---|---|
| 139 | Thornton Tomasetti, Scope of Damage Report, July 5, 2009 | | |
| 140 | Thornton Tomasetti , Code Compliance Report of South Plant Buildings, December 10, 2009 | | |
| 141 | Patrick Cudahy | | |

| | | | |
|---|---|---|---|
| | Reconstruction Schematic Design, Epstein, January 2010 | | |
| 142 | Smithfield 2010 annual report | | |
| 143 | Smithfield 2011 annual report | | |
| 144 | York Adjuster Report | Smithfield 1668-1906 | |
| 145 | JS Held Report | Smithfield 1539-1561 | |
| 146 | Smithfield Press Releases regarding restructuring | Smithfield 1907-16 | |
| 147 | Wisconsin Department of Revenue, Sales and Use Tax | | |
| 148 | Smithfield Policies and Procedures, Capital Expenditures, Revised 1.12.09 | | |
| 149 | Cudahy Police Department Incident Report | PL-Admin. 18840-18876 | |
| 150 | ATF Report of Investigation | USMARINE 00000002-04 | |
| 151 | ATF Statement of Explosives Technology Branch | USMARINE 00000006-07 | |
| 152 | ATF Laboratory report | USMARINE 00000011 | |
| 153 | Criminal Complaint, Wisconsin v. Popp, Joshua, J. and Popp, Kurtis J. | USMARINE 0000049-50 | |
| 154 | Wisconsin Department of Justice DCI, ACISS Investigative Report | USMARINE 000000091-104 | |
| 155 | Judgment of Conviction, State v. Joshua J. Popp | Wis. Crim000000125-126. | |
| 156 | Judgment of Conviction, State v. Kurtis J. Popp | Wis. Crim.000000153-155 | |
| 157 | Expert Report of William Kreidler, P.E., March 24, 2015, and attachments. | | |
| 159 | Supplemental Expert Report of William | | |

| | | | |
|---|---|---|---|
| | Kreidler, P.E., May 29, 2015 and attachments. | | |
| 160 | Expert report of Mark L. Ewing, March 19, 2015, and attachments | | |
| 161 | CV of Mark L. Ewing | | |
| 162 | Expert report of Randal D. Dawson, March 24, 2015, and attachments | | |
| 163 | Expert report of Richard Marchitelli, March 23, 2015, and attachments | | |
| 164 | Expert report of Robert J. Traven, CPA, April 10, 2015, and attachments | | |
| 165 | Supplemental report of Robert J. Traven, CPA, June 2, 2015 and attachments | | |
| 165 | Installation years for F1 | Smithfield000023-24 | |

| | | | |
|---|---|---|---|
| 166 | Exhibit 13 to Schwenk Deposition | | |
| 167 | *Are the Mechanics of the Adjustment Process Correct?* | Marchitelli Deposition Ex. 6 | |
| 168 | Expert Report of Steven M. DeCaster, January 23, 2015, and attachments | | |
| 169 | Expert Report of Harold V. Meyer, January 26, 2015 and attachments | | |
| 170 | Expert Report of Jeff Schwenk, January 12, 2015, and attachments | | |

| | | | |
|---|---|---|---|
| 171 | Smithfield 2012 annual integrated report | | |
| 172 | President Bush's Address to the Nation re troop surge | | |
| 173 | Decaster 2005 PCI appraisal | | |

16

**<u>Depositions</u>**

<u>1</u>.     Kurtis Popp

a.     4:22-25

b.     7:2-6

c.     9:3-10:24

d.     12:9-15

e.     12:16-13:16

f.     18:10-22

g.     18:23-22:25

h.     28:3-5

i.     31:1-19

j.     36:13-37:3

k.     38:18-39:17

l.     41:13-42:6

m.     42:7-45:6


2.     Kim D. Keefer

a.     4:22-5:7

b.     5:19-6:8

c.     10:24-11:9

d.     42:16-44:15


3.     David Malek

a.     5:7-12

b. 13:20-14:5

c. 17:25-18:20

d. 25:10-26:14

e. 28:7-33:12

f. 35:2-36:4

g. 40:11-43:3

h. 50:6-15

i. 51:2-55:23

j. 56:10-22

k. 58:19-60:7

l. 61:10-24

4. Parul Stevens

    a. 5:12-24

    b. 14:9-18

    c. 16:6-13

    d. 20:10-26:4

    e. 26:10-27:13

    f. 30:5-32:1

    g. 59:24-60:23

    h. 71:16-75:14

    i. 86:13-87:3

    j. 88:23-89:2

    k. 90:12-18

    l. 91:24-92:1

    m. 116:20-118:17

n.   133:4-134:7

5.   Scott Saunders

a.   4:17-19

b.   6:12-19

c.   9:3-23

d.   11:9-19

e.   14:16-23

f.   15:12-15

g.   15:21-16:7

h.   18:5-8

i.   20:1-6

j.   21:19-25

k.   22:4-7

l.   23:15-24

m.   29:9-15

n.   46:5-12

o.   48:13-49:12

p.   49:20-22

q.   54:8-23

r.   61:25-62:7

s.   62:13-15

t.   66:14-67:1

u.   67:25-68:4

19

6. Brian Catlin

    a.   27:23-28:9

    b.   28:19-25

    c.   33:12-15

    d.   33:22-34:16

    e.   36:6-13

    f.   38:18-40:4

    g.   40:10-41:3

    h.   41:7-18

    i.   45:9-46:9

    j.   50:1-5

    k.   50:13-23

    l.   51:7-15

    m.   52:19-24

    n.   53:1-3

    o.   53:8-15 (Objection – Foundation; Lack of Personal Knowledge)

    p.   53:16-54:15

    q.   55:9-56:1

    r.   58:14-20 (Objection – Foundation; Lack of Personal Knowledge)

    s.   59:23-60:18

    t.   63:8-64:6

    u.   66:12-14

    v.   68:1-23

    w.   69:18-70:4

    x.   72:12-73:8

y.  75:23-76:19

z.  77:2-78:13

aa.  78:16-23

bb.  79:24-80:1

cc.  82:5-25

dd.  83:7-14

ee.  83:23-85:2

ff.  85:13-86:11

gg.  86:15-19

hh.  86:24-87:7

ii.  87:12-22

hh.  88:2-90:19

jj.  95:13

kk.  95:25-97:24

ll.  98:17-99.5 (Objection – Foundation; Lack of Personal Knowledge)

mm.  98:17-102:6

nn.  103:2-13

oo.  104:7-105:1

pp.  105:2-107:8 (Objection – Foundation; Lack of Personal Knowledge)


7.  Andres Fuentes

a.  14:9-15:10

b.  22:6-14

c.  24:1-4

d.  24:15-25:1

   e. 25:6-23

   f. 28:1-17

   g. 31:24-32:11

   h. 33:15-36:13

   i. 36:18-37:14

   j. 37:17-38:16

   k. 39:23-40:1

   l. 40:4-42:16

   m. 43:10-20

   n. 43:25-44:1

   o. 46:21-47:2

8. Susan Lee

   a. 7:13-17

   b. 25:20-22

   c. 34:22-25

   d. 41:15-17

   e. 42:18-43:2

   f. 46:21-24

   g. 47:1-48:1

   h. 48:23-49:7

   i. 49:25-50:14

   j. 58:23-25

   k. 59:6-8

   l. 59:17-60:1

   m. 60:5-8

n.   60:10-12

o.   61:17-18

p.   63:6-12

q.   65:10-15

r.   71:21-23

s.   72:4-23

t.   73:6-12

u.   73:19-74:3

v.   74:8-25

w.   75:22-76:8

x.   80:4-5

y.   80:11-81:4

z.   81:15-24

aa.   82:1-19

bb.   83:19-25

cc.   84:1-4

dd.   85:6-9

ee.   87:6-15

**<u>Length of Trial</u>**

The trial will take three weeks or less.

**Proposed Findings of Fact**

### MCAGCC Twentynine Palms

1.      Twentynine Palms Marine Corps Air Ground Combat Center (Twentynine Palms) is a Marine Corps base located near the San Bernardino Mountains in California.

2.      Twentynine Palms covers more than 998 square miles, making it the world's largest Marine Corps base.

3.      Due to its desert-like conditions, Marines train at Twentynine Palms throughout the year in live-fire combined arms exercises and military operations.

4.      Twentynine Palms is the permanent base of the Third Battalion, Seventh Marines.

5.      The main base at Twentynine Palms is located in an area designated as "Mainside." Mainside includes most base facilities, including barracks, parade grounds, restaurants, stores, recreational facilities, bank, post office, etc.

6.      No live-fire training exercises are performed at Mainside.

7.      No ammunition or ordnance is permitted at Mainside.

8.      Mainside houses the logistical support operations of the base.

9.      Twentynine Palms has two types of ranges: (1) live-fire training ranges, and (2) non-live fire training ranges.

### Mojave Viper Training Exercise

10.     In 2007, Twentynine Palms hosted the largest military training program in the nation, known as Mojave Viper.

11.     Mojave Viper is an approximately one-month training exercise aimed at preparing Marines and Army personnel for deployment in Iraq and Afghanistan.

12.     In preparation for the troop surge in Iraq and the continuing military campaign in Afghanistan, every Marine deployed to those theatres in 2007 first participated in Mojave Viper.

13.     Each task took between one (1) and six (6) days to complete.

24

14.     Mojave Viper required over eight thousand (8,000) personnel to assist in the training.

15.     Most of the Mojave Viper training exercises took place on live-fire training ranges.

16.     During the execution of the tasks, the exercise unit would expend tens of thousands of rounds of ammunition.

17.     Each range was under the control of an Officer in Charge (OIC) for training.

18.     The OIC is responsible for posting the Range Safety Officer (RSO) whose responsibilities included ammunition accountability.

19.     The RSO inventoried and signed for ammunition and explosives on an Expenditure Report.

20.     Twentynine Palms Center Combat Order P3500.4F (CCO P3500.4F) provides guidelines on conducting live-fire training exercises at Twentynine Palms.

21.     CCO P3500.4F does not specifically require searches of Marines persons or their belongings following training exercises.

22.     Nonetheless, in an attempt to account for all ammunition at the conclusion of a live-fire exercise, Marines who have been issued ordnance are subjected to a search before leaving the range.  These searches are known as line-outs or shake-downs.  The Marines standing in line while the RSO (or his delegate) searches each Marine and his equipment for ammunition and ordnance. Once the RSO is satisfied that all material has been accounted for, the Marines are permitted to leave the range.

23.     Marine Corp Order 4340.1A is a Marine Corp-wide directive for reporting Missing, Lost, Stolen, or Recovered (MLSR) governmental property.

24.     Only certain items identified in Section 5-b of Marine Corp Order 4340.1A are required to be reported.

25.     Marine Corp Order 4340.1A is utilized to give information to Congress on losses and accountability in combat operations.

### Camp Wilson

26.     During Mojave Viper, battalion commanders sought to acclimatize their Marines to war like atmosphere by keeping them in the field for the entire month-long exercise. As a result, when Marines had down time between exercises, they did not return to Mainside; rather, they were housed in a portion of Twentynine Palms known as Camp Wilson.

27.     Camp Wilson served as a forward operating base for battalions between range exercises.

28.     Marines stayed at Camp Wilson during rest periods between live-fire range exercises to get a shower, a hot meal, and haircut.

29.     Camp Wilson is comprised of several rows of dome-shaped huts. Approximately fifty Marines sleep in each hut.

30.     A large dirt area behind the huts is designated as a motor pool. The motor pool is surrounded by large dirt mounds.

