# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

SMITHFIELD FOODS INC., et. al.,

    **Plaintiffs,**

    **vs.**

**UNITED STATES OF AMERICA,**

    **Defendant.**

Case No. 13-C-651

HON. RUDOLPH T. RANDA

---

## PLAINTIFFS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

---

Submitted by:

Todd B. Denenberg
(admitted in the E.D. Wisconsin)
*tdenenberg@dt-law.com*

Charles R. Tuffley
(admitted Pro Hac Vice)
*ctuffley@dt-law.com*

Alyssa J. Endelman
(admitted in the E.D. Wisconsin)
*aendelman@dt-law.com*

DENENBERG TUFFLEY, PLLC
28411 Northwestern Highway, Suite 600
Southfield, MI 48034
PH: (248) 549-3900
FX: (248) 593-5808

Attorneys for Plaintiffs

# I. <u>INTRODUCTION</u>

1.      This is a negligence action brought by Plaintiffs, Smithfield Foods, Inc. and its property insurers (collectively referred to as "Plaintiffs"), against Defendant United States of America ("Defendant") under the Federal Tort Claims Act ("FTCA").  28 U.S.C. §§2671, *et seq*.

2.      Plaintiffs' action arises from a July 5, 2009 fire at the Patrick Cudahy, Inc. ("PCI") pork processing facility in Cudahy, Wisconsin ("the Cudahy Facility").

3.      The fire was ignited by a M125 green star cluster flare ("the M125 Flare"), stolen in 2007 from the Twentynine Palms United States Marine Corps Air Ground Combat Center ("Twentynine Palms Base") in San Bernardino County, California.

4.      The M125 Flare was stolen by Joshua Popp, who at the time was a Marine training at Twentynine Palms Base.

5.      In 2009, PCI was a subsidiary of John Morrell and Company.  John Morrell and Company was a subsidiary of Smithfield Foods.  Tr. 11/16/15--Otis p. 61.  Prior to the fire, Smithfield Food underwent a re-organziation wherein its independent operating companies were realigned.  As a result, PCI went from being a subsidiary of Smithfield Foods to a subsidiary of John Morrell & Company (which was a subsidiary of Smithfield). William "Bill" Otis, president of PCI at the time of the fire, testified that the re-organization had no impact on production at PCI.  Tr. 11/16/15—Otis, p. 59.

6.      At the time of the fire, the Plaintiff Insurers provided property insurance coverage for Smithfield Foods, Inc., which included the Cudahy Facility. Tr. 11/16/15—Stevens, p. 112.

7.      As a result of the fire, the Plaintiff Insurers paid $208,000,000 to Smithfield pursuant to the all-risk property policy coverage in place.  Tr. 11/16/15--Stevens pp. 112-113.

8. Plaintiffs' negligence claim is properly before the Court, as (per the FTCA) Plaintiffs exhausted their administrative remedies prior to timely filing this action. Specifically, Plaintiffs timely served notice of their claim on the U.S. Department of Navy, and that claim was subsequently denied by Defendant.

9. Plaintiffs and Defendant previously reached a settlement regarding liability. There is also a dispute regarding the applicability and/or impact of the Anti-Assignment Act, 31 U.S.C. §3727, on Plaintiffs' claims, but that will be resolved by the Court based on a motion filed by Defendant. Consequently, the only issues tried concerned damages.

10. Starting on November 16, 2015, the Court conducted a six day bench trial regarding Plaintiffs' damages arising out of the fire. Based on the testimony and evidence presented to the Court, its Findings of Fact and Conclusions of Law are as follows.

## II. FINDINGS OF FACT

### A. The Cudahy Facility

11. At the time of the fire, the Cudahy Facility was over 1.2 million square feet. Tr. 11/18/15—DeCaster, pg. 495. It employed approximately 1,400 persons, producing microwave bacon, bacon bits which are also referred to as toppings, cooked hams, sliced hams, precooked sausage, dry sausage, sliced dry sausage and lard. Tr. 11/16/15--Otis p. 108.

12. The Facility was composed of a single large building divided into numerous zones (although at times a particular "zone" is referred to as a "building") with construction dating back to 1895. Numerous additions were added to the facility in 1911, 1912, 1915, 1922, 1930, 1945, 1946, 1949, 1950, 1961, 1985, 2000, 2001 and 2004. Joint Trial Exhibit 230, p. 22.

13. Even though construction dated back to 1895 and did not incorporate a modern food processing facility design, PCI still put in efficient equipment, maintained it and invested in

2

it over the years to make it even more efficient and provide greater throughputs. Tr. 11/16/15—Otis, p. 105.

**B.**    **The Fire**

14.    As a result of the July 5, 2009 fire, over 300,000 of useable square feet of the Cudahy Facility was destroyed. This included Zones A, B, C, D, E, F, Q and W, also referred to as the South Plant. Plaintiffs' Trial Exhibit 505.

15.    The Facility also suffered significant business personal property damage:

     a.    All of the Facility's ham processing equipment was destroyed, along with 6 of its 10 microwave bacon lines (including its only two bacon topping lines, used to make bacon bits). Tr. 11/17/15—Amacher, p. 217.

     b.    PCI's packaging and labels, which were unique to PCI's SKUs (stock keeping units), were destroyed. Tr. 11/17/15—Matthews, p. 332.

     c.    Substantial amounts of inventory, both ready for shipment and in process, were destroyed or contaminated. Tr. 11/16/15-- Amacher, p. 199.

16.    There are four general types of damage Plaintiffs' contend resulted from the fire -- real property damage, business personal property damage, lost business/profits and extra expenses. The Court's findings regarding each are set out below.

**C.**    **Real Property Damage**

17.    While various parts of the Cudahy Facility were extensively damaged by the fire, the Facility was not a total loss.

18.    Plaintiffs' real estate appraisal expert, Steven DeCaster, conducted two appraisals of the Cudahy facility. The first appraisal occurred in 2005 to estimate the market value as of January 1, 2003 and January 1, 2004 for property tax assessment purposes. This appraisal valued

3

the facility at $10,360,000 for both 2003 and 2004. Joint Trial Exhibit 231, pg. 32 and Tr. 11/18/15—DeCaster, pp. 461-462. A second appraisal was conducted in 2015 for the purposes of appraising the fair market value of the Cudahy facility on July 4, 2009, the day before the fire. He determined the fair market value of the Cudahy facility to be $11,275.000. Joint Trial Exhibit 230, p. 8 and Tr. 11/18/15—DeCaster, p. 484.

19. The second appraisal which estimated the retrospective market value for July 4, 2009 took into account increased square footage. The usable square footage appraised increased from 902,300 square feet to 983,316 square feet. This increase recognizes a 9% gain in square footage. Joint Trial Exhibit 230.

20. Both the 2005 and 2009 appraisals resulted in a estimated value per square foot price of $11.50. The difference between the 2005 and 2009 appraisals is 9% which represents the increased value due to the increased square footage. Joint Trial Exhibits 230 and 231.

21. The square footage value was calculated using the sales comparisons of similar large industrial food processing properties. In selecting the sales comparison properties, Plaintiffs' expert considered a variety of factors including age, condition, location and size and then made adjustments to determine the inferiority or superiority of the subject project property as compared to the Cudahy facility. After making the adjustments, a value per square foot for the subject property was determined. Joint Trial Exhibit 230, p. 32 and Tr. 11/18/15—DeCaster, pp. 471-473. The selection of sales comparisons is subjective and based on experience. Tr. 11/18/15—DeCaster, p. 471.

