# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**SMITHFIELD FOODS, INC., et al.,**
       **Plaintiffs,**

    **v.**                                **Case No. 13-C-0651**

**UNITED STATES OF AMERICA,**
       **Defendant.**

---

## <u>DECISION AND ORDER</u>

On July 5, 2009, a fire at a large pork-processing facility owned by Patrick Cudahy, Inc. ("PCI"), caused substantial damage to the company's property. In the present action, PCI and its parent company, Smithfield Foods, Inc., along with six of Smithfield's property insurers, bring claims against the United States under the Federal Tort Claims Act. They allege that the United States was negligent in allowing a military flare to be stolen from one of its bases. This flare ignited the fire at the PCI plant. The parties have settled the liability component of this case, leaving for the court the question of the amount of damages to award to the plaintiffs. Between November 16, 2015 and November 23, 2015, Judge Randa of this court presided over a bench trial concerning the amount of damages. However, Judge Randa passed away before issuing his findings of fact and conclusions of law. The case was then reassigned to me.

In an effort to resolve this case without recalling any witnesses, *see* Fed. R. Civ. P. 63, the parties proposed that I decide four issues that bear on the computation of the plaintiffs' damages. The parties believe that after these issues are resolved, they will be able to reach a settlement concerning the amount of damages. The parties have since

filed briefs on these four issues, and I address their arguments below. Judge Randa previously determined that California substantive law applies to this case, *see* ECF Nos. 192 & 195, and therefore I apply that state's law in resolving these four issues.

Before turning to these issues, I note that my addressing them should not be viewed as a license to the parties to present new evidence that wasn't presented at the trial in November 2015. That is, if I had answered these questions as part of a ruling on motions before trial, the parties would have shaped their trial presentations to match my answers. However, what I am doing now is essentially rendering partial findings of fact and conclusions of law based on the evidence actually presented at trial. *See* Fed. R. Civ. P. 52. It is now too late for the parties to present testimony that might better match my answers to their questions. Thus, the November trial record will control unless I later determine that it is necessary to recall witnesses under Federal Rule of Civil Procedure 63.

## I. Measure of Loss for "Customized Machinery"

The plaintiffs frame the first question as follows: "Is the measure for the loss of PCI's customized machinery its actual cash value or its replacement cost?" Br. at 1, ECF No. 219. The plaintiffs do not ask me to determine what property qualifies as "customized machinery," and they do not ask me to determine the actual cash value or replacement cost of any specific item of personal property. Rather, the plaintiffs ask me to decide the proper methodology for determining the value of any property later deemed to be customized machinery: is it actual cash value or replacement cost? As the parties use the term, "actual cash value" means replacement cost less depreciation.

2

*See* Tr. at 842, 850.[1]  Thus, it appears that the dispute is over whether depreciation should be deducted from the replacement cost of an item of custom property.

Under California law, the measure of damages for the loss or destruction of personal property is the value of the property at the time of such loss or destruction. *Hand Elecs., Inc. v. Snowline Joint Unified Sch. Dist.*, 21 Cal.App.4th 862, 870 (1994). Thus, my goal in this case is to award the plaintiffs the value that PCI's food-processing equipment had just before the fire destroyed it.  In general, this will involve determining the equipment's fair market value at that time.  *See* Cal. Civ. Jury Instr. 3903K.  "Fair market value" is the highest price that a willing buyer would have paid to a willing seller assuming that there is no pressure on either to buy or sell and the buyer is fully informed of the condition and quality of the property.  *Id.*  However, courts recognize that there are situations in which fair market value is not the proper measure of the loss. For example, in *Kimes v. Grosser*, the court held that the measure of damages for a pet cat intentionally injured by the defendant was the reasonable cost of the veterinary care the owner reasonably incurred after the injury, even though the fair market value of the cat was negligible.  195 Cal. App. 4th 1556, 1561–62 (2011).  In *Kimes*, the court recognized that where property has no fair market value, the property's value "must be ascertained in some other rational way, and from such elements as are attainable."  *Id.* at 1561.