31.     Camp Wilson is a non-live fire area where live ammunition is not issued or expended.

32.     Marines are never permitted to use ammunition or ordnance at Camp Wilson.

33.     Before Camp Wilson became an ammunition-free zone in the 1970s, it was an "impact area" where ordnance and ammunition were expended.

34.     Twentynine Palms is subject to flash-flooding that can bury or uncover ammunition.

35.     Amnesty boxes were established for Marines to turn in ammunition discovered at Camp Wilson without fear of reprisal.

36.     In 2007, Camp Wilson was operated by the Mojave Viper Support Detachment which enforced the standard Operating Procedure for Camp Wilson ("2007 Camp Wilson S.O.P.").

37.     The 2007 Camp Wilson S.O.P. required an extensive check-out procedure before Marines could leave the Camp.

38.     The 2007 Camp Wilson S.O.P required, among other things, inspection of the dorms, scheduling of transportation, return of food containers and waste, inspection of loan items, and removal of trash before a unit exited Camp Wilson.

39.     The 2007 Camp Wilson S.O.P. did not require searches of Marines or their bags before the Marines left Camp Wilson to return to "Mainside" of the base at Twentynine Palms.

40.     CCO P3500.4F applies only to the Combat Center's Range/Training Areas and Airspace and, therefore, does not govern conduct at non-live-fire training areas within Twentynine Palms.

41.     Because Camp Wilson is not a live-fire range, it is not governed by Marine Corps orders relating to live-fire range operations, such as CCO P3500.4F.

42.     Nonetheless, battalion commandants had the prerogative to order searches of Marines and their equipment at Camp Wilson before they returned to Mainside at the conclusion of Mojave Viper.

43.     In fact, Marines were subject to line-outs at any time and any place throughout Mojave Viper.

44.     The 2007 Camp Wilson S.O.P. specifics that "Camp Wilson may not have an amnesty program.  Amnesty boxes are not allowed aboard the camp."

45.   Despite the 2007 Camp Wilson S.O.P., some units used amnesty boxes at Camp Wilson as a means of allowing Marines to turn in ammunition discovered at the camp without fear of reprisal.

### *Joshua Popp*

46.     Joshua Popp served in the United States Marine Corps from October 13, 2004 until October 12, 2008.

27

47.     The Marine Corps instructed Joshua Popp to use an M125 signal flare at Camp Pendleton in 2005.

48.     The Marine Corps' training of Joshua Popp regarding the use of an M125 signal flare included a demonstration, safety warnings, and fire hazard warnings.

49.     The Marine Corps repeatedly instructed Joshua Popp to report abandoned or found ammunition or ordnance up the chain of command.

50.     Following his training at Camp Pendleton, Joshua Popp became a member of the Third Battalion, Seventh Marines, Kilo Company, First Platoon.

51.     The Third Battalion, Seventh Marines were permanently based at Twentynine Palms.

52.     Joshua Popp's unit was deployed to Ramadi, Iraq, in 2006.

53.     Joshua Popp served as an infantryman.

54.     During the 2006 deployment to Ramadi, Joshua Popp was wounded in a mortar attack, and his unit suffered more than 100 casualties.

55.     After his first deployment, Joshua Popp returned with his battalion to Twentynine Palms.

56.     Joshua Popp was assigned to the Company Level Intelligence Cell (CLIC) unit for Kilo Company.

57.     As a member of the CLIC unit, Joshua Popp became part of Headquarters Platoon.

58.     Joshua Popp trained with the CLIC unit prior to his second deployment in March 2007.

59.     The CLIC unit's training mostly consisted of classroom instruction on various intelligence-gathering and communication techniques.

60.     During the Third Battalion's Mojave Viper one-month exercise, Joshua Popp trained with the CLIC unit.

61.     The CLIC unit predominantly remained at Camp Wilson, receiving classroom training on intelligence gathering.

62.     Joshua Popp does not recall being on a live-fire training range on more than one occasion throughout his Mojave Viper training.

63.     During that exercise, Joshua Popp remained in the periphery with the other CLIC members, never having expended ammunition.

64.     Joshua Popp returned all of the ammunition issued to him during that training to his supervisor at the conclusion of the exercise.

65.     Joshua Popp was not issued a M125 green star cluster flare at any point during his training at Twentynine Palms.

66.     Joshua Popp's supervisors searched his unit after every exercise on a live-fire range. The search included a pat-down of each Marine's person and the physical search of each Marine's bags.

67.     Joshua Popp's supervisors inventoried all unexpended ammunition before leaving a live-fire range.

68.     Joshua Popp's supervisors thoroughly indoctrinated all Marines in his unit in safety precautions, procedures, and principles.

69.     Joshua Popp's supervisors instructed his unit to only use ammunition for training purposes and told his unit not to bury or hide munitions.

70.     Joshua Popp's supervisors prevented him and his unit from staging munitions in Camp Wilson or transporting munitions into Camp Wilson.

### The Stolen M125 Green Star Cluster Flare

71.     Nearing the conclusion of his battalion's Mojave Viper exercise, and shortly before his second deployment, Joshua Popp claims he was hanging out with a few Marines near a dirt mound behind Camp Wilson.

72.     Marines congregated at that location to smoke and talk on their cellphones.

73.     Joshua Popp claims he, along with several other individuals, discovered ammunition buried in the berm.

74.     Joshua Popp does not know how it became buried in Camp Wilson or for how long the ordnance was buried before he dug them up.

75.     Joshua Popp grabbed a flare and smoke grenade from the berm.

76.     Joshua Popp intentionally concealed the flare in his personal gear for the remainder of exercise Mojave Viper.

77.     With only Joshua Popp providing testimony regarding the stolen ordnance, it remains unknown when and where he obtained the flare and smoke grenade.

78.     The Marine Corps repeatedly instructed Joshua Popp to immediately report any found ordnance or ammunition up the chain of command.

79.     There was no "culture of permissiveness" in Joshua Popp's unit regarding the theft of ordnance.  Marines were not even allowed to keep sand from their deployment.

80.     Joshua Popp knew that he would be punished if he were caught with the flare and his supervisors never "looked the other way" or gave him a reason to believe that they would not enforce Marine Corps rules.

81.     Joshua Popp did not report that he found the flare to any of his superior officers.

82.     Approximately one week after pocketing the flare, Joshua Popp discovered that his unit would be searched before leaving Camp Wilson to return to Mainside at the conclusion of Mojave Viper.

83.     Corporal Langham was in charge of the search.

84.     Corporal Langham was a member of the CLIC unit.

85.     Corporal Langham was aware that members of the CLIC unit were rarely on the live-fire training ranges, if at all.

86.     Corporal Langham knew Joshua Popp was rarely issued ammunition, if at all.

87.     Corporal Langham had no reason to suspect Joshua Popp discovered ordnance while at Camp Wilson.

88.     Corporal Langham had no reason to suspect Joshua Popp would attempt to steal ordnance from Camp Wilson.

89.     Plaintiffs claim that Corporal Langham did not search Joshua Popp's pack. Rather, Joshua Popp was able to circumvent the search by placing his gear on the truck and then explaining to Corporal Langham that his pack did not need to be searched because he was a member of the CLIC unit and not issued any ammunition. Plaintiffs allege that Corporal Langham took Joshua Popp at his word and did not order him to retrieve his pack.

90.     The Court, however, finds that Corporal Langham did search Joshua Popp's pack.

91.     When Joshua Popp realized a shakedown of his unit would occur before leaving Camp Wilson, he removed the flare and smoke grenade from his pack and hid them in the K-span hut where he was was billeted during exercise Mojave Viper.

92.     Joshua Popp then lined up with the rest of his unit to participate in the shakedown.

93.     As a member of the Headquarters Platoon, Joshua Popp lined up with the other CLIC unit members.

94.     Corporal Langham searched both Joshua Popp and his pack during the line-out.

95.     Corporal Langham executed the search in accordance with Marine Corp standard operating procedures for conducting searches.

96.     The performance of the shakedown was consistent with Corporal Langham's ingrained habit for conducting searches.

97.     Following the search, and after he was cleared to leave Camp Wilson, Joshua Popp returned to the K-span hut and retrieved the hidden ordnance.

98.     Joshua Popp later got on the vehicle that returned to Mainside with his unit.

31

*Patrick Cudahy Fire*

99.     At the conclusion of their final pre-deployment exercise, Marines are permitted approximately two weeks of leave before they are deployed to an active combat zone.

100.    During his two-week leave, Joshua Popp drove to his parents' home in Wisconsin and brought the flare with him.

101.    Joshua Popp stored the flare in Wisconsin for more than two years.

102.    Joshua Popp was redeployed to Ramadi, Iraq, in March 2007.

103.    Upon returning to Twentynine Palms, Joshua Popp was assigned to the Fleet

**Assistance** *Program for Mojave Viper Support Detachment*

99.     Joshua Popp ended his active duty in the Marine Corp in October 2008.

100.    On July 4, 2009, Joshua Popp, along with his brother Kurtis, lit off fireworks in their parents' backyard, which is located in a populated residential neighborhood.

101.    Joshua Popp intended to ignite the stolen flare at that time, but Kurtis forgot to bring the ordnance to the house.

102.    The following day, Joshua Popp intended to light the flare at a lake near Grant Park in Wisconsin.

103.    Instead, he gave the flare to his brother Kurtis to ignite.

104.    Joshua Popp knew his brother had never been in the military or otherwise trained in the handling of a military flare.

105.    Joshua Popp knew his brother was previously criminally convicted of receipt of stolen goods, stemming from an incident involving numerous stolen weapons.

106.    Joshua Popp's only instructions to Kurtis on how to use the flare were to "hold it like this" and to "take the cap off and I want you to the hit the cap and it will shoot in the air."

107.    Joshua Popp did not warn Kurtis that the flare was a fire hazard and did not explain how far the flare would go.

108.     Joshua Popp gave Kurtis the flare in a residential neighborhood directly adjacent to a commercial area.

109.     Kurtis knew that the flare had been stolen from a military base.

110.     Kurtis launched the flare near his parent's home in Cudahy, Wisconsin.

111.     Kurtis launched the flare at an incorrect angle.

112.     Upon seeing the trajectory of the flare, Joshua Popp said, "What did you do?"

113.     The flare landed on the roof of Building C of the Patrick Cudahy, Inc. factory in Cudahy, Wisconsin, causing a fire in the roofing material.

114.     Joshua and Kurtis Popp were each convicted of a felony and sentenced to ninety-days imprisonment.

### Green-star Cluster Flares

115.     The M125 flare is used by the Marine Corps during training to signal a shift of the line of fire.

116.     M125 Green Star Cluster Flares are 10.16 inches long and 1.67 inches in diameter.

117.     M125 Green Star Cluster Flares travel between 600 and 800 feet into the air before deploying illuminant clusters made of magnesium fuel.

118.     The M125's magnesium clusters burn for 6 to 12 seconds before the magnesium fuel is exhausted.

119.     The M125 contains 29.62 grams of magnesium fuel.

120.     An M125 flare is launched by holding the flare in your hand and away from your body while pointing it towards the sky. The flare is launched by striking a firing mechanism on the bottom with your other hand.

121.     Aerial flares that travel longer distances than the M125, and burn for a longer amount of time were available to the public for purchase in California at establishments such as West Marine Products, Inc. and Coastal & Marine Industrial Supply in 2007.

33

122.     Publicly available aerial flares may contain more magnesium fuel than the M125.

123.     Publicly available aerial flares may travel more than 100 feet further than the M125.

124.     Publicly available aerial flares may burn for 28 to 30 seconds longer than the M125.

125.     All magnesium-based flares burn at approximately the same temperature.

126.     Publicly available flares are able to ignite a model roofing assembly similar to the roofing assembly on the roof of Building C of Plaintiffs' factory and burn through the rubber membrane to the fiberboard substrate beneath.