22. The calculation adjustment used by DeCaster in determining the value per square foot utilized the subject property, PCI, as the unknown, as opposed to the sales comparable property being treated as the unknown. This calculation is a better process as it is more precise

4

for this type of property.  This methodology has been used by other appraisers, written about in texts and accepted in various courts.  Tr. 11/18/15—DeCaster, pp. 479-482

23.     Unlike Defendant's expert, DeCaster did not conduct a valuation of the land. Defendant's land valuation is overstated as it used land sales that were years removed from the July 2009 valuation date and did not examine available property in the Cudahy industrial land market.  Tr. 11/18/15—DeCaster, pp. 490-491.  Specifically, DeCaster testified that, in his investigation, he learned of available property adjacent to the Cudahy facility which was available for sale for years.  He also learned of a program wherein the Cudahy Development Authority subsidizes up to 95% of the land's value if a buyer will develop the property.  Tr. 11/18/15—DeCaster, pp. 483-484.

24.     As discussed in greater detail below in the Court's Conclusions of Law, the measure of damages to real property (like the Cudahy Facility) which is repairable is the lesser of (a) the cost of repairs, not to exceed the fair market value of the property; and (b) the diminution in fair market value of the property immediately before and after the fire.

25.     The evidence shows that the cost of repair exceeds $80,000,000. (See MKA report which values the cost of repairs at $83,960,000, Joint Trial Exhibit 114 and the Epstein report which values the cost of repairs at $109,248,000, Joint Trial Exhibit 197).

26.     Because, under the law, Plaintiffs cannot recover more than the pre-loss fair market value of the Facility and Plaintiffs' expert presented evidence that the fair market value of the Facility prior to the fire was $11,275,000—the Court finds that the maximum recoverable damages under the cost of repairs analysis is $11,275,000.

27.     Defendant relied solely upon the diminution in fair market value rule in its analysis. Defendant's expert opined that the pre-fire fair market value of the Facility was

$5,175,000, calculated as his view of the property value ($8,825,000) less the contributory value of the land ($3,650,000). Defendant's expert opined that the post-fire fair market value of the facility was $2,175,000, calculated as his view of the property value ($5,825,000) less the contributory value of the land ($3,650,000). As such, Defendant contends that the diminution in fair market value of the land before and after the fire is $3,000,000.

28.     Plaintiffs likewise can calculate the diminution in fair market value of the land before and after the fire. The evidence supports that the per-square-foot value of the Facility is $11.50 and 332,742 square feet of the Facility was damaged due to the Fire.  Therefore, Plaintiffs contend that $3,826,533 worth of property was lost due to the fire (332,742 sq. ft. x $11.50). As a result, Plaintiffs maintain that the diminution in fair market value of the property as a result of the fire is $3,826,533.

29.     The Court finds that there are several problems with the real property damage number presented by Defendant. For various reasons, Defendant's pre-fire fair market valuation of the Cudahy Facility is not as accurate as Plaintiffs' valuation. First, Defendant's expert uses a greatly inflated value for the land itself.  Second, Defendant's expert's appraisal is less than the tax valuation done in 2005.  Tr. 11/18/15—DeCaster, p. 503.  Defendant's expert, Dawson, admits that tax valuations are usually less than the fair market value.  Tr. 11/23/15—Dawson, pg. 1016.  The $11.50 per square footage price is consistent with the 2003 and 2004 appraisals which were conducted for the purpose of obtaining a reduction in taxes.

30.     As a result, the Court finds that Plaintiffs' valuation of $3,826,533 is the correct measure of damages for the diminution in fair market value of the Facility.

31.     Since the correct measure of damages for loss of real property is the lesser of the cost to repair the property ($83,960,000, capped at the fair market value of the property -

6

$11,275,000 – per the Court rule) and the fair market value diminution of the property ($3,826,533), the Court finds that the correct measure of damages for loss of real property is $3,826,533.

### D.    Business Personal Property Damage

32.    PCI's most significant loss arising out of the fire was production equipment which related to the food production processes at PCI.  As a result of the fire, approximately 2,800 pieces of PCI's production equipment was damaged or (more often) destroyed.

33.    The Court finds that prior to the fire, in terms of functionality and productivity, the equipment was operating better than new based on the following:

      a.    The equipment was well maintained through preventative and predictive maintenance programs.  PCI utilized several programs to maintain the operation of their equipment.  For example, TabWare was a software package that scheduled maintenance to keep equipment operating at a top quality basis.  Smart Plan was an internal initiative for PCI personnel to develop and make recommendations on ways to either modify or upgrade equipment in an effort to reduce operating costs and increase productivity of the machines.  Tr. 11/18/15-- Schwenk, pp. 380-381.  In 2009, PCI scored in the top 6 or 7 out of Smithfield's 36 facilities.  In 2012, PCI was in first place out of all the Smithfield facilities.  Tr. 11/16/15—Bridges, pp.136-137.

      b.    The majority of the equipment was made of stainless steel which is corrosion resistant and not subject to physical depreciation.  The USDA, which inspected the site daily, required daily cleaning and sanitation to

reduce contamination, ensuring the equipment's cleanliness and increasing the life expectancy of the equipment. Tr. 11/16/15—Bridges, p. 139, Tr. 11/18/15--Schwenk, p. 438 and Joint Trial Exhibit 73.

c.    PCI maintained the performance levels of its equipment through parts replacement. Tr. 11/16/15—Bridges, p. 172. If parts were not available from the original equipment manufacturer, the equipment was not deemed obsolete. In the meat industry, there are pirate shops which manufacturer the needed parts to maintain equipment. Tr. 11/16/15—Bridges, p. 177.

d.    At the time of the fire, the equipment was only down 4% of the time. In the eyes of the food industry, 3% downtime is considered world class. For PCI, 3% downtime means the equipment runs as designed by the equipment manufacturer. In other words, the equipment produces the product that it was required to produce, at the same quality as though it was day one. Tr. 11/16/15--Amacher, p. 184 and Tr. 11/16/15--Bridges pp. 133-135.

e.    PCI's program called T-Max regularly looked at information regarding productivity and efficiencies of the equipment. Testimony demonstrated that the T-Max data showed that much of the equipment was operating at productivity levels and efficiencies that were better than the new equipment when it was first installed. Tr. 11/17/15--Schwenk, pp. 381-382.

34.    Based on the functionality and productivity of the equipment, prior to the fire, PCI had no intention to replace the ham processing equipment or the microwave bacon

8

equipment. Tr. 11/16/15—Bridges, p. 140 and Tr. 11/16/15--Amacher, p. 184. In fact, PCI does not replace process equipment based on age and typically only replaces equipment for a specific reason such as a particular improvement. Tr. 11/16/15--Amacher, pp. 182-183.

35.     The equipment at PCI is specialty equipment built specifically for PCI's facility, processes and the packaging requirements of PCI's customers. Tr. 11/16/15-- Amacher, pg 200.

36.     Ninety percent (90%) of the damaged equipment was considered custom equipment and there was no secondary market for custom equipment (a fact conceded by Defendant). In other words, used equipment is unavailable to replace the destroyed custom equipment. New equipment had to be purchased to replace the existing equipment. Tr. 11/16/15--Amacher p. 200 and Tr. 11/20/15—Ewing, p. 910.

37.     In calculating their claimed production equipment loss, Plaintiffs valued i) standard damaged or destroyed equipment which was available on the used market at fair market value, and ii) custom equipment at replacement cost plus installation, etc.

38.     The total damage figure included the costs necessary to put PCI back into the position it was prior to the fire and represented the value of the equipment to PCI. Plaintiffs' resulting damage number (amply supported by the evidence presented at trial) is $80,872,531. The breakdown of this figure is as follows:

| | |
|---|---|
| Equipment: | $29,632,395 |
| MEP (Mechanical Electrical and Plumbing): | $21,590,970 |
| Installation Labor: | $ 7,824,112 |
| Commissioning/Sanitation: | $ 5,802,071 |
| Engineering: | $ 2,985,312 |
| Freight: | $ 1,768,996 |
| Material Escalation: | $ 1,148,215 |
| Equipment Re-Installation: | $ 1,501,821 |
| Bond and Insurance: | $ 1,269,330 |
| Overhead: | $ 2,940,929 |
| Profit: | $ 2,938,513 |

Program Mgt. Fees:            $  1,470,464

39.    Defendant offered no evidence contradicting the above costs.  The only evidence as to these costs is the testimony and report of Plaintiffs' expert, Jeff Schwenk.  Joint Trial Exhibits 73 and 74.