In the present case, the parties agree that, to the extent it is possible to identify a fair market value for PCI's machinery and equipment, then fair market value should be

---

[1] Citations to "Tr." are to the trial transcripts from November 2015.

used to determine damages.  At trial, the parties' witnesses calculated fair market value by finding used equipment on the secondary market that was equivalent to the PCI equipment lost in the fire.  *See* Tr. at 387, 849.  However, equivalents to much of PCI's equipment could not be found on the secondary market, which made it impossible to determine the fair market value of that equipment.  According to the defendant, some equipment was simply not available on the secondary market at the time the parties were looking.  But the equipment at issue for present purposes is equipment that would never be available on the secondary market because PCI had that equipment custom-made.

The plaintiffs contend that California has adopted a rule stating that damages for the destruction of custom equipment or property is replacement cost.  In support of this contention, the plaintiffs cite two cases.  The first case is *Leslie Salt Co. v. St. Paul Mercury Insurance Co.*, 637 F.2d 657 (9th Cir. 1981).  In that case, the plaintiff manufactured salt by removing it from seawater.  An accident damaged a custom-made machine that the defendant used for stacking salt.  The defendant argued that the measure of damages for the stacker should be its fair market value.  However, the court found that there was no market for the custom-made stacker, and that therefore the rule requiring use of fair market value to measure damages was inapplicable.  *Id.* at 660. The court then wrote that "[t]he law has long recognized that the actual cash value of property with no market may be measured with reference to the cost of replacement." *Id.*  The court determined that, for this reason, the trial court did not err in giving the following instruction to the jury:

4

> In determining the actual cash value of the property damaged, it shall be as of the time of the commencement of the loss on August 15, 1973, and shall be ascertained according to such actual cash value with proper deduction for depreciation, however caused, and salvage value and shall in no event exceed what it would then cost [the plaintiff] to repair or replace the same with material of like kind and quality.

*Id.*

The plaintiff contends that the *Leslie Salt* court held that "where custom property with no market is concerned, replacement cost is the measure of recovery." ECF No. 219 at p. 12 of 14. However, this is not an accurate statement of the court's holding. The court held that the actual cash value of property with no market may be measured *with reference to* the cost of replacement, not that the value *was* the cost of replacement. And the jury instruction that the court approved instructed the jury to make a "proper deduction for depreciation," and also that replacement value was merely a cap on the amount of damages. Essentially, then, *Leslie Salt* approves the method that the United States used for determining the value of the plaintiff's custom property: the court must start with replacement cost and then take a proper deduction for depreciation. In this way, the court measures value "with reference to" replacement cost, but it does not simply identify the replacement cost and award that cost as damages.

The plaintiffs' other case is *PCB Productions, Inc. v. MJC America, Ltd.*, No. B242443, 2014 WL 2514624 (June 4, 2014), which is an unpublished decision of the California Court of Appeal. In that case, a defective product caused a fire in the plaintiff's recording studio that, among other things, destroyed the plaintiff's library of sound samples that it used to create audio for movies, television, video games, and other media. The plaintiff created this library over a 25-year period by traveling around

5

the world and recording various sounds. The plaintiff argued that the sound library was unique and had no market, and that therefore the proper measure of damages was the cost to reproduce the library, as measured by the time and travel costs associated with recording the sounds. *Id.* at *5. The defendant argued that because commercial sound libraries were available for purchase, the plaintiff's sound library in fact had a fair market value. *Id.* at *7. Therefore, the defendant argued, the proper measure of damages was fair market value rather than replacement cost. *Id.* The court found that the jury could reasonably find that the plaintiff's sound library had peculiar value to the plaintiff, and that the market value of a commercial sound library did not represent the value of the plaintiff's custom library. *Id.* at *13–14. The court then found that if the plaintiff's unique sound library had no market value, a "just and rational" way to measure the plaintiff's damages would be replacement cost. *Id.* at *14.

The *PCB* case does not stand for the proposition that the measure of damages for all custom property is replacement value. Rather, the point being contested in that case was whether the plaintiff's library was comparable to a commercial sound library that could be purchased "off the shelf." If it was, then the fair market value of the commercial library would have been the measure of the plaintiff's damages. The court's opinion in the case does not suggest that the defendant disputed that replacement cost would be the proper measure of damages if the court determined that the plaintiff's library was not comparable to a commercial library. Indeed, if the library were not comparable to a commercial library, it is hard to see any way of measuring damages other than by the cost of traveling around the world and re-recording the sounds. Moreover, the defendant would not have had any grounds to argue for a depreciation

6

deduction, as sounds do not wear out or become obsolete.[2]  Thus, the *PCB* case is simply one instance in which it made sense to measure damages for custom property by its replacement cost.  It does not stand for some broader rule that the measure of damages for all custom property is replacement cost.