### *Patrick Cudahy, Inc., Real Estate*

127.     United States' real-estate expert, Randal D. Dawson, is a designated member of the Appraisal Institute and an experienced appraiser with over 25 years' experience in commercial real-estate valuation.

128.     Mr. Dawson is a Director with the global real-estate firm CBRE, Inc.

129.     Mr. Dawson has extensive appraisal experience involving a wide variety of industrial properties, special use-properties, and multiple other types of commercial real estate.

130.     In addition to this broad-based experience, Mr. Dawson's has extensive experience specifically related to appraising Patrick Cudahy's real property.  He focuses his practice on the Midwest and is very familiar with the Milwaukee real-estate market, having appraised properties in Milwaukee in the decade before the fire.  He also has extensive experience appraising meat-processing facilities such as Patrick Cudahy, appraising about 20 such facilities over his career.

131.     Using established appraisal methodology—the before-and-after method of valuation—Mr. Dawson determined the diminution in value of the portion of the Patrick Cudahy facility destroyed by the fire (buildings C, D, E, and F) to be $1.89 million.

132.     The Court determines that Mr. Dawson's determination of diminution in value is based on standard appraisal practices widely accepted in real-estate practice and the product of experienced and sound appraisal judgment.

34

133.    Mr. Dawson's appraisal took into full consideration regional, local, and site-specific attributes, as of the date of the fire in 2009, which affected the retroactive  market value of the Patrick Cudahy property.

134.    The Greater Milwaukee economy in the summer of 2009 was struggling.  At that time, Milwaukee was plunging even further into the Great Recession with few signs of any recovery.

135.    In 2009, the industrial real-estate market for the greater Milwaukee area generally and the southeast area of Milwaukee more specifically had an abundance of space available, likely resulting in significant ongoing vacancy if the Patrick Cudahy facility were placed on the market for sale or lease.

136.    The Patrick Cudahy facility is situated on about 70 acres of industrial-zoned land bordered by roads to the north and south, Union Pacific Railroad to the east, and land parcels to the west.

137.    The Patrick Cudahy plant is a single and multi-story meat-processing facility first constructed in the late 1800's and added onto piecemeal by various additions through 2004.

138.    Because of this piecemeal expansion and construction, the plant is internally divided into a series of buildings designated by letters A to Z.

139.    The original portion of the plant consists of multiple 3-5 story buildings built in 1895 using wood-frame and brick construction.

140.    This original portion includes much of the "South Plant," the only area of the plant affected by the fire, comprised of Buildings A to F, Q, and W.

141.    The only portions of the South Plant that were not part of the original construction were building Q, built in 1912; building W, the first floor of which was built in 1921 and the second in 1982, and building F, built in 1949.

142.     Each expansion of the plant represents a built-to-suit structure that is a necessary cost of business, but which is only fractionally recoverable when the business moves or closes and the facility is sold.

143.     For instance, staggered walls, varying ceiling heights, multi-stories and multiple buildings make for an inefficient floor plan.

144.     This results in what is termed "incurable obsolesce."

145.     Indeed, Patrick Cudahy's abandonment of a large percentage of the plant exemplifies this principle. Although the plant had a gross building area of 1.2 million square feet, almost 223,000 of it was abandoned. This was particularly true of the South Plant: half of Building B was abandoned and three-quarters of Building Q was abandoned.

146.     The design and layout of the South Plant is plainly obsolete by contemporary design standards; almost all industrial facilities constructed in the past half century are one story.

147.     The fact that the entire plant was cobbled together in stages over a 110 year period resulted in obsolescence significantly diminishing its market value.

148.     Additionally, the entire plant was, on average, almost 110 years old at the time of the fire, also negatively affecting its value.

149.     The plant itself was near the end of its economic life, having an effective age of 43 years out of a total 45-year economic life.

150.     The age of the sprinkler system in the inaccessible compartment below the roof of Building C of the Patrick Cudahy facility is unknown and the pump did not function as intended at the outset of the fire.

151.     Both Plaintiffs and the United States' real-estate experts agree that the highest-an best use of the Patrick Cudahy facility was an industrial-related use. This determination identifies the most profitable use to which the property can be developed.

152.     The sales-comparison approach is the most applicable appraisal methodology for determining the retroactive fair-market value of the Patrick Cudahy facility on July 5th 2009.

153.     The sales-comparison approach  uses the following steps to arrive at a fair-market value:

1) Research the most recent and relevant transactions of properties comparable to the subject;
2) Acquire details regarding those sales;
3) Determine the proper unit of comparison (here, price per square foot);
4) Develop adjustments for various differences between the comparable sales and the subject property;
5) Adjust each comparable property to the subject property to arrive at an adjusted price per square foot which gives an indication of value of the subject property.

154.     The adjustments and final adjusted price per square foot are determined using the appraiser's judgment and experience.

155.     This Court credits the United States' real-estate expert Randal Dawson's application of the sales-comparison approach.   Mr. Dawson applied the method correctly and used sound appraisal judgment based upon his considerable experience.

156.     This Court rejects Plaintiffs' real-estates expert Steven DeCaster's application of the sales-comparison approach because it contained fundamental math errors.

157.     Mr. DeCaster adjusted the value of his comparable properties incorrectly.  By way of example, the adjustment of -50% to $40.00 yields an adjusted price of $20.00.  The math for this result is either :

$$\$40 \times (1-.50) = \$20 \text{  or, alternatively, } \$40/2 = \$20$$

158.     Instead of using these correct mathematical approaches, Mr. DeCaster's method, following the same example, is as follows: $\$40/1.5 = \$26.67$.

159.     As a matter of basic math, reducing $40 by 50 percent does not equate to $26.67, or, put differently, a store having a half-price sale does not offer a $40 item for $26.67.

37

160.     Defendant's expert Richard Martchitelli is well qualified to offer opinions on appraisal methods and damages calculations.  A real-estate appraiser with over forty-years' experience, Mr. Martchitelli is a leader and authority on appraisal practice and standards.  His is a reviewer of the last six additions of The Appraisal of Real Estate, by the Appraisal Institute and currently serves as Chair of the Americas Valuations Standards Board of the Royal Institution of Chartered Surveyors, an international organization promoting qualifications and standards in the development and management of land and real estate.

161.     Mr. Martchitelli plainly showed how Mr. DeCaster's calculation for adjusting the value  of comparable properties was mathematically incorrect, resulting in a significant over-valuation of the Patrick Cudahy real property.

162.     Moreover, Mr. Martchitelli demonstrated that DeCaster's adjustment method is sui generis, at odds with standard appraisal practice, and unsupported by relevant real-estate texts.

163.     Accordingly, the Court rejects DeCaster's appraisal as an invalid estimation of the Patrick Cudahy real property.

164.     Even if this Court were to credit DeCaster's appraisal, it is of no assistance to the court in this case because it fails to provide an estimate of the damages allegedly caused by the fire. Mr. DeCaster simply offered his opinion as to the fair-market value of the Patrick Cudahy real property before the fire at issue in this case happened.

165.     Mr. DeCaster could have, but did not, use at least two established real-estate valuation methods to arrive at an estimate of damages.

166.     As explained by United States' expert Richard Martchitelli, typically in cases such as this one, damages are expressed as the difference between  the property's value before the fire and its value after the fire.  This is referred to as the "before and after method."

38

167.    The before-and-after method is commonly used in a wide variety of situations involving damages to real property, such as contamination, construction defects, eminent domain, and breach of contract.

168.    Additionally, an estimate of the damages to the Patrick Cudahy real property can be calculated by estimating the depreciated replacement cost of the portion of the South Plant initially destroyed by the fire and the remainder of the South Plant subsequently demolished.

169.    Mr. DeCaster has great familiarity with the before-and-after approach, using it many times in his career, most specifically in his role as a county commissioner adjudicating condemnation and eminent domain claims in pre-suit disputes.

170.    Nonetheless, Mr. DeCaster did not use the before-and-after method to value damages in this case.

171.    Nor did Mr. DeCaster use the depreciated-cost method to value damages in this case.

172.    Despite the methods and ability to do so, Mr. Decaster did not estimate the damages caused by the fire.

173.    Without any estimation of a key issue in this case—what damages did the fire cause— in the end the Court finds Mr. DeCaster's appraisal value to be not only incorrect but also inconsequential.

174.    As opposed to Plaintiffs, the United States presented evidence estimating the damages caused by the fire.

175.    Using the before-and-after method, the United States' expert Randal Dawson determined the before value of the Patrick Cudahy property immediately before the fire was $8,825,000 and the value immediately after the fire was $6,933,000.

176.    The difference $1,892,000, calculates the damages to the area of the South Plant destroyed by the fire, buildings C, D, E, and F.

177.     Plaintiffs failed to prove by a preponderance of evidence that the remainder of the South Plant, Buildings A, B, Q, and W, were required to be demolished after the fire. Plaintiffs reliance on a raze order that was never issued and not complied with is unavailing. \

178.     Accordingly, the court determines that the measure of damages to the Patrick Cudahy real property is $1,892,000.

### Damages to Equipment

179.     Defendant's expert William Kreidler applied the Critical Path Method (CPM) to determine the most effective manner for constructing and equipping a facility to replace the buildings and equipment destroyed by the fire. This method allows expeditious scheduling of construction projects that entail interdependent activities. The CPM includes a list of all activities required to complete a project, the time or duration that each activity will take to complete, and dependencies between activities.

180.     Mr. Kreidler analyzed the time required to rebuild the buildings that composed Patrick Cudahy's south plant, namely Buildings A, B, C, D, E, F, Q, and W.

181.     Buildings C, D, and E, were constructed in 1895, were three stories, and were approximately 112 feet x 144 feet. Building F was constructed in 1949, was four stories, and was approximately 337 feet x 48 feet. Buildings C, D, E, and F were approximately 213,000 square feet in area.

182.      Building A and B were constructed in 1895. Building A was three stories and Building B was four stories. Building Q was constructed in 1919 and was three stories. Building W was constructed in 1921/1932 and was two stories. Buildings A, B, Q, and W were approximately 191,000 square feet in area.

183. Buildings A, B, C, D, and E were constructed of load bearing brick exterior walls and heavy timber interior columns, floor beams and roof structures. Building F was constructed of steel beams and columns with masonry brick walls. Building Q was constructed of reinforced concrete framing with exterior masonry walls. Building W was constructed of a steel frame with metal siding on the exterior. The floor slab was concrete slab on grade for all of the buildings.

184. Kreidler reviewed reconstruction schedules prepared for Patrick Cudahy, Inc. and its insurers, which included: (a) Quantum Global Advisors / Continental Machinery Company – prepared on the behalf of PCI; (b) Burton Brothers General Contractors – prepared on the behalf of Smithfield and PCI's insurance carriers; PMA Consultants of Illinois – prepared on the behalf of Smithfield and PCI's insurance carriers; and Epstein and Sons, Inc. – prepared on the behalf of PCI.

185. The Quantum Global Advisors/Continental Machinery Company scheduled projected an overall duration of approximately 45.5 months from July 5, 2009, to April 19, 2013. It includes the demolition and reconstruction of eight buildings, Buildings A, B, C, D, E, F, Q, and W. It was based on an 1895 construction method using brick-bearing walls in conjunction with heavy timber-frame columns and beams.

186. The Burton Brothers reconstruction schedule was intended to be a functionally equivalent reconstruction of Buildings C, D, E, and F with an initial overall duration of approximately 26.9 months. The buildings would be of contemporary design and be constructed of contemporary materials, structural steel framing, concrete slabs on deck, and concrete masonry units (CMU) with exterior brick facing. The Burton Brothers' schedule did not include hot commissioning, which is the term used for the preliminary processing of unsaleable products while fine tuning of equipment and processing methods occurs .