40.    These costs were strictly related to the food production processes at PCI and were necessary for the Cudahy facility to operate.  Joint Trial Exhibit 74 and Tr. 11/17/15—Schwenk, p. 390.  More specifically, these costs are described as follows:

     a.    The MEP costs signify the mechanical, electrical and plumbing necessary to operate the food production processes at PCI.  Tr. 11/17/15—Schwenk, p. 370.

     b.    The material escalation costs signify the increase in cost of material during construction due to the length of the project.  Joint Trial  Exhibit 73.

     c.    The engineering costs signify, among other things, the necessary engineering review of equipment configuration and compatibility, review of USDA standards, reviews of industry standards, review of Smithfield specifications, and design and documentation drawings for the processes.  Joint Trial Exhibit 73 and Tr. 11/17/15—Schwenk, pp. 375-376.

     d.    The commissioning and sanitation costs signify, among other things, equipment start-up costs, labor, assuring pre-loss operating conditions for each SKU, and necessary USDA and Smithfield sanitation procedures for start-up.  Joint Trial Exhibit 73 and Tr. 11/17/15—Schwenk, p. 376.

     e.    The installation labor/supervision/coordination costs signify, among other things, planning and preparation with client engineering representatives,

10

project scheduling, safety meetings, safety equipment, supervision and management. Joint Trial Exhibit 73 and Tr/ 11/17/15—Schwenk, p. 376.

41.     Defendant's expert, Mark Ewing ("Ewing"), was retained to determine and approximate the fair market value for the equipment damaged in the fire. This was the first case that Ewing had been retained to provide a fair market value opinion. Ewing has never previously testified or been qualified as an expert on fair market value. In fact, 90% of Ewing's assignments are under first party property policies for insurers where replacement cost and actual cash values are the measures of damage for equipment. Tr. 11/20/15—Ewing, p. 891.

42.     Ewing agreed with Plaintiffs' expert that the majority of the equipment was not available in the used market. Specifically, Ewing testified that he could only obtain used prices for 10% or less of the property destroyed or damaged in the fire. Tr. 11/20/15—Ewing, p. 897.

43.     In the absence of locating used equipment, Ewing testified that the actual cash value is a good approximation of the fair market value or the value of the used equipment. Tr. 11/20/15—Ewing, pp. 909-910.. However, Ewing agreed that actual cash value is only one of many factors that might be utilized to arrive at fair market value. Tr. 11/20/15—Ewing, pp. 900.

44.     Ewing does not dispute the replacement cost values determined by Plaintiffs' expert, Jeffrey Schwenk. Tr. 11/20/15—Ewing, p. 899. Ewing's replacement cost value of the equipment is $31,316,603. Tr. 11/20/15—Ewing, p. 898.

45.     In the overwhelming number of cases where Ewing has evaluated equipment, he has included the cost of installation. Tr. 11/20/15—Ewing, p. 902. Ewing failed to account for the costs of installation because calculating those costs was not part of his assignment. Tr. 11/20/15—Ewing, p. 903. Therefore, he did not follow his usual methodology in valuing PCI's equipment. His usual valuation methodology is the same as PCI's expert.

11

46.     Ewing prepared an estimate of the time necessary to install, sanitize and commission the equipment which was incorporated into the Madsen Kneppers and Associates timeline. However, he did not convert that time into costs in his evaluation because it was not part of his assignment. Tr. 11/20/15—Ewing, p. 903.

47.     Significantly, Ewing agreed that his fair market value analysis would not put PCI back into the same position it was on July 5, 2009 because it does not include any costs associated with installing the equipment. Tr. 11/20/15—Ewing, pp. 902-903 and 914. Therefore, under Ewing's cost estimate analysis, the equipment would not be operational. Tr. 11/20/15—Ewing, pp. 914-915.

48.     If Ewing's analysis included the cost in connecting the equipment, mechanical, electrical, plumbing, sanitation, cold commissioning and hot commissioning, his evaluation would be increased by the undisputed installation costs set out in Tr. 11/20/15, Ewing, p. 904. However, Ewing did not calculate the actual costs since he was not asked to do so. Tr. 11/20/15—Ewing, p. 903.

49.     Defendant's "fair market valuation" of all the damaged/destroyed production equipment is $14,000.000. The Court finds that Defendant's position does not reflect the proper measure of Plaintiffs' equipment loss and is incomplete. Defendant's expert mistakenly valued the custom equipment at fair market value which is contrary to the measure of damages under Wisconsin law.

50.     The Court finds that the proper measure of PCI's loss is the value of PCI's custom process equipment to PCI which is replacement cost plus installation and related costs. David Amacher testified that the value of the custom equipment to PCI is replacement plus installation.

Tr. 11/16/15—Amacher, pp. 200-201. Ewing did not attempt to determine the value of the custom equipment to PCI. Tr. 11/20/15—Ewing, pp. 909-910.

E. **Other Property Damage**

51. As a direct result of the fire, PCI incurred expenses for the initial costs for protecting and preserving the property, debris removal, demolition and temporary property repairs and personal property replacement necessary to continue the business.

    a. Demolition started in July 2009 and continued through early February 2010. Tr. 11/16/15—Bridges, p. 156. As part of the demolition process, PCI was charged for idle time by Champion Environmental Services while its equipment sat idle pending decisions by or on behalf of PCI. Idle time is standard during any construction project and this time related to the fact that there was a fire. Tr. 11/18/15—Meyer, p. 550. Defendant erroneously omitted costs for idle time in the amount of $269,778. The source documentation for these costs is included in Joint Trial Exhibit 72 in the PDF named "Invoice Support _ 091010 pp. 9501-10637. These costs are also included in Joint Trial Exhibit 158, PDF file "PD-Expenses" p. 1.

    b. Temporary repairs were necessary for the utilities, including electrical and refrigeration, to get unaffected areas of the PCI facility back up and running. Tr. 11/16/15—Bridges, pp. 150-152. Defendant wrongfully omitted $579,921 which includes the entirety of the costs related to temporary property repairs. These costs are included in Joint Trial Exhibit 71. The source documentation for these costs is found in Joint

13

Trial Exhibit 158, PDF file "PD-Expenses," PD Summary tab cell G34 (specific line detail can be found in the same file, pp 18-19).

    c.    Repairs of switchgear were also necessary because the switchgear was damaged in the fire. It was necessary to make these repairs in order to get power back to the undamaged parts of the Cudahy facility, including areas with refrigeration. Tr. 11/18/15—Meyer, pp. 549-550. Defendant omitted costs for damaged switchgear in the amount of $383,735. These costs are included in Joint Trial Exhibit 71. The source documentation supporting these costs is included in support _091010 pp. 9501-1067.

    d.    Plaintiffs presented sufficient evidence that these recoverable costs total $5,299,178.00.

52.    Plaintiffs also presented evidence that, as a direct result of the fire, PCI lost inventory (both finished and work-in-process) and supplies in the amount of $4,948,791.00. Defendant's own damage numbers do not significantly differ from this figure.

53.    The most significant component of inventory loss omitted by Defendant's expert, Robert Traven ("Traven"), were supplies in the amount of $822,365. These supplies were undamaged, but not useable and rendered obsolete by the fire. David Schulz ("Schulz"), the controller of PCI, testified that the supplies were used in connection with products which could no longer be produced because the process equipment which produced the products were destroyed in the fire. The supplies were sized or related to actual machines destroyed. Further, a lot of these supplies had PCI's establishment number on them and could not be used in production anywhere else. Tr. 11/17/15—Schulz, pp. 245-246. In fact, Traven testified that obsolete inventory can be a loss and conceptually the cost would be recoverable. Tr. 11/23/15--

14

Traven p. 1136. Traven also testified that he has no reason to believe that Schulz was not telling the truth when he talked about the supplies. Tr. 11/23/15—Traven p. 1163. The supplies and values are described in detail and included in the Expert Report of Harold Meyer in Exhibit N7.4, N7.4a and N7.4b of Joint Trial Exhibit 70. They are also described in detail on tab INV-2C of Joint Trial Exhibit 157, and the total amount of theses supplies can be found in Cell M514 in Joint Trial Exhibit 157. The Court finds that the $4,948,791.00 for inventory and supply losses is amply supported by the evidence.