In the present case, PCI's custom property is not comparable to the sound library in the *PCB* case.  Unlike sounds, equipment used in a food-processing facility will eventually wear out or become obsolete, and thus a deduction for depreciation will be appropriate, as it was in the *Leslie Salt* case.  The plaintiffs contend that PCI's custom property did not deteriorate because PCI took extremely good care of it.  However, while PCI might have maintained its property in as pristine a condition as possible, that does not mean the equipment's value did not depreciate over time.  No matter how well PCI maintained this equipment, I do not believe that a third party who could have used it would have paid as much for PCI's equipment, which had been heavily used in a pork-processing facility over many years, as it would have for the same equipment new and unused.  In any event, even if I believed that PCI's equipment never physically deteriorated (which I do not), the property would lose value over time as it became obsolete.  PCI's own witness testified that it would replace equipment as new, more efficient equipment became available.  *See* Tr. at 183 (PCI would replace equipment "if we can find an improvement in speed, reduction of people, something that would give us an appropriate return on investment").  Thus, to answer the plaintiff's first question, I

---

[2] The media on which the sounds were recorded might wear out or become obsolete, but the value of the sounds was not in the media.  It was the sounds themselves that were valuable, and presumably they could be transferred to new media at nominal cost and preserved indefinitely.

find that the proper measure of damages for PCI's custom property is replacement cost less depreciation, i.e., the actual-cash-value methodology employed by the defendant's expert, Mark Ewing.

## II. Mechanical, Electrical, and Plumbing Utilities

The second question relates to the value of certain mechanical, electrical, and plumbing utilities, or "MEP." The parties agree that MEP that would be found in any commercial facility, such heating and air conditioning, light fixtures, and plumbing for restrooms, should be valued as part of the real estate. However, they dispute whether MEP that serviced PCI's specialized food-processing equipment should also be considered part of the real estate. The plaintiffs describe this kind of MEP as "utility lines, ammonia piping, grease collection lines, etc. that are installed for the sole purpose of servicing the food processing equipment at the facility." Br. at 2, ECF No. 220. The plaintiffs do not explain in detail what this kind of MEP consists of. However, from their use of the terms "piping" and "lines," I am assuming that this MEP consists of pipes and wires that are installed in the walls, floors, and ceilings of the facility, much like ordinary plumbing lines would run through the walls, floors, and ceilings of a building.

The defendant contends that items of specialized food-processing MEP are essentially fixtures that would be conveyed with the real estate and therefore should be valued as part of the real estate. The plaintiffs contend that this MEP should be excluded from the real-estate valuation and included in PCI's personal-property loss. Thus, the second question presented is whether PCI's food-processing MEP is properly classified as a real-property loss or as a personal-property loss.

8

The parties have not cited any cases or other legal authority that apply to this question. The parties cite cases holding that the goal of awarding tort damages is to make the plaintiff whole, and that the usual measure of damages for destroyed property is fair market value, but these cases are not helpful because they do not identify what it means to make a plaintiff whole or to award fair market value when there is a dispute over whether property should be treated as real property or personal property.[3] Moreover, it seems to me that either party's approach could potentially make PCI whole, in that both methods purport to assign value to the food-processing MEP: the plaintiffs would include the value of this MEP in the personal-property loss but not the real-property loss, while the defendant would include the MEP in the real-property loss but not the personal-property loss.

Because the parties have not cited any applicable legal standards other than the general damages standard, I assume that they are asking me to treat this issue as predominantly a question of fact. In answering this question, I keep in mind that the plaintiffs bear the burden of proof. Therefore, I will examine whether the plaintiffs have shown that the food-processing MEP is properly treated as personal property. As explained below, I conclude that they have not.

The plaintiffs assert that food-processing MEP should be treated as personal property because, whenever PCI made an investment in food-processing equipment, it categorized, for internal accounting purposes, the associated MEP expenses as

---

[3] The plaintiffs also cite cases relating to "fixtures," but only for the purpose of arguing that this area of law does not apply. Br. at 9 n.6, ECF No. 220. The defendant has not expressly argued that the law governing fixtures applies, although in general its approach is to treat the food-processing MEP as fixtures.