187. A Change Order to the Burton Brothers' schedule increased the scope of the work, with the largest change being the addition of insulated metal panels on the ceilings and walls. This

change extended the completion date by four months to 30.9 months with a projected completion date of January 31, 2012.

188. PMA Consultants of Illinois produced a schedule graphic addressing the rebuild of Buildings C, D, E, and F for insurance-claim purposes. PMA projected plant operational activity, subsequent to hot commissioning and U.S. Department of Agriculture inspection, on September 27, 2011, approximately 26.8 months after the fire.

189. Epstein and Sons, Inc., another insurance consultant, submitted a report for construction and reconstruction work at PCI that differed from the other reconstruction projections as Epstein's included the construction of a new refinery facility. Subsequent to the new refinery being operational, the existing refinery was to be demolished, which was to be followed by the construction of a new microwave bacon facility on the site of the existing refinery. Epstein's report was for a totally new concept and not representative of the layout at the time of the fire. Epstein projected an overall project duration of approximately 29.9 months.

190. Kreidler prepared a detailed Critical Path Method schedule to independently address the time period to reconstruct and commission the PCI facility.

191. Kreidler's schedule calculated the following milestone dates:

- Substantial completion of Buildings C, D, E, and F: December 1, 2011

- Completion of process equipment cold commissioning: December 12, 2011

- Completion of process equipment hot commissioning: January 20, 2012.

192. Kreidler projected an overall duration for Buildings C, D, E, and F of approximately 30.9 months, from July 5, 2009, to January 30, 2012.

193. .Kreidler's Critical Path Method schedule also included activities for the reconstruction of Buildings A, B, Q, and W, which had a milestone date for substantial completion of February 10, 2012.

194.     Kreidler projected an overall duration for Buildings C, D, E, and F, as well as Buildings A, B, Q, and W of approximately 31.3 months, from July 5, 2009, to January 30, 2012.

195.     Kreidler projected an overall duration for the completion of all buildings of 31.3 months with substantial completion by February 10, 2012.

196.     Kreidler prepared a detailed schedule report, which report showed: (a) activity number and description; (b) work day calendar; (c) work days; (d) early start date; (e) early finish date; (f) total float in workdays; (g) building; (h) estimated man hours; and (i) average man hours per workday.

197.     Early start and early finish dates are the earliest dates on which an activity can start and finish given the start and finish of preceding activities.

198.     Late start and late finish dates are the latest dates on which an activity can start and finish without delaying the final project completion.

199.     Float is the amount of time an activity's completion can be delayed past its early finish date without delaying the final project completion.

200.     Kreidler separated its reconstruction schedule into two locations: (1) Buildings C, D, E, and F; and (2) Buildings A, B, Q, and W.

201.     Kreidler's schedule grouped activities into the following general categories: (a) investigation; (b) demolition; (c) design; (d) procurement of construction services and process equipment; (e) construction of buildings; and (f) installation of process equipment, including cold and hot commissioning.

202.     .     Kreidler estimated the replacement cost of the eight buildings, Buildings A, B, C, D, E, F, Q, and W at $83,960,344 broken-down by the two major building aspects:

- Buildings C, D, E, and F:     $57,465,833

- Buildings A, B, Q, and W:     $26,494,511.

43

203.     Kreidler estimated that the reconstruction, excluding process equipment installation and commissioning, would take 376,368 man hours.

204.     During the deposition of. Kreidler, questions arose concerning whether some items identified as "Building" by PT&C LWG were encompassed in MKA's initial reconstruction and commissioning schedule, and its cost estimate.  Items identified as "Building" by PT&C LWG were not considered machinery or equipment, and were not included by PT&C LWG it its determinations.  As a result, Kreidler identified items that neither he nor Defendant's expert Mark Ewing had evaluated.

205.     Kreidler prepared a supplemental report in which he estimated the direct cost and direct labor man hours for those  items that had not previously been evaluated by either of Defendant's experts.  The direct costs totaled $2,979,089 and the direct man hours totaled 9,375, resulting in a total cost increase of $3,783,872, or 4.5 percent.

206.      The largest additions were for cooling lines for microwave transmitters in Buildings D and F, the Fireye Flame Detection Systems for the microwave systems in Buildings D and F, and coolers, piping, and equipment in Buildings A, B, and Q.

207.     Using the same methodology as employed in its initial conclusions where estimated man hours were used to calculate schedule durations by dividing estimated man hours by average crew size, Kreidler developed a new schedule of activities for the additional items.  Kreidler made no other changes to its initial estimates and conclusions.

208.     The additional 9,375 man hours represent 1,462 man hours for Buildings C, D, E, and F, and 7,917 man hours for Buildings A, B, Q, and W.

209.     The additional 9,375 man hours increased the total man hours for the entire reconstruction to 387,980.63, representing an increase of 2.48 percent.

210.     The addition of the new activities to Kreidler's reconstruction schedule did not change the final completion date.

211.     The completion date for Buildings C, D, E, and F were not impacted because the installation of the microwave transmitter cooling lines and the Fireye flame detection system in Buildings D and F could be done concurrently with the other work with small crews.

212.     The initial schedule for Buildings A, B, Q, and W had enough float (open time) in the schedule to accommodate the installation of coolers, piping and equipment without delaying the final completion of the buildings.

213.     Kreidler's supplemental analysis retained its initial projected overall duration for the completion of all buildings of 31.3 months with substantial completion by February 10, 2012.

214.     Plaintiff's expert Schwenk included mechanical, electrical, and plumbing (MEP) fixtures in its assessment of damages (Item 25 attached to Schwenk Report dated January 12, 2015 report),  Inasmuch as these fixtures typically transfer with the real estate, Schwenk's inclusion of them in his report results in a double counting, because the damage and destruction of MEP is captured in the analysis of Patrick Cudahy's real property losses.

215.     Many of the "Market Value[s]" set forth by Schwenk in Continental Machinery Company's in its assessment of damages (Item 25 attached to its January 12, 2015 report) are the result of negotiations that took place during the settlement of Smithfield and PCI's insurance claim between CMC, who represented Smithfield and PCI, and Industrial Loss Consulting (ILC), who represented the insurance carriers, and are values for which there is no documentary support.

*Smithfield Foods, Inc.*

216.    About the time of the fire at its Patrick Cudahy facility, Smithfield was the largest pork processor and hog producer in the world.

217.    Smithfield has about 45,000 employees.

218.    Smithfield Foods is a vertically-integrated company which raises about 18 million hogs each year and processes about 30 million hogs a year.  Smithfield supplies both fresh meat and packaged meats.

219.    In 2009, Smithfield was organized as multi-national publically-owned corporation with over $11 billion in sales in fiscal year 2009 and further divided into five reporting segments.

220.    The pork group was divided further still into three wholly-owned U.S. fresh pork and packaged meat subsidiaries.

221.    These three subsidiaries contained 25 properties across the United States dedicated to the slaughtering or production of various pork products, such as Patrick Cudahy.

222.    Thus, Patrick Cudahy is an operating company, or a subsidiary, of Smithfield Foods.

223.    All of Smithfield Foods Incorporated's subsidiaries are insured through Smithfield; its policy covers Patrick Cudahy.

224.    Within Smithfield, Patrick Cudahy is wholly owned by a sub-company called John Morrell and Company.

225.    John Morrell is comprised of a number of subsidiaries which engaged in producing similar pork products.

226.    Ultimately, John Morrell has ultimate authority to make decisions concerning Patrick Cudahy's operations.

227.    If a product is transferred from John Morrell to a different part of Smithfield, such as Farmland, the profits reported to Smithfield would differ, but Smithfield would reap the profits regardless of the transfer.

228.    Patrick Cudahy is a further-processing facility, meaning it takes raw material to make different pork products such as sliced bacon, microwave bacon, precooked sausage, and ham products.

### Pork Group restructuring

229.    In February 2009, Smithfield announced a major re-organization of its pork group.

230.    This restructuring plan included multiple initiatives: reducing the number of independent-operating companies from seven to three; merging fresh-pork sales into two cost effective groups; closing six plants; and various other restructuring initiatives to create significant synergies, particularly in high-margin packaged meats.

231.    Smithfield's CEO touted this plan in his annual letter to shareholders, noting that would improve Smithfield's cost structure by consolidating its manufacturing, lowering operating costs, and increasing plant utilization.

232.    In April 2009, as part of a larger restructuring within its Pork Group, Smithfield closed its Sioux City, Iowa, plant, part of the John Morrell Company. Smithfield decided to close the plant, in part, to realize greater efficiancies. Sioux City was an old facility with an inefficient layout and the cost to make it more streamlined was determined to be either too great or it made more sense to add new operations to other facilities that had a better layout.

233.    A goal of the restructuring was to realize greater efficiencies among Smithfield's operations.

234.    Sioux City was one of seven or eight plants Smithfield shuttered, many of which were further-processing plants like Patrick Cudahy.

235. Smithfield saved $55 million in the year of the Cudahy fire resulting from the pork group restructuring.

### Post-fire investments in Patrick Cudahy

236. As of 2012, Patrick Cudahy had repaired only a fraction of those portions of the building affected by the fire. It made some repairs in the dry-sausage area and the docks costing less than $10 million.

237. Instead of rebuilding at Cudahy Smithfield chose to invest in other facilities because it was restructuring its pork group and because Patrick Cudahy had an inefficient layout.

238. Instead of rebuilding at Patrick Cudahy, Smithfield mitigated its loss at Cudahy by transferring production of Cudahy products to other facilities, and by making capital investments at the other facilities.

239. Under the terms of its insurance policies, Smithfield was entitled to spend the insurance proceeds to make a capital expenditure at any one of its facilities within a two-year timeframe.

240. Smithfield was easily able to do so; typically spending about $200 million, nearly the full amount of the settlement, in capital expenditures yearly.

### Settlement of insurance claim by Plaintiffs

241. Although there were individual differences in coverage, in general terms, various insurance contracts covered loss due to the fire based on replacement cost.

242. Under the terms of its insurance policies, Smithfield was first entitled to an advance of cash for the actual cash value of property damaged in the fire. The full amount of replacement cost was determined later.

243. In November 2010 Smithfield and its insurers met for a final settlement conference in an attempt to fully resolve the insurance claim.

48

244.    Before the meeting, the insurers and Smithfield had made different offers to compromise the settlement.  Smithfield and its insurers ultimately negotiated a settlement of the insurance dispute settling the claim for $209 million.

245.    According to Patrick Cudahy internal memoranda, the fire caused only one week of lost production to Kraft Foods and the disruption caused by the fire was "minimal."  This is reflected in Patrick Cudahy's sales data.

### Lost Profits, Inventory Losses, and Certain Property Losses

246.    Defendant's expert accountant Robert Traven, of the firm Meaden & Moore, accurately calculated Plaintiff Smithfield Foods' operational profits and losses that resulted from the July 2009 fire at the Smithfield Foods subsidiary Patrick Cudahy, Inc.

247.    To develop a rich data set for analyzing these profits and losses, Traven analyzed data product by product (i.e., by individual stock-keeping units ("SKUs") and by customer).

248.    Analyzing data by SKU and by customer enabled Traven to identify production and sales anomalies.  It also ensured that all fire-related losses were captured.

249.    Plaintiffs' accounting expert Harold Meyer did not analyze data by SKU or by customer.

250.    To calculate sales trends, Traven used a year-over-year approach, comparing sales during the 12 months immediately before the fire (July 2008–June 2009) with sales during the 12 months before that (July 2007–June 2008).  A year-over-year approach minimizes the effects of short-term fluctuations resulting from sales cycles, production interruptions, customer-specific changes, and consumer demand.  It is particularly appropriate to use this approach when calculating longer-term trends.  Traven used these two comparison periods consistently across all product lines, to establish the trend that existed in each product line during the year before the fire.  He then compared that trend with actual post-fire sales to determine whether Smithfield experienced losses or gains after the fire.