## F.   Extra Expenses and Other Costs

54.    In addition to the aforementioned property damages, PCI incurred significant extra expenses, in an effort to continue its operations and mitigates its losses. These expenses included the extra costs associated with trailer rentals, fuel, transportation, shipments, travel and entertainment, freight and packaging, maintenance, storage, supplies, SAP delay and lost cost savings and other miscellaneous costs. Defendant does not dispute that Plaintiffs are entitled to recover emergency property damage expenses in the immediate aftermath of the fire. Defendant's Pre-Trial Report, pg 35. The extra expenses listed by the Plaintiffs total $6,813,977. The extra expenses accepted by Defendant total $4,453,915. The principal differences in the totals are freight and packing of $800,000 and additional SAP changes i.e., changes in the software accounting system, of $984,209.

a.    Additional Freight and Packing Costs. Traven only considered freight and packing costs through February 2012 when his rebuild period ended. Tr. 11/23/15--Traven, p. 1124. Traven admitted that extra freight and packaging costs continued beyond February 2012. Tr. 11/23/15--Traven, pp. 1160-1161. As heretofore discussed, the theoretical period of

15

reconstruction is not a proper measure of damage and the additional extra freight and packaging charges, which Traven admitted continued, are recoverable and should be included as extra expenses.

b. <u>SAP Charges</u>. SAP is an accounting software system which was implemented by PCI and John Morrell, but was delayed as a result of the fire. Tr. 11.23/16--Traven, p. 1126.

Meyer calculated an additional payment made by John Morrell and PCI in the amount of $987,354, which were additional payments and not simply payments which were delayed. Joint Trial Exhibit 66 and Tr. 11/18/15—Meyer, pp. 555-556. Defendant erroneously omitted this expense in its entirety.

c. The Court finds that the Plaintiffs provided evidence that the extra expense claims were $6,813,077 and its estimates and analysis are better supported by the evidence than Defendant.

55. PCI also incurred alternate production costs arising out of the fire consisting of additional costs at sister facilities.

a. Immediately following the fire, Smithfield/PCI shifted some of the production lost at the Cudahy Facility to sister facilities, external producers at PCI's Sioux Center, Iowa facility and converted two toppings lines to mitigate its sales losses caused by the fire. Meyer calculated the alternate production costs as $3,233,838. Traven calculated the alternative production costs as $682,354.

16

b.    The principal difference between the two analyses is $1,967,820, which PCI spent to convert two of its undamaged microwave sliced bacon lines to microwave bacon topping lines to mitigate its topping sales losses because both of its microwave bacon topping lines were destroyed in the fire. For detail relating to the conversion costs, see expert report of Harold V. Meyer in Exhibit G, Tabs G.8 and G.9, Joint Trial Exhibit 56. The source documentation supporting those costs is included in Meyer's report in the folder named "Exhibit G – Source Files."

c.    Traven excluded those costs based on his belief that the conversion costs were included in the equipment losses and are therefore duplicative.

However, Schwenk's equipment loss list does not include the toppings conversion costs. The conversion was not a repair or replacement of damaged equipment but the conversion of two undamaged microwave sliced bacon lines to toppings lines. Therefore, the conversion costs are recoverable as expenses to mitigate PCI's microwave bacon toppings losses. Joint Trial Exhibit 76.

The Court finds that Meyer's calculation in the amount of $3,233,838 is better supported by the evidence.

56.    In addition, PCI incurred significant costs due to production inefficiencies. Meyer estimated the loss due to production inefficiencies as $3,035,572. Traven measured the production inefficiencies as $5,471,879. Plaintiffs accept Traven's measure of production inefficiencies in the amount of $5,471,879.

17

## G.    Incremental Production Costs

57.    The incremental production costs involve the additional costs incurred in producing PCI products at other external facilities.

Meyer calculated those expenses as $2,421,884 while Traven calculated the incremental production costs as $2,327,731.

The difference is the additional cost of lard purchases to make up for the losses of grease produced by the destroyed microwave bacon lines in the amount of $953,114.  According to Traven, the amount "goes in both directions and nets out" to approximately $100,000.

Defendant omitted two significant costs from their incremental costs at sister facilities.

   a.    Traven omitted the extra cost of purchasing lard on the spot market in the amount of $953,114.  Bill Otis, the President of PCI at the time of the fire, testified that since the microwave bacon lines and toppings line were lost in the fire, all of the grease produced by those operations was lost.  As a result, PCI was required to go to the outside market and purchase lard.  Tr. 11/16/15 – Otis p. 46.

   b.    James Matthews, the Senior Vice President of Sales and Marketing of PCI, also testified that lard was purchased on the outside market at additional cost to make up for the lost bacon grease.  Tr. 11/17/15— Matthews, pp. 340-341.

   c.    Of the $2,061,507 lard purchases, $953,114 was from March 12 – April 13, which was also not considered by Traven because the expenses went beyond his February 2012 rebuild schedule.

18

d. These costs are calculated and included in the expert report of Meyer in Exhibit G, Joint Trial Exhibit 63, Tabs G.7, G.7A, G.7B and G.7C. The source documentation supporting the extra cost of lard versus using microwave bacon grease is included in Meyer's report in the Exhibit D – Source files folder, Excel file named "Production Cost Comparison – Refinery."

58. Therefore, the Court finds that Meyer's figure of $2,421,884 is better supported by the evidence than that of Traven.

**H.** <u>**Miscellaneous Losses**</u>

59. Despite PCI's best efforts, some product that was shipped post-fire from the Cudahy facility was either damaged or contaminated. This product was either disposed of or returned, and PCI had to provide its customers with a total of $187,925 in credits. Tr. 11/17/15 – Schulz, pp. 248-250.

60. Defendant's valuation of customer credits of $121,046 omits $66,879 in credits issued to a sister company on the basis that the credits were issued to a sister corporation. Tr. 11/23/15—Traven, pp. 1131. However, as Schulz testified, even if that product was sold to a sister company, the loss would have been sustained at PCI and would have been considered a loss to Smithfield. Tr. 11/17/15—Schulz, pp. 260-261. In any event, PCI/Smithfield lost the value of the product, so it suffered a loss.

61. Due to the fire PCI had to lay off part of its workforce. This resulted in severance payments and increased liabilities to the Wisconsin Unemployment Insurance Fund totaling $1,135,396. Schulz testified to the validity of this loss and the fact that the unemployment

reserve fund was replenished as required by Wisconsin law.  Tr. 11/17/15—Schulz, pp. 247-248; 256-259.

62.     Defendant omitted replenishment of unemployment insurance in the amount of $984,209 despite Traven's testimony that there is conceptually nothing wrong with including it as a recoverable damage.  Tr. 11/23/15--Traven p. 1132.  Further, Traven admitted that if the replenishment of the unemployment account could be demonstrated, it can be added as an expense.  Tr. 11/23/15--Traven pp. 1162.  A summary of the depletion of the Wisconsin Unemployment Insurance reserve fund balance from July 12, 2009 through December 31, 2009 is included in the Expert Report of Harold Meyer in Exhibit L, Joint Trial Exhibit 68.  The source documentation supporting this summary is included in the PDF named "Exhibit L Unemployment Ins & Severance Pay" provided as part of this exhibit.  This summary and amount (cell J34) is also included in Joint Trial Exhibit 154.  The Plaintiffs' loss in the amount of $1,135,366 is valid and therefore the Court considers the expense a recoverable damage.