9

equipment expenses rather than as real-property expenses. *See* Br. at 4–5, ECF No. 220. However, the plaintiffs have not cited to any trial testimony that supports this assertion. Rather, they cite a series of "capital appropriation requests" that were admitted as exhibits during the trial. However, these exhibits are technical documents that a layperson cannot understand (I do not fully understand them), and the plaintiffs point to no expert testimony that interprets them. Moreover, these exhibits appear to be documents approving various projects; they do not appear to be accounting documents that identify how PCI classified the property for tax or other purposes.

Even if I could find that PCI treated food-processing MEP as personal property for accounting purposes (which I cannot), the plaintiffs do not explain why this matters for purposes of calculating damages. PCI might have obtained tax or other accounting advantages by treating the MEP as equipment rather than as part of the real property. For example, by treating the MEP as equipment, PCI may have been able to take larger depreciation deductions than it could have if the MEP had been classified as real property. Thus, PCI's treatment of this property for tax or accounting purposes might not reflect the actual value of the property on the date of the fire. As the plaintiffs themselves argue, tax law and tort law "involve very different core underlying concerns," and thus the proper treatment of this property for tax or accounting purposes may not have anything to do with the value of the property for purposes of tort law. Br. at 9 n.6, ECF No. 220; *see also* Reply Br. on Issue #3 at 3, ECF No. 227 ("What has or has not been done concerning property from a tax and bookkeeping basis has no relevance as to what damages a party should recover when that property is destroyed . . . .").

Next, the plaintiffs assert that "[i]f the food processing equipment was removed from the building, so would the food-processing MEP." Br. at 8, ECF No. 220. I am assuming that what the plaintiffs mean by this is that if a hypothetical third party decided to purchase a specific item of food-processing equipment from PCI, then PCI would convey the associated MEP to the buyer as part of the sale. For example, if a third party decided to purchase a piece of equipment serviced by the grease-collection lines, then PCI would rip the grease-collection lines out of its walls and ceilings and convey them to the buyer along with the equipment. If in fact the food-processing MEP would be conveyed to a buyer as part of a sale of the associated equipment, then I would likely find that the MEP should be valued as personal property rather than as real property. However, the plaintiffs have cited no trial evidence that supports their assertion that the food-processing MEP would be conveyed to a buyer as part of a sale of the equipment. *See id.* Moreover, it seems unlikely that PCI would actually rip MEP out of its walls as part of a hypothetical sale of food-processing equipment to a third party. Rather, it seems to me that, once this MEP is installed, it becomes part of the real estate.

The plaintiffs also point out that the food-processing MEP exists for the sole purpose of servicing the food-processing equipment. Br. at 8, ECF No. 220. That may be true, but the fact remains that this MEP is installed in the building and thus arguably has become part of the real estate. As I discussed in the prior paragraph, if it is true that, as part of a sale of the associated equipment, PCI would rip out the MEP and convey it to the buyer, then probably the MEP would be personal property rather than real property. But as discussed, the plaintiffs have cited no evidence indicating that PCI

would do this.  Nor have they cited evidence that, if PCI sold the real estate but not the equipment to a third party, PCI would take its food-processing MEP with it rather than convey it to the buyer with the real estate.

Finally, the plaintiffs point out that one of the defendants' experts, Mark Ewing, "testified that the time spent to install food processing related MEP was a separate consideration from the time it would take to reconstruct the actual building."  Br. at 5, ECF No. 220.  The plaintiffs argue that if food-processing MEP is separate from the real property for purposes of a construction timeline, then it should also be separate for purposes of calculating damages.  However, I do not see why this should be so, and the plaintiffs do not explain why they think this.  It seems to me that something can be part of the real property even if it is installed at the end of the construction process.  Therefore, I am not persuaded by the plaintiffs' argument concerning the construction timeline.

In short, I find that the plaintiffs have not carried their burden to show that food-processing MEP should be treated as personal property rather than as part of the real property.