49

251.     Plaintiffs' expert Meyer used data sets drawn from relatively short periods (8-13 weeks) to develop his projections for future sales over a long period (more than four years). Sales during short periods are more likely to be unrepresentative of long-term sales because of the short-term fluctuations that regularly occur. Meyer chose periods that are too short to ensure that they are representative of true pre-fire trends—far too short to project sales over the 52-month period for which he calculated lost sales. Unlike Traven, Meyer did not choose the same periods for comparison across all product lines but instead chose different periods for various product lines.

252.     Meyer has failed to show that the periods he selected for establishing sales trends are representative of pre-fire sales trends.

253.     Meyer has based his calculation of lost profits on unrealistically high projections of future sales.

254.     Meyer's inconsistent selection of comparison periods served the purpose of inflating projected future sales and inflating his calculated lost profits.

255.     As an example, Meyer supported his calculation of lost profits on sliced dry-sausage products by identifying an unusually high growth rate that occurred for a short time about a year after the fire. This rate exceeded the rate at which these products were growing before the fire. He attempted to justify his use of the unusually high growth rate by hypothesizing that dry-sausage products would have grown even faster than they were growing after the fire, if the fire had not occurred. Even though the fire did not damage the dry-sausage production equipment and dry-sausage production resumed a few weeks after the fire, Meyer assumed that sales were being adversely affected years later. He therefore based his calculation of lost profits using a sales trend that exceeded even the unprecedentedly high rate that he derived from the short-term data sets he selected from post-fire sales periods. By eschewing pre-fire sales trends in favor of a higher trend extrapolated from selected post-fire data, Meyer inflated his calculated losses.

256. Defendant's expert Traven analyzed Smithfield as an integrated enterprise that comprises numerous operating companies that have similar production facilities and supply chains that Smithfield successfully used to mitigate the financial impact of the fire.

257. Plaintiffs' expert Meyer did not analyze Smithfield as an integrated enterprise. Instead, he focused on the decreased production at Smithfield's facility where the fire occurred. Consequently, Meyer did not capture the full scope of Smithfield's mitigation, resulting in a direct overstatement of losses.

258. Traven calculated operating profits and losses for the 32-month period after the fire, when the impact of lost production from the fire is reasonably certain. After that period, Smithfield could have mitigated losses by restoring production at the Cudahy location. Since Smithfield chose not to restore production at that location, calculating profits and losses beyond 32 months entails considerable speculation about how much mitigation would likely have occurred if Smithfield had restored the plant to its pre-fire condition.

259. Attempting to calculate lost profits beyond the 32 months immediately after the fire requires substantial speculation about what actual sales would have been at times so far removed from the fire.

260. Smithfield could have replaced all of the production capacity that was lost to the fire by February 2012, as demonstrated by the testimony and analysis of Defendant's expert William Kreidler.

261. Rather than rebuild and replace what was lost at the Cudahy plant, Smithfield chose to make capital improvements in other operating units. Smithfield reasonably mitigated its losses by making capital improvements and operating changes where those expenditures were likely to yield the highest profits.

262. By making capital improvements and operating changes in its business during the 32-month period of recovery, Smithfield increased profits by more than $30 million. By making these

51

changes, Smithfield fully mitigated all lost profits. Total losses from lost sales, post-fire inefficiencies, extra expenses, incremental costs at sister plants, customer credits, unemployment and severance costs, and incremental production costs amounted to about $27 million, substantially less than the amount of increased profits that Smithfield realized by moving expeditiously to mitigate losses.

263.     Meyer calculated profits and losses for the 52-month period after the fire. Meyer used this period because he thought it would take 46 months to restore the Cudahy facility to its pre-fire production capacity, and he added 6 months because Smithfield's insurers were obligated to reimburse Smithfield for lost profits during the rebuilding period and the following 6 months.

264.     Plaintiffs' accounting expert Harold Meyer was not qualified to opine as to the length of time required to restore capacity at the Cudahy facility. He has no training or experience as a civil engineer or in any of the trades that would be required to build a replacement building and to equip it for pork production. Even though Meyer was assisted by other persons who may have been more competent to estimate times for building and furnishing a production facility, the schedule is nevertheless unreliable because he had the final authority over it.

265.     Meyer's opinion concerning Smithfield's operating losses is unsound because it is the result of three analytical errors: First, he established unrealistically high sales projections. Second, he calculated losses far beyond the true recovery period. Third, he failed to account for sales by Smithfield operating units other than Patrick Cudahy, Inc.

266.     The calculation of losses for an unjustifiably long period and the use of unrealistically high sales projections are not independent mistakes. Because growth rates compound over time, the two errors combined to grossly inflate Meyer's calculation of lost profits.

267.     Had Meyer projected losses over the true recovery period, July 5, 2009, through February 2012, when full production could have resumed at the Cudahy facility, the total lost profits

*using Meyer's unrealistic growth rates* would have been about $45 million, not $79 million, without correcting for Meyer's other errors.

268. The prime example of the combined effect of these two errors (unrealistically high growth rates applied over too much time) is Meyer's calculation of Microwave Bacon profit losses. Meyer calculated a loss of nearly $60 million. The true loss was less than $9 million, as demonstrated by Defendant's expert Traven.

269. A fourth analytical mistake contributed to Meyer's calculation of lost profits: he calculated lost sales of microwave bacon toppings based on volumes that vastly exceeded PCI's pre-fire production capacity. Patrick Cudahy documents establish that the Cudahy plant had the capacity to produce 163,200 pounds per week. Meyer calculated a loss of profits for future sales that far exceeded the plant's capacity. Using an inflated growth trend, he calculated "lost" production of about 8 million pounds of microwave bacon toppings beyond what could have been produced at Cudahy during that period if the fire had not occurred. The "lost" profit associated with this beyond-capacity "loss" was calculated by Meyer at $13 million.

270. Meyer's calculation of lost profits from microwave bacon toppings is unsound because it exceeds the capacity that existed when the fire occurred. Smithfield met post-fire demand for toppings by converting a microwave bacon-slice line to a toppings line at its Sioux Center, Iowa, plant and by producing elsewhere. Smithfield's successful mitigation of these and other production losses demonstrates that Smithfield could and would have fully mitigated any future loss of toppings sales by increasing production to meet demand.

271. Meyer also inflated his calculation of lost profits by ignoring pre-fire sales trends that were negative. Instead of projecting declining sales into the future, Meyer projected flat sales. Meyer based his projection of flat sales on undocumented conversations with Patrick Cudahy employees. Because Meyer has not demonstrated a sound basis for ignoring the declining pre-fire

53

sales trends of Cooked Hams and Sliced Hams, his calculation of lost profits for these product lines is unreliable.

272.    Meyer also inflated his calculation of lost profits by incorrectly calculating profit margins. In calculating lost net profits, Meyer incorrectly added Selling, General, & Administrative (SG&A) expenses to the gross margins. Meyer mistakenly assumed that Patrick Cudahy's stated gross margins did not include these expenses. This mistake resulted in an overstatement of more than $11 million.

273.    Meyer also overstated lost profits by including losses related to the non-renewal of a contract by Oscar Mayer, a subsidiary of Kraft Foods Global, Inc. Sales to Oscar Mayer were not affected by the fire. The master contract expired in December 2010, nearly 18 months after the fire, and Smithfield met Oscar Mayer's orders through February 2011. Plaintiffs' speculation about the termination of sales to Oscar Mayer does not establish that sales to Oscar Mayer were lost as a result from the fire. Meyer's calculation of lost profits is inflated by about $30 million, the amount he attributes to the loss of the Oscar Mayer account.

274.    Meyer also improperly characterized the cost of converting the Sioux Center microwave bacon slice line to a toppings line. This was a permanent operating change, not a temporary remedial measure. Because the change was permanent, it amounts to a replacement of the toppings-line equipment that was destroyed by the fire. The loss of the toppings-line equipment was evaluated by Plaintiffs' expert Stephen Decaster and by Defendant's expert Mark Ewing. These experts calculated production-equipment losses. Meyer's inclusion of the conversion costs is duplicative of the loss measured by Decaster and Ewing. Inasmuch as the conversion was permanent, allowing Smithfield to permanently shift topping production from Cudahy to Sioux Center, the appropriate compensation, if any, is the fair market value of the Cudahy topping-line equipment that it replaced. Meyer's inclusion of it in his report amounts to double counting by Plaintiffs, as Decaster includes a loss for the equipment.

54

275.    Meyer incorrectly calculated the expense associated with an accounting change that was expected to occur shortly after the fire. When the fire occurred, Patrick Cudahy was preparing to begin using different software for accounting. To prepare for the change, PCI contracted for consultants to train and advise PCI employees before the transition. After implementation, the software vendor was contracted to provide support. The fire delayed the transition, increasing the costs of pre-transition training. Correspondingly, the fire also delayed the accrual of post-transition charges by the software vendor. Although Meyer calculated the increased cost of prolonged pre-transition expenses, he did not offset that increase by the vendor charges that were not incurred during the period of delay.

276.    Meyer's calculation of what he terms "extra expenses" is unreliable because he does not have documentation to show that some of the claimed expenses were actually incurred.

277.    As calculated by Defendant's expert Robert Traven, Plaintiffs' total lost profits were about $27 million. This loss does not reflect increased profits of about $30 million that Smithfield generated by making capital investments in operating units other than PCI during the 32-month recovery period. Nor does it reflect Smithfield's profits from capital investments that totaled about $29 million annually after the 32-month recovery period.

278.    As calculated by Traven, Smithfield incurred inventory losses amounting to $4 million and a variety of property-damage expenses totaling $4 million.

279.    Traven's calculated losses are reliable because he analyzed a rich data set (by SKU and by customer), based his projection of future sales on the real annual growth immediately before the fire, analyzed Smithfield as an integrated enterprise with similar production facilities in separate operating units, correctly calculated both historical and actual profit margins, and assessed individual product lines to determine when they recovered from the production losses caused by the fire.

280.    Smithfield successfully mitigated all operating losses by moving production to more efficient plants, outsourcing production of certain products, and investing capital in non-PCI

55

operating units. By generating $30 million of new profits from capital investments during the 32-month recovery period, Smithfield not only mitigated all lost profits but also mitigated production-related property losses such as inventory losses. As a result of Smithfield's mitigation efforts, Smithfield's net business-interruption loss (comprising lost profits, inventory losses, and the property losses valued by the parties' expert accountants) is less than $5 million.

281. To the extent that Smithfield suffered losses beyond the 32-month recovery period as a result of losing customers, those losses are completely offset by Smithfield's realization of $29 million in annual profits from capital investments.

**Proposed Conclusions of Law**

*Choice of Law*

1. "[T]he Federal Tort Claims Act permits suit only 'where the United States, if a private person, would be liable . . . in accordance with the law of the place where the act or omission occurred." *United States v. Spelar*, 338 U.S. 217, 218 n.3 (1949) (quoting statute's jurisdictional provision). The Court's jurisdiction depends on the correct application of "the law of the place where the negligence occurred." *Richards v. United States*, 369 U.S. 1, 9 (1962). The Supreme Court "ha[s] construed § 1346(b) in determining what law should apply in actions brought under the FTCA. But the section is more than a choice-of-law provision: It delineates the scope of the United States' waiver of sovereign immunity." *Smith v. United States*, 507 U.S. 197, 201 (1993). Thus, to ensure subject-matter jurisdiction under the FTCA, the Court must conduct a choice-of-law analysis to identify the applicable substantive state law. *See also Offshore Rental Co. v. Continental Oil Co.*, 583 P.2d 721, 725 n.5 (Cal. 1978) (conducting choice-of-law analysis sua sponte).