I.     **Loss of Sales**

63.     In 2009, PCI was on track to produce record profits when the fire interrupted its business.  PCI's earnings were 55% ahead of the prior year.  In 2008, PCI had a record year wherein they exceeded 2007 earnings by roughly 26%.  In 2007, PCI's earnings exceeded those in 2006 by 30%.  Tr. 11/16/15—Otis, p. 52.

64.     As a result of the fire, PCI lost substantial profits, as more fully described below.

65.     Defendant's expert, Traven, projected lost profits on lost sales of $13,375,543.

66.     The principal errors in Traven's projections are as follows:

a.     He arbitrarily cut off his extra expenses and lost profits analysis on February 2012 notwithstanding the fact that PCI continued to incur

20

expenses and lose substantial profits beyond that date. Tr. 11/18/15 – Meyer, p. 566.

b.  February 2012 was a theoretical period of recovery used in a projection by Defendant's expert, William Kriedler of MK&A, in a property insurance context, measuring the time by which PCI could have reconstructed its destroyed buildings, reequipped those buildings, and restarted production. That artificial limitation was not applicable to PCI's extra expenses or loss of profits claims.

c.  Traven's arbitrary recovery cutoff date fails to capture certain losses of sales and profits relating to the fire, including lost customers which extended beyond February 2012 including but not limited to profits of the refinery and the retail and deli channels.

d.  The evidence demonstrates that even if the MK&A period of reconstruction was applicable, it is inconsistent with the reality of the depth of the disaster. According to Gene Bridges, Vice President of Operations and Maintenance and Dave Amacher, Senior Vice President of Operations and Engineering, reconstruction would have not even started until 1-1/2 – 2 years after the fire. Adding that time to MK&A's time line for construction and commissioning could extend the reconstruction process to over fifty months. Tr. 11/16/15—Bridges, pp. 163-164.

e.  According to Traven's report, the difference in the parties' periods of recovery in and of itself represented a $34,000,000 difference between his measure of recovery and that of Meyer.

21

68.     The Court finds that the arbitrary cutoff dates used to measure the period of indemnification under insurance policies is not the measure of loss in the case and does not serve to properly capture all of the recoverable sales and profits that PCI sustained as a result of the fire.

**J**.     **Cooked Hams**

69.     Meyer's measure of lost profits is $4,904,781 for cooked hams while Traven's calculation is $1,921,871. The Court finds that Defendant's analysis is understated for the following reasons:

a.      Traven projected a post fire annual decline of sales of 8%-10%. Dan Kapella currently President of PCI and formerly Vice President of Sales for Food Service testified that the sales dips upon which Traven relied were explained by the loss of one or two products and that the projected annual 8%-10% sales decline was not an accurate projection. Tr. 11/17/15—D.Kapella, pp. 281-283.

b.      Regardless of sales trends, there was a substantial decline of cooked ham sales from the date of the fire through fiscal year 2013. Joint Trial Exhibit 41.

c.      Bud Matthews, Senior Vice President of Sales and Marketing of the retail and deli channels, testified that as a result of the fire, PCI was forced to discontinue 40%-50% of its specialty hams and 124 of its 191 sliced meat products. These sales were lost forever. Tr. 11/17/15—Matthews, pp. 336-337.

d.     Bud Matthews testified that after the fire PCI attempted to satisfy its supermarket customer Roundy's, but after 13 months Roundy's was not satisfied with PCI's post fire service and stopped doing business with PCI. Roundy's represented 17% of PSI's retail/deli channels business. Tr. 11/17/15—Matthews, p. 338.

e.     Bud Matthews testified that before the fire the retail/deli channels were selling 38,000,000–39,000,000 pounds of products per year. However, the post-fire sales in the retail/deli channels never recovered to pre-fire levels. Even as of 2015, the sales of those channels are only anticipated to reach 29,000,000 pounds per year for the current year. Tr. 11/17/15—Matthews, pp. 339-340.

f.     Traven cut off his lost profits loss for cooked hams as of February 2012. The Court finds that by doing so, he failed to capture all of the cooked ham lost profits related to the fire.

g.     Based upon the evidence, the Court finds that Plaintiffs' estimate of lost ham sales in the amount of $4,904,781 is more supported by the evidence than Defendant's estimate.

## K.     <u>Sliced Meats</u>

70.     Plaintiffs' measurement of lost sales for sliced meat is $8,607,573 while Defendant's calculation is $2,445,959. The Court finds that Defendant's analysis is understated for several reasons:

a.     Traven projected a post-annual decline of sales of 8% - 10%. Dan Kapella, currently President of PCI and formerly Vice President of Sales

23

for Food Service, testified that the sales dips relied on by Traven were explained by the loss of a few products and that the projected 8%-10% sales decline was not an accurate projection. Tr. 11/17/15—D. Kapella, pp. 281-283.

b.    Regardless of sales trends, there was a drastic decline in sales of sliced meats from the fire through the fiscal year 2014. Joint Trial Exhibit 41.

c.    Bud Matthews, Senior Vice President of Sales and Marketing of the retail and deli channels, testified that as a result of the fire, PCI was forced to discontinue 124 of its 192 sliced meat products, the sales of which were lost forever. Tr. 11/17/15—Matthews, pp. 336-337.

d.    Bud Matthews testified that when PCI could not produce sliced meats for retail and deli channels, PCI lost shelf space and many customers were lost forever. Tr. 11/17/15—Matthews, p. 338.

e.    Bud Matthews testified that before the fire, the retail/deli channels were selling 38,000,000 – 39,000,000 pounds of product per year. However, the post-fire sales for the retail and deli channels have never recovered to pre-fire levels. Even as of 2015, the sales of the retail and deli channels are expected to reach a post-fire high of 29,000,000 pounds per year. Tr. 11/17/15—Matthews, pp. 339-340.

f.    Traven cut off his lost profits for sliced meats as of February 2012. The Court finds that by doing so, he failed to capture all of the sliced meats lost profits related to the fire.

71.     Based upon the evidence, the Court finds that Plaintiffs' estimate of lost sliced meats profits in the amount of $8,607,573 is more supported by the evidence than Defendant's estimate of $2,445,959.

**L.     Dry Sausage**

72.     Plaintiffs calculated lost profits for dry sausage of $921,768, while Defendant calculated lost profits for dry sausage of $148,432.

73.     The Court finds that Defendant's analysis is flawed because:

a.     Traven arbitrarily stopped measuring lost profits after July 2009 primarily because there was no physical damage to the dry sausage production equipment and inventory levels even when his own projection continues to show a shortfall.  Joint Trial Exhibit 149, Excel file "Sch. 1 – Calculated Lost Margin by Category", Tab '6A', Column H compared to Column K.

b.     Traven fails to consider the permanent loss of the 7-Eleven account for dry sausage with annual sales of $1,700,000 pounds.  Tr. 11/17/15--Dan Kapella, pp. 275-276.

c.     Traven fails to consider lost sales of 800,000 pounds of pepperoni to Subway which may have been only partially made up from sales by sister companies to Subway.  Tr. 11/17/15—D. Kapella, pp. 288-289; Joint Trial Exhibit 40.  In addition, there was a shortfall in dry sausage sales to Subway after the fire.  Joint Trial Exhibit 149, Excel file "Sch. 1 – Calculated Lost Margin by Category, tab '68', cell b186, c186 and d186".

25

d.     Traven fails to consider the effect that quality issues relating to the fire i.e., refrigeration had on sales Tr. 11/17/15—D. Kapella, p. 276.

e.     Traven analysis fails to recognize that lack of physical damage to the equipment or inventory does not eliminate lost sales to disgruntled customers with complaints related to post-fire service and quality.

74.     Therefore, the Court finds that Plaintiffs' estimate of lost profits for dry sausage of $921,768 is better supported by the evidence than Defendant's estimate of $148,432.

**M.     Precooked Sausage**

75.     Plaintiffs' calculated lost profits for precooked sausage to be $1,232,018, while Defendant calculated lost profits for precooked sausage of $722,318.