### III. Recovery for Freight, Installation, and Commissioning of Equipment

The next issue is whether PCI is entitled to recover, as part of its compensation for the destruction of its equipment, the costs of shipping the equipment to its plant, installing the equipment at the plant, and "commissioning" the equipment (which involves tasks such as sanitizing the equipment so it can be used in food production).  According to the United States, PCI is entitled to recover only the value of the destroyed

equipment and is not entitled to additional compensation for freight, installation, and commissioning.  The plaintiff disagrees.

As noted in Section I, above, the general purpose of tort damages is to make the plaintiff whole.  The general rule for the loss or destruction of personal property is that the plaintiff is entitled to recover the fair market value of the property at the time of the loss.  *See* Cal. Civ. Jury Instr. 3903K.  As discussed in Section I, much of the equipment at issue in this case is custom-made, and I have determined that the proper measure of damages for this property is replacement cost less depreciation.  However, for present purposes, the distinction between custom property and property having an established fair market value can be ignored, as the need to ship, install, and commission the property has nothing to do with whether it is custom.  Rather, even if the property consisted entirely of "off the shelf" equipment that had a fair market value, PCI still would have had to pay freight, installation, and commissioning costs to get the property up and running.

In support of their argument that freight and other costs are recoverable, the plaintiffs cite several cases stating that, in some cases, damages for destruction of property may be measured by taking into account  "the difficulty and expense to which plaintiff was put in acquiring the property."  Br. at 5, ECF No. 221.  However, these cases, and this statement, are not on point.  The issue in these cases was not whether freight or other acquisition costs are recoverable in addition to the value of the personal property itself.  Rather, the issue in these cases was how to measure the value of personal property that had no market value.  And I have already determined that the proper way to measure the value of PCI's personal property is either to use fair market

13

value (if it can be determined) or to use actual cash value (replacement cost less depreciation). The plaintiffs have not cited, and I have not found, any cases directly holding that, in addition to the value of the personal property, the plaintiffs are entitled to be compensated for freight, installation, commissioning, or other costs associated with acquiring the property and getting it up and running. But the defendant has not cited, and I have not found, cases holding that these costs are not recoverable.

Returning to the general purpose of tort damages, which is to make the plaintiff whole, I conclude that freight, installation, and commissioning costs may be recoverable in some instances, depending on the age of the equipment and its useful life. For example, assume that shortly before the fire PCI purchased new equipment. The equipment was shipped to PCI's plant, and the installation and commissioning of this equipment was completed on the day before the fire. The day of the fire was to be the first time that PCI used its new equipment to make product. However, the property was immediately destroyed in the fire. Assume that the fair market value of the destroyed equipment at the time of the fire was $1 million. Assume further that PCI paid $100,000 in freight, installation, and commissioning costs to get the equipment up and running. Thus, the total cost that PCI incurred in connection with the equipment was $1.1 million. If PCI received only $1 million as damages for the equipment (its fair market value), PCI would be undercompensated for its loss by $100,000. In this situation, to make PCI whole, it seems obvious to me that the $100,000 in freight, installation, and commissioning costs should be included in PCI's damages.

Now, however, assume that the facts are the same as in the example above, except that the fire occurred seven years after PCI began using the equipment to make

14

product. Assume further that the useful life of the equipment is ten years. In this situation, PCI would have "consumed" at least some of the value represented by the cost of freight, installation, and commissioning the equipment by using the equipment for seven years. Thus, awarding PCI the fair market value of the equipment on the date of the fire plus the full $100,000 in freight and related costs would make PCI more than whole. It would be analogous to awarding PCI the full cost of brand new equipment when the equipment lost in the fire was seven years old and therefore had a much lower fair market value. In this example, it seems to me that, to make PCI whole, the court should award the fair market value of the equipment plus $30,000 for freight and related costs: because at the time of the fire the equipment had 30% of its useful life remaining, PCI would be entitled to recover 30% of the costs of freight, installation, and commissioning the equipment, which is $30,000.[4]

For these reasons, I conclude that the cost of freight, installation, and commissioning of PCI's equipment is partially recoverable so long as the related equipment had some useful life remaining at the time of the fire. However, the plaintiffs may recover only the percentage of these costs that correspond to the remaining useful life of the equipment at the time of the fire.[5]

---

[4] I note that I am not finding that the plaintiffs are limited to recovering the "book value" of the equipment, or that the shipping and related expenses are recoverable only to the extent that PCI did not "write them off" during an earlier year. Rather, I am merely recognizing that, by using the equipment to make product, PCI already recouped some of the initial shipping and related costs, and that therefore it cannot recover all of these costs as damages.