2. As the place where the Plaintiffs allege the act or omission occurred, California's whole law, including its choice-of-law jurisprudence, governs. California's governmental-interest approach involves three steps: "First, the court determines whether the relevant law of each of the

56

potentially affected jurisdictions with regard to the particular issue in question is the same or different. Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists. Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law 'to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state' and then ultimately applies 'the law of the state whose interest would be more impaired if its law were not applied.'" *McCann v. Foster-Wheeler LLC*, 225 P.3d 516, 527 (Cal. 2010) (quoting *Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914 (Cal. 2006)).

3.     The Court concludes that material differences exist between California's and Wisconsin's negligence law. *Compare Ingham v. Luxor Cab Co.*, 113 Cal. Rptr. 2d 587, 595 (Cal. Ct. App. 2001) ("the theory expounded in Palsgraf . . . has been adopted in California"), and *Hoida, Inc. v. M&I Midstate Bank*, 717 N.W.2d 17, 28-29 & n.15 (Wis. 2006) (applying *Palsgraf* dissent); compare *Menchaca v. Helms Bakeries, Inc.,* 439 P.2d 903, 909 (Cal. 1968) (elevating the standard of care for inherently hazardous instrumentalities), and *Brandenburg v. Briarwood Forestry Servs., LLC,* 847 N.W.2d 395, 411 (Wis. 2014) (remanding with instructions that negligence action for injury caused by inherently dangerous activity "proceed, with the plaintiffs have the opportunity to show that [defendant] failed to use ordinary care with regard to the activity"); *compare Bolt v. United States,* 509 F.3d 1028 (9th Cir. 2007) (establishing standard of care based on federal procedures), and *Dixson v. Wisconsin Health Org. Ins. Corp.*, 612 N.W.2d 721, 728 (Wis. 2000) (finding standard of care only in safety regulations intended to protect a specific class).

4.     The Court concludes that both California and Wisconsin have an interest in applying their negligence law to this action and, therefore, a true conflict exists. *See Kearney v. Salomon Smith Barney, Inc.,* 137 P.3d 914, 924 (Cal. 2006) (identifying three critical issues for true conflict analysis: "(1) compensation for survivors, (2) deterrence of conduct and (3) limitations, or lack thereof, upon

57

the damages recoverable"). California has an interest in the deterrence issue, as the United States maintained a presence within the state and its alleged negligence occurred there. However, Wisconsin likewise has an interest in deterring the alleged conduct, since Wisconsin is where the flare was negligently fired and where it damaged Plaintiffs' property. *See Mazza v. American Honda Motor Co.,* 666 F.3d 581, 593 (9th Cir. 2012) ("place of the wrong'" is state where last event necessary to make actor liable occurred); *McCann,* 225 P.3d at 534 (state ordinarily has interest in regulating conduct within its borders); *Offshore Rental Co., v. Continental Oil Co.*, 583 P.2d 721 728 (Cal. 1978) ("although the law of the place of the wrong is not necessarily the applicable law for all tort actions . . . , the situs of the injury remains a relevant consideration"); *Hurtado,* 522 P.2d at 672 ("state's interest in deterrence . . . extend[s] to all persons present within its borders").

5.      Plaintiffs have alleged negligence – the search that failed to discover Popp's concealment of the flare – that occurred in California.  However, the negligence that was more temporally and spatially proximate to Plaintiffs' injuries occurred in Wisconsin – namely, Joshua Popp's decision to give the flare to his brother who lacked adequate training and their joint decision to ignite the flare in a residential neighborhood directly adjacent to a commercial area.  Moreover, Smithfield Foods Inc. and Patrick Cudahy procured insurance for casualty losses in Wisconsin, thereby reasonably anticipating that Wisconsin law would dictate the coverage terms.  See Offshore Rental Co., 583 P.2d at 728 (acknowledging insurance contract may establish expectations among parties).  The Court finds that Wisconsin's interest in applying its negligence law would be more impaired if its policy were subordinate to California's law.  *See Castro v. Budget Rent-a-Car Sys., Inc.*, 65 Cal. Rptr. 3d 430 (Cal. Ct. App. 2007).  Wisconsin negligence law therefore applies.

### Negligence

6.      To prove negligence under Wisconsin law, Plaintiffs must prove four elements: "(1) the existence of a duty of care on the part of the defendant, (2) a breach of that duty of care, (3) a causal connection between the defendant's breach of the duty of care and the plaintiff's injury, and

(4) actual loss or damage resulting from the injury." *Gritzner v. Michael R.*, 611 N.W.2d 906 (Wis. 2000) (quoting *Rockweit v. Senecal*, 541 N.W.2d 742 (Wis. 1995)).

7.      Wisconsin law does not consider every violation of a legislative rule or regulation to constitute negligence. *Olson v. Ratzel,* 278 N.W.2d 238 (Wis. App. 1979) (declining to find negligence per se as a result of violation of federal and state gun control legislation)

### Duty

8.      "[E]very person is subject to a duty to exercise ordinary care in all of his or her activities." *Brandenburg v. Briarwood Forestry Servs.*, LLC, 847 N.W.2d 395, 397 (Wis. 2014). "Ordinary care is the care which a reasonable person would use in similar circumstances." *Gritzner*, 611 N.W.2d at 912-13 (quoting Wis JI-Civil 1005). "The mere possibility of harm is insufficient to establish negligence." *Meihost v. Meihost*, 139 N.W.2d 537 (Wis. 1966).

9.      The Court finds that the Marine Corp Orders (MCOs) and the Center Combats Orders (CCOs) evidenced by the Plaintiffs do not create the standard of care for this case. First, no order cited by the Plaintiff requires that searches of Marines and their packs be performed at Camp Wilson. Camp Wilson was operated under the Mojave Viper Support Detachment, which enforced the standard operating procedure for Camp Wilson (2007 Camp Wilson S.O.P.). The 2007 Camp Wilson required an extensive check-out procedure before Marines could leave the Camp. The procedure, however, did not require searches of Marines or their packs before leaving Camp Wilson to return to Mainside.

10.      Plaintiffs claim that the searches at Camp Wilson were an interpretation of the various MCOs and CCOs. But even if that were the case, it was the prerogative of the battalion commandant to order them. Searches were conducted on a battalion-by-battalion basis and applied only to those Marines under the commandant's control. Unit commanders were permitted to order that Marines be searched at virtually any time or place. Such ad hoc application of an order cannot create the universal standard of care under Wisconsin law.

59

11.     Second, under the FTCA's "law of the place" requirement, Plaintiff must prove the breach of a state law duty.  Any alleged violation of a federal statute or regulation "also must constitute violations of duties analogous to those imposed under local law."  *Cecile Indus., Inc. v. United States*, 793 F.2d 97, 100 (3d Cir. 1986) (internal quotation and citation omitted).  In other words, "the violation of a federal statute or regulation does not give rise to FTCA liability unless the relationship between the offending federal employee or agency and the injured party is such that the former, if a private person or entity, would owe a duty under state law to the latter in a nonfederal context."  *Johnson v. Sawyer*, 47 F.3d 717, 728 (5th Cir. 1995) (en banc).

12.     Wisconsin law does not consider every violation of a legislative rule or regulation to constitute negligence.  Only safety rules and regulations that are intended to protect a specific class set a standard of conduct in negligence actions.  See *Dixson v. Wisconsin Health Org. Ins. Corp.*, 612 N.W.2d 721, 728 (Wis. 2000); *Fortier v. Flambeau Plastics Co.*, 476 N.W.2d 593, 600 (Wis. Ct. App.), *rev. denied*, 479 N.W.2d 172 (Wis. 1991); *Johnson v. City of Darlington*, 466 N.W2d 233, 235 (Wis. Ct. App.), rev. denied, 471 N.W.2d 510 (Wis. 1991).  Wisconsin law rarely imposes a duty to prevent theft.  *See, e.g., Meihost v. Meihost,* 139 N.W.2d 537 (Wis. 1966).

13.     The standard operating procedure of performing searches at Camp Wilson was not intended to protect the safety of a class to which Plaintiffs belong.  As the evidence bore out, the searches at Camp Wilson arose from concern for Marines' safety.  Following incidents of mishandling ammunition while on the base, battalion commanders decided to ensure Marines did not have ordnance of their persons as they were being transported from Camp Wilson.  The procedure seeks to protect Marines, not "the public at large."  In other words, to any extent Corporal Langham had a duty to search Joshua Popp and his pack, the duty was to his fellow Marines, not property owners in Cudahy, Wisconsin.

14.     Corporal Langham's duty was simply to act reasonably under the specific circumstances.

**Breach of Duty**

15.      "Whether there has been a breach . . . will depend in part upon what is reasonable to require a person to do, or to refrain from doing, under the circumstances." *Hoida, Inc. v. M & I Midstate Bank,* 717 N.W.2d 17, 29 (Wis. 2006).

16.     The Court credits the testimony of Corporal Langham and finds that he performed a search of both Joshua Popp and his pack prior to departing Camp Wilson for Mainside at Twentynine Palms.  Although Corporal Langham did not remember the precise search in question, that is of no moment, as he cannot be expected to remember a routine search that occurred eight years ago.  Corporal Langham did testify regarding his ingrained habit of following established protocol, which consisted of searching both the person and the pack of every time a Marine was subject to a search.  The Court fully credits his testimony that it is highly unlikely that he would have given Joshua Popp "a free pass" because his pack was already on the truck.

17.     Joshua Popp provided trial testimony that differed from his deposition testimony. Joshua Popp's inconsistent testimony prevents the Court from citing his version of events as the basis for its decision.  Indeed, given the totality of evidence and Joshua Popp's differing version of events, the Court finds it more likely than not that Joshua Popp hid the flare in his hut during the search, presented his pack for inspection, and then returned to the hut to retrieve the ordnance. That story is much more plausible than Joshua Popp being able to "kind of bull crap" his way out of Marine protocol.

18.     Yet even if Corporal Langham did not search Joshua Popp's pack, he did not breach a duty under the circumstances.  *See Hoida, Inc. v. M&I Midstate Bank*, 717 N.W.2d 17 (Wis. 2006) (finding no negligence despite defendant's failure to comply with "basic industry standards" of conduct).

61

19.     Corporal Langham knew that Joshua Popp was a member of the Company Level Intelligence Cell (CLIC).  In that role, Popp spent the vast majority of his time during the Mojave Viper exercise in classrooms at Camp Wilson and non-live fire training ranges.  Members of CLIC were instructed on gathering and communicating intelligence.  They were separated from their previous platoon and became members of Headquarters Platoon.  As a result, they rarely participated in combined arms training exercises with the other Marines in Third Battalion.  Joshua Popp testified that he does not recall being issued ammunition and, if he was, it was only on one occasion when he observed a live-fire training exercise from the periphery.  Following the exercise, Joshua Popp returned the munition and was searched before leaving the live-fire training range.  Joshua Popp was not issued a M125 green star cluster flare during his training at Twentynine Palms.

20.     Corporal Langham further knew that Camp Wilson is not a live-fire training range and that Marines were prohibited from having ordnance at the Camp.  Marines and their gear were searched before they entered Camp Wilson.  They were repeatedly instructed to report abandoned or found ordnance up the chain of command.  Amnesty boxes were established in Camp Wilson to allow Marines to turn in discovered ordnance without fear of retribution.  There was no "culture of permissiveness" in within unit regarding theft of ordnance.  Marines were not even allowed to keep sand from their deployment.