76.     The Court finds that Defendant's analysis is flawed because:

a.     Traven cuts off his analysis in February 2012; however, instead of considering all precooked sausage products, he limits his lost profits analysis to Oscar Meyer and Maple Leaf products because they were packaged on equipment which was damaged by the fire. By doing so, he fails to recognize that despite production capabilities, PCI lost sales. Tr. 11/19/15--Meyer, pp. 622-624.

b.     An example of lost sales unrelated to production capabilities are those to Sysco after November 2009. Joint Trial Exhibit 204, Excel File "SM – Precooked Sausage Sales Analysis", tab "Pre SAP GM Sub Brand", Cell 135.

c.      Meyer captured all lost precooked sausage profits by analyzing projected sales and actual sales of all precooked sausage products.

77.      Therefore, the Court finds that Plaintiffs' estimate of precooked sausage lost profits of $1,232,018 is better supported by the evidence than Defendant's estimate of $722,318.

## N.      <u>Sliced Dry Sausage</u>

78.      Plaintiffs calculated lost profits for sliced dry sausage of $1,332,526 while Defendant calculated lost profits for sliced dry sausage to be $276,461.

79.      The Court finds that Defendant's analysis is flawed because:

a.      Traven cut his lost profits analysis at September 2009 because of no physical damage and because inventory levels rose. His analysis, once again fails to recognize that sales losses due to quality or service occurred regardless of production capabilities and inventory levels. Tr. 11/19/15 – Meyer, pp. 624-627.

b.      Traven's own projections show a sales shortfall beyond September 2009. Joint Trial Exhibit 149, Excel file "Sch. 1 – Calculated Lost Margin by Category", tab '7A', column h compared to column k].

c.      Meyer's analysis recognizes lost profits beyond September 2009 caused by post-fire quality and service issues and Tr. 11/19/15 – Meyer, pp. 624-627.

80.      Therefore, the Court finds that Plaintiffs' estimate of sliced dry sausage lost profits of $1,332,526 is better supported by the evidence than Defendant's estimate of $276,461.

O.    **Refinery**

81.    Plaintiffs' lost profit figure for the refinery is $2,296,539 while Defendant's figure is $1,701,255.

82.    The Court finds that the principal difference between the two projections is that Traven cut off lost sales as of February 2012.  Tr. 11/23/15--Traven p. 1119.  Traven cut off his projections even though he admitted that his analysis shows that actual sales had not reached his projected levels by February 2012.  Tr. 11/23/15--Traven p. 1118.

83.    Traven's testimony is substantiated by James Matthews, who was responsible for the refinery's sales, and testified that even by 2015 the refinery had not regained its pre-fire sales levels Tr. 11/17/15 – Matthews, p. 341.

84.    The Court finds that by arbitrarily cutting off the refinery lost profits at February 2012, refinery profits are underestimated.  Therefore, the Court finds that Plaintiffs' lost profits caused by the fire for the refinery are $2,296,539 as calculated by Meyer.

P.    **Microwave Bacon – Toppings**

85.    Plaintiffs' projection of lost profits for microwave toppings from the date of the fire to October 2013 is $15,048,377.  Defendant's projection of lost toppings profits from the date of the fire through November 2011 is $4,103,054.  Defendant's projected loss of profits is understated for the following reasons:

a.    Traven's projected growth rate for sales is very low and contrary to the facts; his opinion that Meyer's sales projection was beyond PCI's production capacity is wrong; and his belief that Meyer's projected growth rate due to inadequate capacity is also incorrect.

86. With respect to projected sales growth of toppings, the evidence is:

a. From 2007 to the time of the fire, PCI's profits were rapidly growing, see paragraph 63.

b. Meyer projected toppings sales growth at 18.5% per year which is consistent with PCI's increasing profitability.

c. Actual microwave toppings sales for the fiscal year ending in April 2009 (a few months before the fire) were 6,460,704 pounds as compared to toppings sales of 9,437,995 pounds for the fiscal year ending April 2013. Joint Trial Exhibit 149; Excel file "Sch. 1 – Calculated Lost Margin by Category" tab '2C', cells C177 and G177. That comparison calculates into an <u>actual</u> growth rate of 46% over four years (approx. 10% on an annual basis, <u>even after the fire which completely destroyed PCI's microwave toppings production equipment.</u>

d. The evidence shows that, but for the fire, PCI topping growth would have exceeded 46%. Bud Matthews was in charge of the Costco account. He testified that Costco was very patient with PCI and only purchased what they needed. He said "as Costco grew, we didn't grow with them." It was not until early 2013 when PCI installed a second toppings line when PCI got back to pre-fire levels and Costco sales increased permitting PCI to grow with Costco. Tr. 11/17/15—Matthews, pp. 332-335.

e. PCI sales records of toppings to Costco support Matthews' testimony and therefore the Court finds his testimony credible and convincing. In fiscal year 2009 (ending April 2009), PCI sold Costco 685,580 pounds of

29

microwave toppings. Joint Trial Exhibit 149, Excel file "Sch. 1 – Calculated Lost Margin by Category" tab '2C', cell B25. Sales to Costco more than doubled in fiscal year 2009 (prior to the fire) to 1,615,960 pounds Joint Exhibit 149, Excel file "Sch. 1 – Calculated Lost Margin by Category" tab '2C', Cell 25. In fiscal year 2013, PCI sold Costco 3,635,040 pounds of toppings. Joint Trial Exhibit 149, Excel file "Sch. 1 – Calculated Lost Margin by Category" tab '2C', cell 25. Given the actual sales numbers and the fact that Costco sales were depressed during the recovery period, it is reasonable to infer that the sales to Costco would have been significantly higher had the fire not occurred.

f.  In projecting growth of toppings, the loss of toppings customers is also important. In the industrial and co-manufacturing channels, the biggest disruption of sales was its microwave topping business. Tr. 11/18/15—J, Kapella, p. 303. Joint Trial Exhibit 48 lists the toppings customers which the industrial/co-manufacturing channels lost forever or for several years following the fire: Hotfield – 500,000 pounds, Golden County 1,000,000 pounds, Nation Pizza – 500,000 pounds, ConAgra 300,000 pounds, and Wilshire Farms 40,000 pounds.

g.  Traven's low growth rate is also belied by his opinion that toppings returned to normal levels beginning in December 2011. As heretofore indicated, Bud Matthews testified that the toppings business did not return to normal until early 2013 when PCI installed the second toppings line. Tr. 11/17/15--Bud Matthews, pp. 332-335. Traven's December 2011 cut-

30

off date is the result of his very low growth rate which in turn produces low sales which may equate to equally low sales projections as of December 2011. The evidence indicates that losses occurred well past December 2011 and that the genesis of Traven's opinion i.e., a 5.6% growth rate, is entirely flawed.

   h.    The evidence clearly supports Meyer's projected growth of 18.5% as opposed to Traven's projected growth of only 5.6%.

87.    The Court further finds that Traven's position that Meyer's sales growth of sales of 254,053 pounds per week could not be supported by PCI's capacity of 163,200 pounds per week, Joint Trial Exhibit 144, to be without merit. David Amacher, Senior Vice President of Operations and Engineering, testified that PCI could have converted a third line of toppings so that its capacity to produce approximately 280,000 pounds of toppings per week. Tr. 11/16/15--Amacher, pp. 187-188.

88.    Based upon the evidence, the Court finds the Plaintiffs' estimate of lost toppings profits in the amount of $15,048,337 is better supported by the evidence than Defendant's estimate.

**P.    Microwave – Sliced Bacon**

89.    Meyer's measurement of lost microwave sliced bacon products is $26,000,000 while Traven's analysis is $1,919,378.00. The Court finds that Traven's analysis is understated for several reasons.

   a.    For the period July 5, 2009 (the fire) through February 2011, Traven failed to consider lost sales to Kraft and Subway. Traven ignores that PCI's sales to Subway were dramatically increasing before the fire. Subway

31

microwave bacon slices sales pounds were 3,438,247 in fiscal 2008, growing 24 percent to 4,258,944 sales pounds in fiscal 2009 and then falling to 4,028,944 sales pounds in fiscal 2010 (the year of the fire). In fiscal 2011, Subway microwave bacon slice sales pounds rose 4,907,707 demonstrating that post-fire Subway microwave bacon sales continued their historical increase. Joint Trial Exhibit 149, Excel file "Sch. 1 – Calculated Loss Margin by Category" Tab 2B, Row 44, Columns B, C, D and E. So there were losses post fire.