[5] The plaintiffs contend that PCI's equipment did not depreciate and therefore did not have a limited useful life. However, as I explained in Section I, I do not find this to be true. Moreover, the equipment would eventually become obsolete and be replaced by more efficient equipment. Therefore, to the extent that the plaintiffs mean to argue that

15

## IV. Duration of Recoverable Lost Profits

The final question the parties ask me to resolve is a question of fact: "What is the duration of the recoverable lost profits as shown by the evidence?"  Br. at 1, ECF No. 222. The parties agree that this period is "the period of time reasonably necessary to 'repair' the damage" to PCI's facility.  *Id.*; *see also* Def. Br. at 28, ECF No. 224.  That is, the question is how long would it have reasonably taken PCI to get its facility repaired and up and running again.  The plaintiffs would then receive as damages the lost profits from the time of the fire until the end of this period.

The plaintiffs state that there are actually two lost-profits time periods.  One time period pertains only to PCI's sausage business.  The area of the facility that produced PCI's sausage products was not damaged in the fire, and thus PCI would have been able to produce sausages after the fire sooner than it would have been able to produce other products.  The plaintiffs contend that PCI is entitled to damages for lost profits relating to the sausage business through October 2011.  The United States, in its brief, does not address the lost-profits time period for sausages.  *See* Br. at 26–33, ECF No. 224.  Thus, it appears that the United States does not dispute the plaintiffs' contention that the lost-profits period for sausages runs until October 2011, and I will adopt that time period as a finding of fact.

The second lost-profits time period is the time it would take to rebuild and re-commission the areas of the facility that were damaged in the fire and that produced non-sausage products, including deli meats, lard, and bacon toppings.  The plaintiffs

they are entitled to recover the full costs of freight, etc., because the useful life of PCI's property is unlimited, I reject that argument.

contend that the lost-profits time period for these products ended in October 2013. The defendant contends that the time period for these products ended in February 2012. I state my findings of fact with respect to the time period for non-sausage products below.

At trial, both parties presented accountants as expert witnesses who gave opinions as to the amount of PCI's lost profits. The plaintiffs' lost-profits expert was Hal Meyer, and the defendant's lost-profits expert was Robert Traven. Each party's lost-profits expert relied on other witnesses to determine how long it would reasonably take PCI to rebuild its facilities. Traven relied on a construction timeline prepared by William Kreidler, who was the defendant's expert witness on how long it would take PCI to rebuild. Meyer relied on the testimony of Gene Bridges, who was PCI's Vice President of Engineering and Maintenance.

The plaintiffs argue that I should accept Meyer's time periods rather than Traven's because Meyer's time periods are rooted in "PCI's prior business experience." Br. at 3, ECF No. 222. By "prior business experience," the plaintiffs mean the testimony of Gene Bridges, who gave estimates of how long the various phases of construction would take based on his prior experience with other PCI construction projects. *See id.* at 3–6 (citing extensively from Bridges's testimony). In contrast, the defendant's construction expert, Kreidler, did not interview any of PCI's employees or visit the site of the facility. Rather, he created a construction schedule based on what a hypothetical construction engineer would have done under the "critical path method," which is an established method for estimating the length of construction projects. Tr. at 934–35.

The plaintiffs contend that Meyer's reliance on PCI's actual experience is in accord with California law on lost-profits damages. The plaintiffs cite California cases

17

stating that, when evaluating a claim for lost profits, a plaintiff's or a third party's "prior experience" in the same or similar business is "probative." *See Parlour Enters, Inc. v. The Kirin Group*, 152 Cal. App. 4th 281, 288 (2007); *Kids' Universe v. In2Labs*, 95 Cal. App. 4th 870, 886 (2002). However, the courts made these statements in the context of summarizing the legal standards governing the recovery of lost profits generally. They were not addressing the more specific question that the plaintiffs have asked me to decide, which is how long it reasonably would have taken PCI to get its facility up and running again. Moreover, the "prior experience" being referred to in these cases was not the party's prior experience with rebuilding destroyed facilities; rather, it was the party's economic track record—things like past profit margins and growth rates—which could then be extrapolated to determine the lost profits for the period after the tort or breach of contract. This is evident from the *Kids' Universe* court's citation to *Beverly Hills Concepts v. Schatz & Schatz*, 717 A.2d 724, 735–37 (Conn. 1998), which in turn cites numerous cases in which lost profits were determined by extrapolating from the plaintiff's economic track record. Thus, the cases the plaintiffs cite do not suggest that a party's prior experience with other construction projects is especially probative of how long it would take that party to rebuild following a fire.