21.     Corporal Langham had no reason to suspect Joshua Popp would attempt to steal ordnance.  At the time of the incident, Popp had already served one tour of duty in Iraq and was preparing for redeployment within a matter of weeks.  There was no reason to suspect he would not follow instructions for reporting found ordnance.

22.     The MCOs cited by Plaintiffs do not prove that Corporal Langham should have known Joshua Popp would attempt to steal ordnance from Camp Wilson.  Marine Corp Orders 4340.1A and 8020.10A are Marine Corp-wide policy issued by the Commandant of the Marine

Corp. MCO 4340.1A creates a global policy for the reporting of Missing, Lost, Stolen, or Recovered Government Property. MCO P8020.10A outlines a global policy for ammunition and explosives management. Those macro orders fail to establish a heightened risk of theft from any individual base, nor do they create specific regulations for preventing theft at Twentynine Palms, much less Camp Wilson.

23.     Under the circumstances, Corporal Langham would have acted reasonably in deciding not to require Joshua Popp to retrieve his bag from the truck to search for ordnance that was never issued to him.

24.     Holding that Corporal Langham breached a duty under the circumstances would be tantamount to finding a duty that Corporal Langham must treat Joshua Popp as a suspected criminal rather than a trusted soldier. Corporal Langham was reasonable in believing that if Joshua Popp had discovered ordnance – which would have been the only way he obtained it given that the ordnance was not issued to him – he would have adhered to protocol and reported it up the chain of command. Joshua Popp instead violated multiple Marine Corp regulations by failing to report it and storing it in his pack. To hold that Corporal Langham had a duty to anticipate such nefariousness and thwart Joshua Popp's criminal subterfuge would place too great a burden on the Marine Corp.

25.     Because there is no dispute that the Marine Corps had no reason to suspect that Joshua Popp could not be trusted to act properly, the Marine Corps did not breach a duty to Plaintiffs to supervise him more closely. *See L.L.N. v. Clauder,* 563 N.W.2d 434, 445 (Wis. 1997).

**Causation**

26.     Wisconsin applies the "substantial factor" test to determine causation. *Fischer by Fischer v. Ganju*, 485 N.W.2d 10, 19 (Wis. 1992). The test focuses on whether the breach of the duty was a cause-in-fact of the injury. *Kidd v. Allaway*, 807 N.W.2d 700, 703-04 (Wisc. App. 2011). If cause-in-fact is proven, courts then assess whether any public policy grounds exists – including whether the negligence was the proximate cause of the injury – to determine whether the defendant should be held liable. Id. at 705.

27.     Plaintiffs have failed to prove cause-in-fact. Namely, Plaintiffs have not demonstrated that, even if Corporal Langham made a decision not to inspect Popp's pack, this was a substantial factor in causing the alleged injury. To prove cause-in-fact, Plaintiffs cite Joshua Popp's deposition testimony (subsequently recanted) that, if Corporal Langham had searched his pack, he would have discovered the ordnance. The Court finds no support for that speculation. Had Joshua Popp been ordered to retrieve his pack from the truck, there is no telling what he would have done to conceal the flare. He may have scurried back to his hut and stashed it there during the line-out, as he subsequently stated. He may have tried to conceal it in the sand or bathroom in order to retrieve it at a later time – a scenario that is particularly credible in light of the fact that Twentynine Palms was his battalion's permanent base. He may have hid it in the truck and grabbed it upon arriving at Mainside. What is highly doubtful, however, is that Joshua Popp would have simply left it in his pack and conceded guilt. See *Prosser & Keeton, Torts* § 41 (5th ed. 1984) )("A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.").

28.     In early 2007, the Marine Corp was preparing for the surge in Iraq and the continuing military campaign in Afghanistan. Every Marine deployed to those theaters first participated in the Mojave Viper exercise at Twentynine Palms. Thousands of soldiers were training

in the 998-square-mile desert terrain. Each unit expended tens of thousands of rounds of ammunition per exercise. A Marine intent on stealing a piece of ordnance from Twentynine Palms would have been able to do so regardless of whether every Marine Corp procedure was followed. *See Restatement (Second) of Torts* § 432 ("The actor's negligent conduct is not a substantial factor in bringing about the harm to another if the harm would have been sustained even if the actor had not been negligent.").

29. Plaintiffs cannot prove that Corporal Langham's failure to search Popp's pack was a substantial factor in causing the fire. *Cf. Beacon Bowl, Inc. v. Wisconsin Elec. Power Co.*, 501 N.W.2d 788, 788-89 (Wis. 1993) (dismissing action because plaintiff failed to proffer sufficient evidence that it was more likely than not the fire would have occurred regardless of negligence).

### *Public Policy*

30. "Negligence and liability are two distinct concepts. Even if the elements of negligence are established or assumed in a case, liability is not guaranteed, but may still be restricted by Wisconsin courts on the basis of judicially recognized policy factors." *Hornback v. Archdiocese of Milwaukee*, 752 N.W.2d 862 (Wis. 2008) (citing *Hoida*, 717 N.W.2d at 17, 24).

31. The Wisconsin Supreme Court has recognized six policy grounds that warrant withholding liability "even in the face of proven or assumed negligence:" (1) the injury is too remote from the negligence; (2) the recovery is wholly out of proportion to the culpability of the negligent tort-feasor; (3) the harm caused is highly extraordinary given the negligent act; (4) recovery would place too unreasonable a burden on the negligent tort-feasor; (5) recovery would be too likely to open the way to fraudulent claims; and (6) recovery would enter into a field that has no sensible or just stopping point. *Id.* at 875 (citations and internal quotation marks omitted); *see also Rockweit v. Senecal*, 541 N.W.2d 742, 749-50 (Wis. 1995).

32.     The Court finds that the injury in Wisconsin in 2009 is too remote from the alleged negligence in California in 2007 to hold the United States liable. *Kidd,* 807 N.W.2d at 705 ("As used in the public policy analysis, the remoteness inquiry 'revives the intervening or superseding cause doctrine, which had passed away with the adoption of the substantial factor test of cause-in-fact.'") (*quoting Cefalu v. Continental W. Ins. Co.*, 703 N.W.2d 743 (Wis. App. 2005)).

33.     "Where the intervening act is intentionally tortious or criminal in nature, it is more likely to be considered a superseding cause. . . .  There is much less reason to anticipate intentional misconduct than there is to anticipate negligence, since under ordinary circumstances it is reasonable to assume that no one will commit an act that will violate the criminal law. . . . Courts are properly reluctant to find that an intervening criminal act should have been foreseen by the original tortfeasor.  In ordinary circumstances, a criminal act breaks the chain of legal causation." *Eichstedt v. Lakefield Arms, Ltd.*, 849 F. Supp. 1287, 1292 (E. D. Wis. 1994) (internal citations omitted).

34.     "The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime." *Eichstedt v. Lakefield Arms, Ltd.*, 849 F. Supp. 1287, 1292 (E. D. Wis. 1994) (quoting *Restatement (Second) of Torts* § 448 (1965)).

35.     After Joshua Popp stole the ordnance from Twentynine Palms, he drove to Cudahy, Wisconsin and stored the illegal munition at his parent's residence.  He then deployed for a second time to Ramadi, Iraq before returning to Twentynine Palms to conclude his military service.  After being discharged by the Marine Corp, Joshua Popp returned to Cudahy, Wisconsin.  On July 5, 2009 – more than two years after stealing the flare – Joshua Popp intended to launch the flare with his

66

brother over a lake near Grant Park in Wisconsin. Joshua Popp's criminal and reckless behavior is certainly an intervening cause of the injury for which he bears primary responsibility.

36. The Court also finds an additional unforeseeable act that breaks the causal nexus between the alleged non-search and the injury. Joshua Popp was a trained Marine who had been instructed to properly use the military-grade flare. He gave the flare to his untrained brother without providing instruction on how to properly launch it. Even more alarming, Kurtis Popp was not only uneducated in the use of flares, he was previously convicted for receiving stolen goods as a result of an incident involving illegal weapons. It is simply unforeseeable that a trained Marine would give the ammunition to an untrained person with a record for mishandling weapons. *See Pawlak v. Mayer,* 62 N.W.2d 572 (Wis. 1954) (finding father not liable for plaintiff's eye injuries because he could not have reasonably anticipated that his son would violate his instruction and give the hidden air rifle to a friend and use it in a reckless manner).

37. Making matters worse, Joshua and Kurtis Popp decided against launching it by the lake. Instead, they launched it in a residential neighborhood adjacent to a commercial area. This constitutes gross recklessness and is not the foreseeable behavior of a trained Marine. Yet as a direct result of that fateful decision, Kurtis improperly launched the flare at an angled trajectory directly at the Patrick Cudahy plant. The negligent ignition was apparently not contemplated by Joshua Popp, as he admitted that when he saw the trajectory of the flare, he immediately responded, "What are you doing?" The decision to launch the flare near private property caused the fire.

38. Joshua and Kurtis Popp were convicted of Recklessly Endangering Safety (Second Degree), §941.30(2), §939.50(3)(g).

39. The recovery sought by Smithfield and its insurers is wholly out of proportion to the United States' culpability. Plaintiffs seek $326 million as a result of the United States being unable to prevent a Marine from stealing a flare from a military base. The extent of damages claimed by Plaintiffs underscores the recklessness of the Popps, rather than the liability of the United States.

67

This is particularly so given that Joshua Popp was not exiting a training area where munitions are routinely issued, expended, and recovered. To hold the United States liable for millions of dollars because a corporal trusted one of his subordinates when he was told that he had no ordnance in his pack would be wholly out of proportion to culpability.

40. Plaintiffs' injury is also highly extraordinary. The flare stolen by Joshua Popp could have been fired almost anywhere without causing the damage for which Plaintiffs seek recovery. It could have been fired in thousands of locations in California, Wisconsin, or any state in between without causing such damage. Indeed, if the burning flare had fallen on just about any roof in the neighborhood where it was ignited, it would not have caused the extent of damages alleged in this case. The harm is highly extraordinary given the negligent act.

41. Fourth, allowing recovery for Defendant's failure to prevent the theft of the flare would place an unreasonable burden on the United States. Trusting that Marines will follow orders and not steal ordnance is critical to the success of Twentynine Palms. In 2007, when the United States was preparing for the troop surge in Iraq and the continuing campaign in Afghanistan, every Marine deployed to those theatres first trained at Twentynine Palms. Thousands of Marines were billeted at Camp Wilson as they prepared for overseas deployment. Marines were searched every time they left a live-fire training area, where live ammunition was issued, used, and expended. Holding the government responsible for failing to prevent such theft, in essence, is adopting a strict liability standard. *Dalehite v. United States*, 346 U.S. 15 (1953) ("prohibiting strict liability under the FTCA); *Smith v. United States*, 621 F.2d 873 (7th Cir. 1980) (same). Such an obligation would place an unreasonable burden on the United States.

42. Fifth, allowing recovery on these facts would enter into a field that has no sensible or just stopping point. Plaintiffs have alleged that "even if Mr. Popp's new story is to be believed it does not alter the fact that Defendant violated its own mandatory procedures by failing to search Mr. Popp and/or his pack immediately before he boarded a truck to travel to Main Base." Does

68

that mean the Marines not only have to be search but ushered immediately onto the trucks after the shakedown?  Do searches need to be performed upon leaving Mainside as an extra security measure against theft?  Does the Marine Corp need to place a gate at Camp Wilson to prevent Marines from driving their personal vehicles onto the base to retrieve ordnance?  Could Marines no longer be trusted when signing out ammunition from the Central Magazine Area?