Traven claims that PCI suffered no losses of Subway business of microwave bacon slices after the fire since microwave sliced bacon was produced at PCI's Sioux City plant and Dan Kapella did not believe there were any sales losses to Subway. (However, Traven misquoted Dan Kapella at Kapella's Deposition: 22-43:11). However, four of PCI's microwave sliced bacon lines were destroyed in the fire and the records definitely show a shortfall in sales of microwave bacon to Subway for the period following the fire.

For the period July 5, 2009 – February 11, 2011, Traven also failed to consider lost sales to Kraft resulting from Kraft's decision to begin producing some microwave sliced bacon immediately after the fire from Sugarcreek which became Kraft's supplier of microwave sliced bacon when the PCI/Kraft contract expired. Tr. 11/19/15-- Meyer, pp. 634-638.

b. Meyer did not consider Burger King after February 2011. He did not do so because Burger King sales were declining prior to the fire, that is

during the base period. The dramatic increase in Burger King's sales occurred in March 2011 when the Kraft business went to Sugarcreek and Burger King business that left Sugarcreek came to PCI. Tr. 11/19/15-- Meyer, p. 641. Therefore, any projection after February 2011 that included the additional Burger King business was the result of a loss of the Kraft business and not the fire. Tr. 11/19/15-- Meyer, p. 642.

However, Traven did continue to consider Burger King business after February 2011. In fact, he testified that in March 2011, there was a significant sales increase in microwave bacon slices to Burger King that was due to PCI taking on the Burger King business. Traven, p. 1063. In fact, Traven stopped measuring the loss of microwave sliced bacon sales at that time because in his opinion, "sales volumes of microwave slices returned to normal projected levels after the loss. Therefore, we have not considered any shortfall for additional volume in this category after February 2011." Exhibit 144, p. 217. Therefore, Traven did not look for any further shortfalls subsequent to February 2011 and did not look beyond March 2011 at the microwave sliced bacon business as a whole. Meyer 746. Meyer did determine, in reviewing the product line as a whole, that there were in fact significant shortfalls in the microwave sliced bacon category which led to significant loss of profits. Tr. 11/19/15-- Meyer, pp. 642-643.

c. The Court finds that by failing to adjust his lost profits per pound number to exclude the low margins of Subway and Kraft, Traven understated the

33

profit PCI would have made from lost sales to higher margin customers between July 5, 2009 and February 2011.

90. The Court finds that Traven failed to consider evidence of lost sales to Subway and Kraft between July 5, 2009 and February 2011 thereby understating the loss of sales for that period.

91. The Court also finds that by failing to adjust his lost profits per pound number to exclude the low margins of Subway and Kraft, Traven understated the profit PCI would have made from lost sales to higher margin customers between July 5, 2009 and February 2011.

92. The Court finds that Traven improperly used the dramatic increase in sales to Burger King in March 2011 (which would not have been contemplated in his loss projection) to conclude that PCI microwave sliced bacon sales had returned to pre-fire levels. As a result, Traven failed to consider any lost sales to other customers after March 2011 whereas Meyer identified shortfalls and substantial loss of profits subsequent to March 2011. Joint Trial Exhibit 56.

93. Therefore, the Court finds that Traven's projection of microwave sliced bacon profits of $26 Million is better supported by the evidence than Traven's estimate of $1,919,378.

Q.     **Microwave Bacon – By Products**

94. Plaintiffs' lost profit figure for microwave bacon – by products is $6,446,792 while Defendant's figure is $2,846,057. Plaintiffs accept Defendant's lost profit figure for microwave bacon – by products of $2,846,057.

34

## R.  **Defendant's Reduction From Profits**

95.  Traven improperly reduced Plaintiffs' profits as follows:

   a.  Traven's measurement of lost profits is inappropriately reduced for indirect labor in the amount of $1,064,145.  For Fiscal years 2011 and 2012, Traven reduced his measurement of lost profits for the Indirect Overhead Labor costs for the quality control and laundry individuals laid off by PCI as a result of the fire as referenced in joint exhibit 149, excel file "Sch. 1 – Calculated Lost Margin by Category" tab "9B-1", Cell Q34.  This reduction assumes that these costs are already included in the variable sales margin they allow, which includes variable profit and fixed indirect costs as referenced in Joint Trial Exhibit 149, excel file "Sch. 1 – Calculated Lost Margin by Category" tab "9A".  The actual fixed indirect costs for Fiscal Years 2011 and 2012 used and allowed by Traven do not include the costs for the quality control and laundry individuals laid off by PCI as a result of the fire, and therefore Traven understates his measurement by reducing it for costs that are not already included in it.

   b.  Traven reduces lost profits by his deduction of what he refers to as saved depreciation expenses, when PCI wrote off destroyed assets from the ham and microwave bacon departments in the amount of $1,173,783.

   This appears to be a legal issue although Plaintiffs have found no legal authority directly on point.

By destroying those assets, Defendants actually removed PCI's ability to expense depreciation relating to those assets which was a loss to PCI and not a savings.

Absent legal authority which supports Traven's position, the Plaintiffs object to his reduction of lost profits.

### III. <u>CONCLUSIONS OF LAW</u>

96.     As this Court recognized in its November 18, 2014 Opinion and Order denying Defendant's Motion for Summary Judgment, Wisconsin law governs any determinations regarding damages.

97.     PCI/Smithfield suffered four types of damage from the fire – real property damage, business personal property damage, lost business/profits and extra expense.  Each is addressed below.

### S.     <u>Real Property Damage</u>

98.     The Court has found that, as a result of the fire, the Cudahy Facility was damaged but not destroyed.  In other words, it could be repaired.

99.     Pursuant to *Wis JI-Civil* 1804, there are two possible measures for damage to repairable real property:

    a.     "Fair Market Value" rule -- the measure of damages is the difference between the fair market value of the property immediately before the loss and its fair market value immediately after the loss.

    b.     "Cost to Repair" rule -- the measure of damages is the reasonable cost of the repairs necessary to restore the property to its prior condition, but not exceeding the fair market value of the property prior to the loss.

36

100.    Fair market value is the amount a piece of real property will sell for upon arms-length negotiation in the open market, between an owner willing but not obliged to sell, and a buyer willing but not obliged to buy." *Rademann v. State Dep't of Transp.*, 252 Wis.2d 191, 219, 642 N.W.2d 600, 613 (Wis. App. 2002).

101.    Plaintiffs may introduce evidence regarding either measure of damage.    If Defendant wishes to rely on the other measure, it is under a duty to offer evidence on it.  *Engel v Dunn County*, 271 Wis. 218 (Wis. 1956).  If evidence supporting both approaches is submitted, the Court must accept the lesser of the two resulting figures.  *Wis JI-Civil* 1804

102.    Pursuant to *Wis JI-Civil* 1804, the pre-fire fair market value of the Facility represents a cap on recovery under the Cost to Repair.  Based on the evidence presented, the Court finds the cost of repairs exceeded the $11,275,000 pre-fire fair market value of the Facility.  Therefore under the Cost of repair rule, Plaintiffs' real property loss is $11,275,000.

103.    Pursuant to *Wis JI-Civil* 1804, the Fair Market Value rule measures the difference between the value of the property immediately before and immediately after the loss. Considering the size of the lost real property (332,742 square feet) and the value of the property ($11.50/sq. ft. as appraised), under the Fair Market Value rule, Plaintiffs' real property loss is $3,826,533.

104.    As the Court found evidence supporting both approaches, it must choose the lesser of the two figures. *Wis JI-Civil* 1804. Accordingly, the Court finds that Plaintiffs' recoverable real property damages total $3,826,533.