Nonetheless, I do not dispute that PCI's past construction experience might in some sense be "probative" of how long it would have reasonably taken PCI to rebuild after the fire. Thus, Gene Bridges's testimony on PCI's past experiences with construction projects is generally relevant. But here the problem is that Bridges's testimony is not very persuasive. Bridges is not qualified as a construction expert, and he did not employ any identifiable methodology to determine, based on PCI's

18

experience, how long it reasonably would have taken PCI to rebuild after the fire. Rather, he simply came up with some ballpark time ranges that were based on his experience with three construction projects that PCI had undertaken during his tenure as a vice president of the company. Bridges did not explain how he translated his experience with these projects into a timeframe for rebuilding the portions of the facility that were damaged in the fire.

Moreover, Bridges's testimony as to how long it would have taken PCI to rebuild is extremely imprecise. For example, when asked how long it would have taken PCI to commission certain parts of the facility, Bridges answered that it could have taken as little as one month or as much as two-and-a-half years. Tr. at 166. This extremely wide time range allows me to draw no reasonable conclusion as to how long it would actually have taken PCI to commission the facility. The plaintiffs in their brief suggest that, based on Bridges's testimony, I should determine that the commissioning phase would have taken twelve months. Br. at 13, ECF No. 222. However, twelve months is just an arbitrary number in Bridges's unacceptably long time range and has no apparent connection to reality. Thus, I will not accept a construction timeline based on Bridges's testimony.

In contrast to Bridges, the defendant's expert, Kreidler, estimated the reasonable length of construction using an established methodology, i.e., the critical-path method. I have reviewed Kreidler's testimony and find it generally persuasive. It is true, as the plaintiffs point out, that Kreidler's testimony was not based on PCI's prior experience. However, this does not render Kreidler's testimony unpersuasive. PCI, after all, was not in the construction business, and thus there is no reason to think that PCI's past

19

experience with construction projects would indicate how long it would take a professional construction-management company to oversee the construction of a new facility.[6]  In contrast, Kreidler testified that, for "most construction projects," the critical-path method is the accepted method for determining construction times.  Tr. at 934–35.  Using this method, Kreidler testified that PCI could have had its replacement facility up and running within 32 months after the fire, or by February 2012.  Tr. at 936–37, 949, 955.  Based on this testimony, I find that the lost-profits period for all product lines other than sausages is 32 months.

## V.  Conclusion

For the reasons stated above, I make the following partial findings of fact and conclusions of law:

1.  The proper measure of damages for PCI's custom property is replacement cost less depreciation, i.e., the actual-cash-value methodology employed by the defendant's expert, Mark Ewing.

2.  The plaintiffs have failed to prove that food-processing MEP should be treated as personal property rather than as part of the real property.

3.  The cost of freight, installation, and commissioning of PCI's equipment is partially recoverable so long as the related equipment had some useful life remaining at the time of the fire.  However, the plaintiffs may recover only

---

[6] I suppose PCI's experience with commissioning would be relevant, as it seems that PCI's employees would have been the ones that performed the commissioning tasks. Tr. at 164–65.  But as I've already noted, Bridges's testimony as to the time it would have taken to complete the commissioning phase—between 1 and 30 months—is too broad to be of any value.  In any event, Kreidler estimated that commissioning would take two months, *see* Pl. Br. at 6, ECF No. 222, which is within Bridges's broad time range and thus consistent with Bridges's testimony and PCI's experience.

the percentage of these costs that correspond to the remaining useful life of the equipment at the time of the fire.

4.  PCI is entitled to damages for lost profits relating to its sausage business through October 2011.  For all other product lines, the lost-profits period ends in February 2012.

Dated at Milwaukee, Wisconsin, this 20th day of March, 2017.

s/ Lynn Adelman
_____
LYNN ADELMAN
United States District Judge

21