43.     Considering Joshua Popp gave the flare to an untrained person with a criminal record for mishandling weapons, what other acts would be deemed foreseeable?  *See, e.g.,* Nichols v. Progressive Northern Ins. Co., 746 N.W.2d 220, 230 (Wis. 2008) (finding parents not liable for intoxicated teenager causing an accident after drinking in their home because "allowing liability under such circumstances would provide too much potential for the out of control growth of liability").  Without a logical stopping point for how the United States must prevent theft and be accountable for the gross recklessness of former Marines, it cannot be held liable in this case.

44.     Based on these five policy grounds, the Court refuses to impose liability on Defendant.

45.     "If the average consumer would anticipate the dangerous condition of the product and appreciate the risk of injury attendant to the use of the product, it cannot be said to be unreasonably dangerous.  Where a reasonable person in the position of the user of the product would recognize the dangerous condition and the risk of injury, the defect is open and obvious."  *Eichstedt v. Lakefield Arms, Ltd.*, 849 F. Supp. 1287, 1293 (E. D. Wis. 1994) (citations omitted).

# DAMAGES

### *Choice of Law*

47.     Wisconsin's comparative-fault jurisprudence governs this case.  In applying California's governmental-interest analysis with respect to damages, this Court concurs with the decision rendered by Judge Marshall in granting the United States' Motion to Transfer Venue.  A true conflict exists.  Compare Cal. Civ. Code 1431 (joint liability among tortfeasors), and Wis. Stat. Ann. § 895.045 (joint liability for tortfeasors more than 51% liable).  Wisconsin clearly has the greater interest in applying its damages law, as all of the damages at issue occurred there.  Law Apportioning Fault Among Tortfeasors (Wis. Stat. Ann. § 895.045)

48.     "The liability of each person found to be causally negligent whose percentage of casual negligence is less than 51% is limited to the percentage of the total causal negligence attributed to that person.  A person found to be causally negligent whose percentage of causal negligence is 51% or more shall be jointly and severally liable for the damages allowed."  Wis. Stat. Ann. § 895.045.

49.     The Court finds that Joshua Popp must bear the lion's share of liability.  He circumvented numerous Marine regulations in hiding the discovered ordnance rather than reporting it.  He acted criminally in stealing the flare and transporting it across state lines.  His criminal behavior continued when he acted in concert with his brother to ignite the flare in a residential neighboring directly adjacent to a commercial area.  This underscores that the vast apportionment of fault must be directed at Joshua Popp.

50.     Kurtis Popp must also assume substantial liability.  He too acted criminally in igniting the flare in a residential neighborhood directly adjacent to a commercial area.  He was criminally prosecuted and sentenced.  His liability should be commensurate with his criminal conduct.

51.     To any extent the United States may be held liable in this case, its apportionment of fault must be infinitesimal in comparison to the liability of Joshua and Kurtis Popp.

### *Patrick Cudahy, Inc., Real-Estate Claims*

52.     United States' expert Randal D. Dawson, a real-estate appraiser with 25 years' experience and specific familiarity with the Milwaukee real-estate market and valuing food-processing facilities, is well qualified to offer opinions as to the diminution in value of Patrick Cudahy's real property as a result of fire at issue in this case.  Fed. R. Evid. 702

53.     United States' expert Richard Marchitelli, a real-estate appraiser with over forty years' experience is a nationwide leader in real-estate appraisal standards and practice and is well qualified to offer opinions on the appraisal report Plaintiffs' expert Steven M. DeCaster produced.  Fed. R. Evid. 702

54.     Wisconsin law has long held that damages caused by partial destruction of property can be determined one of two ways: either (1) "the evidence of the amount it would cost to repair the building" or (2) "the amount of its diminished value by reason of the damages."  *Hickman v. Wellauer,* 171 N.W. 635, 639 (Wi. 1919); *see also, Engel v. Dunn County*, 77 N.W.2d 408 (1956); *Bunker v. City of Hudson*, 99 N.W. 448, 452 (Wi. 1904).

55.     The plaintiff is only allowed "the lesser of the two amounts."  *Hickman*, 171 N.W. at 639.

56.     Under Wisconsin law, by merely giving a fair-market value of Patrick Cudahy's real property before the fire, Plaintiffs have failed to produce evidence as to the effect of the alleged damages on the property.  *See Cianciola, LLP v. Milwaukee Metro Sewerage Dist.*, 796 N.W.2d 806 (Wisc. App. 2011) (finding merely estimating fair-market value insufficient to measure "the effect of damages on the fair market value").

57. Accordingly, because the United States presented the only evidence concerning the real estate's diminution in value as a result of the fire and that amount is substantially less than the cost of repair, this Court determines that is the measure of damages to the real property. *See Hickman v. Wellauer,* 171 N.W. 635, 639 (Wi. 1919); *Milwaukee Metro Sewerage Dist.,* 796 N.W.2d 806; *Blodgett v. State Farm Mut. Auto. Ins. Co.,* No. 01-1572, 2002 WL 664157, at *1 (Wisc. App. April 24, 2002).

### Personal-Property Claims

58. The starting point for measure of damages to personal property is the fair market value of the property at the time and place of its destruction. *See United States v. Crown Equip. Corp.,* 86 F.3d 700, 707 (7th Cir. 1996).

59. Fair market value is that price "arrived at between a willing but not obligated buyer and seller." *Schwalbach v. Antigo Electric & Gas, Inc.,* 135 N.W.2d 263, 268 (Wisc. 1965).

60. In situations in which destroyed property has no ascertainable market value, the measure of damages is the value to the owner of the property. *Eastman Industries v. Norlen, Inc.,* 538 F.Supp.2d 1069, 1072 (W.D. Wisc. 2008) (citing *Town of Fifield v. State Farm Mutual Automobile Ins. Co.,* 349 N.W.2d 684, 688 (Wisc. 1984)).

61. It is always, "the value to the owner, the injured party, that is the measure of damages, but market value is just one way to measure damages." *Town of Fifield v. State Farm Mutual Automobile Ins.* Co., 349 N.W.2d 684, 688 (Wisc. 1984).

62. Many factors may be considered in determining the value of the owner such as "the original cost less depreciation; the age of the property; the property's use and utility; the property's condition; and the continued usefulness of the property." *Eastman Industries v. Norlen, Inc.,* 538 F.Supp.2d 1069, 1072 (W.D. Wisc. 2008).

63.     In the absence of fair-market value, "the replacement cost less depreciation method of determining fair market value is commonly used and is permissible." *Schwalbach v. Antigo Electric & Gas, Inc.*, 135 N.W.2d 263, 268 (Wisc. 1965).

**Lost-Profit Claims**

64.     Plaintiffs "had a duty to mitigate damages, that is, to use reasonable means under the circumstances to avoid or minimize the damages." *Kuhlman, Inc. v. G. Heileman Brewing Co.,* 266 N.W.2d 382, 384 (Wis. 1978); *accord Howard v. State Farm Mut. Auto. Liab. Ins. Co.,* 236 N.W.2d 643, 647 (Wis. 1975) *Lakeside Packing Co. v. Minneapolis, St. Paul & Sault Ste. Marie Ry.,* 203 N.W. 334, 337 (1925); *S.C. Johnson & Son, Inc. v. Morris,* 779 N.W.2d 19, 28 (Wis. Ct. App. 2009).

65.     Plaintiffs' duty to mitigate was "the active duty of using all ordinary care and making all reasonable exertions to render the injury as light as possible." *Thurner Heat Treating Co. v. Memco, Inc.,* 30 N.W.2d 228, 233 (Wis. 1947); *accord Handicapped Children's Educ. Bd. v. Lukaszewski,* 332 N.W.2d 774, 779 (Wis. 1983) ("injured party must take all reasonable steps to mitigate damages"); *Poposkey v. Munkwitz,* 32 N.W. 35, 39 (Wis. 1887) (requiring "all reasonable effort to reduce to a minimum the damages").

66.     Plaintiffs had "wide latitude" to decide how best to minimize the damages. *Kuhlman,* 266 N.W.2d at 385. *Cf. Bigelow v. Chicago, B. & N. Ry.,* 80 N.W. 95, 98 (Wis. 1899) (concluding plaintiff should have broadened mitigation efforts after initial unsuccessful efforts).

67.     Expenses for hosting PCI's S.A.P. accounting records were expenses that Plaintiffs did not incur during the period of the delay in implementation, which Plaintiffs attribute to the fire. Those unrealized expenses are properly deducted as an offset from the damages. *See Morley-Murphy Co. v. Zenith Elecs. Corp.,* 142 F.3d 373, 382 (7th Cir. 1998); *Thorp Sales Corp. v. Gyuro Grading Co.,* 331 N.W.2d 342, 347 (Wis. 1983); *First Wis. Land Corp. v. Bechtel Corp.,* 235 N.W.2d 288, 292 (Wis. 1975) (noting savings of cost of growing damaged crop to maturity).

73

68. Smithfield Foods met its "active duty" to mitigate damages and "render the injury as light as possible" by taking a variety of actions that involved other Smithfield operating units and third-party manufacturers.

69. By moving production of affected products to other Smithfield facilities and to outside suppliers, Smithfield Foods mitigated its loss of profits, reducing the loss to $26,583,655, as demonstrated by Defendant's expert Robert J. Traven.

70. Smithfield Foods further mitigated its damages by investing capital in other operating units instead of using it to repair and replace the lost capacity at the Cudahy plant. Smithfield's decision to mitigate by increasing production and profits at non-PCI operating units was reasonable, based on the greater sales and income that could be generated at non-PCI operating units. Smithfield's capital investments in other operating units yielded profits totaling $30,169,855 during the 32-month period after the fire. After that period, Smithfield generated profits totaling $29.1 million annually from its post-fire capital investments.

71. Smithfield had fully recovered from the fire and was no longer incurring fire-related losses by February 2012, when the lost production facilities could have been replaced and production restored at the Cudahy plant if Smithfield had chosen to mitigate in that way.

72. Since Smithfield met its duty to mitigate in other ways, any possible loss that might have continued after February 2012 is too speculative to calculate. Those speculative losses include putative lost profits on sales to customers who left and did not come back. Whether those customers would have come back if Smithfield had rebuilt and restored the Cudahy plant to its pre-fire production status is unascertainable, given the means of mitigation that Smithfield employed.

73. To the extent that losses from the permanent loss of customers extended beyond February 2012, those losses are too uncertain to support an award of damages for them.

74.    Profits from post-fire capital investments in Smithfield's operating units constitute an offset to the damages resulting from the fire, as Smithfield made those investments to fulfill its active duty to tender the injury as light as possible.

75.    Smithfield Foods incurred inventory losses totaling $4,033,022 from the fire, as demonstrated by Defendant's expert Robert J. Traven.

76.    Smithfield Foods incurred emergency property-damage expenses in the immediate aftermath of the fire in the amount of $4,041,357, as demonstrated by Defendant's expert Robert J. Traven.

77.    Smithfield's business-interruption loss—comprising lost profits, lost inventory, and certain property damages evaluated by the parties' accounting experts—was reduced to $4,488,179 as a result of Smithfield's mitigation efforts.

.

Respectfully submitted,

JAMES G. TOUHEY, JR.
Director, Torts Branch

RUPERT M. MITSCH
Assistant Director

ROBIN DOYLE SMITH
Senior Trial Counsel

J. STEVEN JARREAU
Trial Attorney

PAUL D. STERN
Trial Attorney

*/s/ John A. Woodcock*
JOHN A. WOODCOCK
Trial Attorney
Civil Division, Torts Branch
United States Department of Justice
P.O. Box 888
Benjamin Franklin Station
Washington, D.C. 20004
Telephone: (202) 616-4233
Facsimile: (202) 616-5200
Jack.woodcock@usdoj.gov
*Attorneys for the United States*

Dated: June 11, 2015