**T.** **Business personal property damage**

105.    The primary component of Plaintiffs' business personal property loss is damage to (and more often the destruction of) approximately 2,800 pieces of PCI's production equipment.

106.    When personal property is completely destroyed, "compensation to the owner is measured by the fair market value of the property at the time and place of its destruction . . . [based on] the amount it would sell for where the owner is willing but not required to sell the property to a buyer willing but not required to buy the property. *Wis JI-Civil 1803*.

107.    However, if there is no willing buyer or willing seller, even hypothetically, the property is said to have no market value. *Town of Fifield*, 119 Wis.2d at 228.  Here, the Court has found the business personal property located in PCI's facility is specialized, and only useful to the present owner.  Even hypothetically no one would be willing to buy the machinery. Therefore, these pieces of machinery had no market value at the time of the loss.

108.    When there is no market value, compensation to the owner is measured by the value of the property to the owner at the time of its destruction.  In making this determination, one can consider a number of factors, including "the nature of the property, its use, age, original cost and depreciation, the cost to replace the property [if the property can be replaced], and all other facts and circumstances received in evidence which bear on the value of the property to the plaintiff."  *Wis JI-Civil 1803*.  *See also Town of Fifield*, 119 Wis.2d at 228.

109.    "The point of an award of damages, whether it is for a breach of contract or for a tort, is, so far as possible, to put the victim where he would have been had the breach or tort not taken place." *Chronister Oil Co. v. Unocal Ref. & Mktg. (Union Oil Co. of California)*, 34 F.3d

38

462, 464 (7th Cir. 1994), citing *Nicolet Instrument Corp. v. Lindquist & Vennum,* 34 F.3d 453, 457 (7th Cir.1994).

110. Defendant heavily factors in depreciation in its production equipment damage calculations. The Court finds that, in this particular instance, depreciation should not be a factor in calculating Plaintiffs' business personal property loss.

      a.      When the damaged property was in good condition just prior to the loss, subject to regular inspections, and there was no plan to replace the property for an extended period of time depreciation should not be considered. *Town of Fifield v. State Farm Mut. Auto. Ins. Co.*, 119 Wis.2d 220, 234, 349 N.W.2d 684 (1984).

      b.      Here, evidence presented at trial established the damaged equipment was inspected, cleaned, and maintained for its specific purpose at the factory, and would have a continued useful life. Indeed, one of Plaintiffs' damage experts (Mr. Schwenk) concluded that stainless steel components of the processing equipment have an indeterminable life and are not subject to physical depreciation.

111. As this Court has already found, Plaintiffs provided ample evidence at trial that PCI's production equipment loss is $80,872,531. This figure properly considers the various factors set forth above regarding the equipment's value to PCI at the time of the loss, and would put the Insured in the same position had the tort not taken place. Accordingly, the Court finds Plaintiffs' recoverable PCI production equipment damages total $80,872,531.

112. In addition, Plaintiffs contend that, as a result of the fire, PCI suffered an inventory loss of $4,948,791. The Court finds that Plaintiffs have adequately supported this

figure. Consequently, the Court finds Plaintiffs' recoverable inventory damages total $4,948,791.

113. Therefore, in total the Court finds Plaintiffs' recoverable business personal property damages are $85,821,322.

**U.** **Lost Business/Profits**

114. As a general matter, "[w]here a regular and established business is injured, interrupted, or destroyed, [the proper] measure of damages is diminution in value of business by reason of wrongful act, measured by loss of usual profits from business." *United Const. Workers, Affiliated with United Mine Workers of Am. v. Laburnum Const. Corp.*, 347 U.S. 656, 74 S. Ct. 833, 98 L. Ed. 1025 (1954).

115. There are three factors to consider in determining whether Plaintiffs can recover lost business/profits arising out of the fire.

    a.    Were the lost profits proximately caused by the damage to the business? Robert Dunn, *Recovery of Damages for Lost Profits* 374 (6th ed. Lawpress Corp. 2005).

    b.    Can the lost profits be computed with some reasonable certainty? *See Wis JI-Civil 3725*. While such damages cannot be based on speculation, mathematical certainty is not a requirement. *Id*. "It will be enough if the evidence shows the extent of the damages as a matter of just and reasonable estimation, although the result may only be an approximate." *Id*.

    c.    Did Plaintiffs (here PCI) make reasonable attempts to mitigate their lost profits? *Dunn*, *supra* note 2, at 69-72.

116.     The Court finds that all three of these factors weigh in favor of Plaintiffs recovering lost profits as damages.  First, Plaintiffs' damage expert sufficiently established that the various claimed lost profits were a proximate result of the subject fire.  Second, this expert also provided the Court with ample lost profits calculations that not only go far beyond mere speculation (using an October 2013 cutoff date), they significantly exceed the "just and reasonable estimation" threshold.  Finally, PCI unquestionably attempted to mitigate its loss of business by, among other things, looking to sister companies and non-Smithfield facilities to make up for lost production arising out of the fire.

117.     With regard to establishing the exact amount of lost profits caused by the fire, Plaintiffs are required to present credible "comparable evidence or business history and business experience sufficient to allow a fact finder to reasonably ascertain the amount of future lost profits."  *T & HW Enters. v. Kenosha Assocs.*, 206 Wis.2d 591, 605 n. 6, 557 N.W.2d 480 (Wis. App.1996).

118.     Here, Plaintiffs' expert evaluated PCI's business history and business experience in great detail (some of this is summarized above in the Court's Findings of Fact regarding damages).  He arrived at a total lost profits number of $68,035,506.  The Court finds this figure to both be credible and amply supported by the evidence.  Accordingly, the Court finds Plaintiffs' recoverable lost profits total $68,035,506.

## V.     Extra Expenses

119.     Extra expenses are additional expenses incurred as a result of a defendant's negligent act.  They are distinct from claims for real and personal property damage, and are often (but not always) incurred to reduce the amount of business income loss.  Subject to preclusion

based on "double recovery," extra expenses are generally recoverable as consequential damages in a negligence action. *Restatement (Second) Torts*, §§927 and 928(b).

120.     As addressed in greater detail above in this Court's Findings of Fact, Plaintiffs have submitted ample evidence establishing various types of extra expenses and initial emergency costs incurred by PCI as a result of the fire.  These are separate and distinct from any other damages (real property, business personal property, or lost profits) claimed by Plaintiffs. Therefore, the Court finds Plaintiffs' recoverable extra expenses are $22,127,760.

## IV.  SUMMARY

Based on the totality of the testimony and evidence presented at trial, the Court finds and concludes that Plaintiffs' damages arising out of the subject fire are $3,826,533 in real property damage, $85,821,322 in business personal property damage, $66,790,374 in lost business/profits and $22,127,760 in extra expenses, for a total damage number of $178,565,989.

The parties shall submit a proposed Judgment for the Court to enter based on this total damage number, after factoring in the terms and conditions of the prior settlement regarding liability.

Respectfully submitted,

**DENENBERG TUFFLEY, PLLC**

BY:     /s/ Todd B. Denenberg
Todd B. Denenberg
(Admitted E.D. Wisconsin)
*tdenenberg@dt-law.com*
Charles R. Tuffley
Alyssa J. Endelman
28411 Northwestern Highway, Suite 600
Southfield, MI  48034
PH:  (248) 549-3900
FX:  (248) 593-5808
Attorneys for Plaintiffs

DATED:  December 23, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2015, I electronically filed Plaintiffs' Proposed Findings of Fact with the Clerk of the Court, and served counsel for Defendant, using the CM/ECF System.

BY:    /s/ Todd B. Denenberg
Todd B. Denenberg
(Admitted E.D. Wisconsin)
*tdenenberg@dt-law.com*
Charles R. Tuffley
Alyssa J. Endelman
28411 Northwestern Highway, Suite 600
Southfield, MI 48034
PH: (248) 549-3900
FX: (248) 593-5808

Attorneys for Plaintiffs